**Ricky WYATT, By and Through his aunt and legal guardian, Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,**

**Diane Martin, et al., Plaintiff–Intervenors,**

v.

**Virginia ROGERS, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants,**

**United States of America, Amicus Curiae.**

Civil Action No. 3195–N.

United States District Court, M.D. Alabama, Northern Division.

Dec. 15, 1997.

See also, 942 F.Supp. 518.

Fern Singer, Watterson & Singer, Birmingham, AL, James A. Tucker, ACLU of Alabama, Montgomery, AL, Ira A. Burnim, Andrew Bridge, Shelley Jackson, Claudia Schlosberg, Bazelon Center for Mental Health Law, Washington, DC, Michael S. Scheier, Birmingham, AL, James M. Lichtman, Ropes & Gray, Washington, DC, Kathryn H. Sumrall, Jackson, Garrison & Sumrall, P.C., Birmingham, AL, for plaintiffs.

David Ferleger, Philadelphia, PA, Drew P. Baker, Reuben Wright Cook, Victoria Ann Farr, Alabama Disabilities Advocacy Program, Tuscaloosa, AL, for intervenor-plaintiff.

Joel Klein, Klein, Farr, Smith & Taranto, Washington, DC, Robert F. Northcutt, Robison & Belser, P.A., Mary Elizabeth Culberson, Office of Atty. Gen., Gregory Dale Crosslin, Robert E. Sasser, Clifton E. Slaten, Sasser & Littleton, P.C., G.R. (Rick) Trawick, Department of Mental Health & Mental Retardation, Montgomery, AL, Paul Smith, Genner & Block, Washington, DC, for defendants.

Pamela Chen, U.S. Department of Justice, Civil Rights Division, Washington, DC, Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, Deval L. Patrick, Robinsue Frohboese, Judith C. Preston, Tawana E. Davis, United States Department of Justice, Civil Rights Division, Special Litigation Section, Washington, DC, for U.S.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

This class-action lawsuit, commonly referred to as the "*Wyatt* litigation," was filed over 26 years ago by the plaintiffs (who represent all current and future mentally-retarded and mentally-ill residents in the Alabama Mental Health and Mental Retardation System) against the defendants (officials of the State of Alabama), claiming that conditions in the system's facilities violated residents' rights under state and federal law. In 1986, the court approved a consent decree resolving the parties' continued conflicts over the defendants' compliance with orders entered in the early 1970's and the adequacy of the state's funding and administration of the state's mental health and retardation facilities. *Wyatt v. Wallis*, 1986 WL 69194 (M.D.Ala. Sept.22, 1986) (Thompson, J.).

In 1991, a new round of litigation began. On January 18, 1991, the defendants moved for a finding that they have met their obligations under the 1986 decree and for an order terminating this lawsuit. On January 22, 1993, the plaintiffs moved to enforce the 1986 consent decree and for further relief in light of both the defendants' continuing failure to comply with the 1986 consent decree and the recently enacted Americans with Disabilities Act of 1990, commonly referred to as the "ADA," 42 U.S.C.A. §§ 12101–12213. The court held a hearing on these motions for 35–trial days, spanning over several months, in 1995. The trial was followed by extensive briefing of the parties.

The hearing was, by agreement of the parties, a 'summary proceeding.' To try this case as a normal trial would have taken many months and the parties therefore agreed to try it as a summary proceeding. As a summary proceeding, the evidence was submitted in a jointly prepared record before the hearing, and both the defendants' and the plaintiffs' live and in-court examination of witnesses was limited to 60 hours of direct and 30 hours of cross-examination, with rebuttal testimony limited to two days. The purpose of the live testimony was to highlight the most pertinent and relevant parts of the already filed record.[1] Nevertheless, the rec-

---

1. *See* Orders of May 8, 1995 (Doc. nos. 996, 997, and 998), Dec. 30, 1994 (Doc. no. 429), Nov. 9, 1994 (Doc. no. 265), and Sept. 26, 1994 (Doc. no. 144). The notation 'Doc. no.' indicates the file docket number given to a document. It is pen-ciled in the right-hand bottom corner of a pleading or order and is entered on the docket sheet. Because of the large number of documents (pleadings and orders) generated almost daily in this case, the court has attempted to identify a

ord that the court has had to review is comparable to that of a trial lasting many months.

Subsequent to the trial, on October 8, 1996, the court held that the plaintiffs' failure to follow proper court procedures for obtaining the defendants' compliance with the 1986 consent decree warranted denial of their motion for enforcement except to the extent the plaintiffs seek relief other than under the consent decree. *Wyatt v. Rogers*, 942 F.Supp. 518 (M.D.Ala.1996) (Thompson, J.).

Based on the hearing and the evidentiary record and for the reasons that follow, the court now concludes that the defendants' motion for a finding that they have met their obligations under the 1986 decree and for an order terminating this lawsuit should be granted in part and denied in part, and that the plaintiffs' motion for relief other than under the 1986 consent decree should be denied.

## I. BACKGROUND

Because, as will be explained later, the court must determine whether defendants have complied in good faith with the whole of the 1986 consent decree since its entry, it is necessary that the court provide a detailed historical review of the defendants' past conduct and current attitudes.

This longstanding lawsuit began in 1970 when two classes of plaintiffs, former employees at Bryce Hospital and current patients, filed a complaint against various officials of the State of Alabama alleging that staff reductions deprived patients of their rights under state and federal law.[2] Since this date there have been four different phases of *Wyatt* litigation.

### A. First Phase of *Wyatt* Litigation

In the 1970's, in expansive and landmark opinions, the court, speaking through Judge Frank M. Johnson, Jr., found that conditions in the facilities operated by the Alabama Department of Mental Health and Mental Retardation violated patients' constitutional rights, and the court entered injunctions requiring the defendants to bring the facilities into compliance with certain minimal constitutional standards.

*WYATT* STANDARDS ESTABLISHED: Beginning in 1971, the court found that the programs of treatment in use for the mentally ill at Bryce Hospital were "scientifically and medically inadequate" and that the treatment "failed to conform to any known minimums established for providing treatment for the mentally ill." [3] *Wyatt v. Stickney*, 325 F.Supp. 781, 784 (M.D.Ala.1971) (Johnson, J.). The court further found that the majority of patients were involuntarily committed through noncriminal procedures and therefore had an unquestionable constitutional right "to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition." *Id.* The court, therefore, ordered the defendants to develop and implement within six months a treatment program to secure these rights. *Id.* at 785. Nine months later, the court reviewed the defendants' progress in securing these rights. The evidence indicated that the treatment at Bryce Hospital continued to be "wholly inadequate." *Wyatt v. Stickney*, 334 F.Supp. 1341, 1344 (M.D.Ala.1971) (Johnson, J.). Bryce lacked a humane psychological and physical environment, qualified staff in numbers sufficient to administer adequate treatment, and individualized treatment plans. *Id.* at 1343. As evidence of an inhumane psychological and physical environment, the court pointed to the fact that residents lived in barn-like structures with no privacy, they were provided shoddy apparel, and given non-therapeutic work to do. The facility was plagued by ventilation problems, fire and safety hazards, and overcrowding. And the

---

document by both its filing or entry date and its docket number. The clerk of the court did not begin. giving documents a docket number until November 22, 1993.

**2.** While this lawsuit initially also involved a claim that employees at Bryce had been deprived of certain rights as a result of staff reductions, the plaintiff-employees withdrew their claims,

leaving only patients' rights issues remaining. *Wyatt v. Stickney*, 325 F.Supp. 781, 782 n. 1 (M.D.Ala.1971) (Johnson, J.).

**3.** At the invitation of the court, the United States of America participated as amicus curiae in this litigation. Order of March 12, 1971, at 7.

defendants spent only 50 cents a day on providing food to each resident. As for staffing, Bryce was deficient in all areas. Not only did it not have enough staff, nonprofessional staff was poorly trained. And as to treatment, the records kept on patients were less than adequate and the treatment was geared to housekeeping functions only, not to improving the lot of the patient. *Id.* at 1343–44. The defendants were essentially warehousing patients in an inhumane environment. The court later enlarged the litigation to include patients involuntarily confined for mental treatment purposes at Searcy Hospital for the mentally ill and Partlow State School and Hospital for the mentally retarded and found that the conditions at these hospitals were no better than those at Bryce. *Id.* at 1344.

Noting that the plaintiffs' rights were "present ones, and they must be not only declared but secured at the earliest practicable date," the court held a hearing in order to establish minimum standards to be met by these facilities. *Id.* at 1344. After that hearing, in 1972, the court entered injunctions requiring the defendants to bring state facilities into compliance with certain minimum constitutional standards. *Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972) (standards for mentally ill) (Johnson, J.), *aff'd in relevant part,* 503 F.2d 1305 (5th Cir.1974); *Wyatt v. Stickney,* 344 F.Supp. 387 (M.D.Ala. 1972) (standards for mentally retarded) (Johnson, J.), *aff'd in relevant part,* 503 F.2d 1305 (5th Cir.1974). These mental-illness and mental-retardation standards, which were developed with the assistance of the parties and experts in the fields of mental health and mental retardation, are commonly known as the 'Wyatt standards.' The *Wyatt* standards were designed to meet what the district court called the three "fundamental conditions for adequate and effective treatment," *Wyatt,* 334 F.Supp. at 1343: "(1) a humane psychological and physical environment, (2) qualified staff in numbers sufficient to administer adequate treatment and (3) individualized treatment plans." *Id.* Over the years, the court has periodically revisited these standards at the parties' request, and has from time to time approved modifications to these standards in order to bring them into compliance with evolving professional standards. *See, e.g., Wyatt v. Poundstone,* 1995 WL 430939 (M.D.Ala. July 11, 1995) (Thompson, J.); *Wyatt v. King,* 793 F.Supp. 1058 (M.D.Ala.1992) (Thompson, J.); *Wyatt v. Ireland,* No. 3195–N, 1979 WL 48254 (M.D.Ala. Oct. 25, 1979) (Johnson, J.); *Wyatt v. Hardin,* No. 3195 (M.D. Ala. June 29, 1976) (Johnson, J.).

*WYATT* STANDARDS EXTENDED: In 1975, the court extended the *Wyatt* standards to apply to all state facilities for the mentally ill and mentally retarded. *Wyatt v. Hardin,* No. 3195–N, 1975 WL 33692 (M.D.Ala. Feb. 28, 1975) (Johnson, J.). However, the establishment of the *Wyatt* standards proved to be only the first step in an extended struggle to secure the rights of mentally ill and mentally retarded residents of Alabama's institutions. And as this litigation continued and the Alabama Department of Mental Health and Mental Retardation expanded, the litigation came to encompass a large number of facilities. This lawsuit is unique in its broad scope and all-encompassing nature in that it applies to so many facilities and to both the state's mental-illness and mental-retardation systems.

### B. Second Phase of *Wyatt* Litigation

LITIGATION RESUMES IN 1975: Litigation began again in 1975, when the court allowed the parties to reopen discovery to determine whether the defendants had complied with the 1972 orders. In 1977, the plaintiffs and amicus curiae United States of America filed a motion for further relief and requested, among other things, that the court appoint a special master or receiver to assure compliance.

SYSTEM PLACED IN RECEIVERSHIP AND PLAN OF COMPLIANCE APPROVED: In a separate petition, the Governor of Alabama advised the court that "the Alabama mental health system is in a distress situation" and that achievement "of an effective mental health system maintained and operated in the interest of the safety and welfare of the patients and indeed, all of the citizens of this state, require[s] the assertion of the extraordinary equitable power of this Court." The Governor requested that the

court appoint him receiver of the Department. The court determined that the defendants had not complied with its injunctive orders and appointed the Governor as receiver of the state mental health system. The Governor proposed a plan of compliance under which the defendants were to achieve compliance with all *Wyatt* standards within 18 months, except new physical plant construction or major renovation. The court approved the plan.

### C. Third Phase of *Wyatt* Litigation

LITIGATION RESUMES IN 1981: In 1981, the plaintiffs returned to court again to ensure that the *Wyatt* standards were fully implemented as required by the Governor's compliance plan. The plaintiffs moved for the provision of sufficient funds to enable compliance with the 1972 orders and implementation of the Governor's plan. The defendants, in response, moved to eliminate all of the *Wyatt* standards and substitute in their place a requirement that the defendants achieve accreditation of the State's mental illness facilities by the Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO") and certification of the mental retardation facilities through Title XIX of the Social Security Act, 42 U.S.C.A. § 1396, *et seq.* The defendants sought elimination of the *Wyatt* standards on the grounds that these standards exceeded minimum constitutional requirements. The Governor and the Commissioner of the Alabama Department of Mental Health and Mental Retardation also moved for termination of the receivership, and the plaintiffs moved to remove and replace the Governor as receiver.

In 1983, the Governor resigned as receiver. The court appointed a non-state official as receiver. *Wyatt v. Ireland,* No. 3195–N (M.D.Ala. Feb. 1, 1983) (Thompson, J.). The defendants appealed to, and obtained a stay of the appointment from, the Eleventh Circuit Court of Appeals. In response to the stay, this court appointed the governor's legal advisor as receiver. *Wyatt v. Ireland,* No. 3195–N (M.D.Ala. March 8, 1983) (Thompson, J.). Also in 1983, the court held

a hearing on both the defendants' and plaintiffs' motions but did not rule on them.

1986 CONSENT DECREE ENTERED: In 1986, the parties submitted to the court their proposed settlement of the litigation. After conducting a fairness hearing on the objections to the consent decree, the court approved the decree, which resolved the parties' continued conflicts over the department's failure to comply with all the *Wyatt* standards, funding, and other issues. *Wyatt,* 1986 WL 69194. In general, the final settlement reflected a resolution of three issues: (1) the defendants' desire to terminate court supervision of the state system; (2) the plaintiffs' concern about the continued viability of the *Wyatt* standards; and (3) the plaintiffs' efforts to focus the litigation on the provision of community facilities and programs and the placement of qualified patients in those facilities and programs.[4] The final settlement reflected a balancing of these concerns, and the memorandum opinion that accompanied the decree further underscored the tradeoffs that had been made by each side in order to reach a compromise.

Under the terms of the consent decree, the Department of Mental Health and Mental Retardation was freed from active judicial supervision. The settlement dissolved not only the receivership but the Office of Court Monitor, an office specifically created to monitor on a daily basis the defendants' implementation of the court's orders and standards. The consent decree, however, required several affirmative actions by the defendants. First, it required that all the *Wyatt* standards "remain in effect." *Wyatt,* 1986 WL 69194, at *7. And it required that the defendants make substantial progress in achieving and maintaining compliance with all of the *Wyatt* standards. *Id.* at **3, 7. The court noted the significance of this provision in its accompanying memorandum opinion. The validity of the *Wyatt* standards had been vigorously attacked by the defendants, and a number of court decisions cast doubt on whether they would withstand the defendants' challenge. *See, e.g., Young-*

---

4. *See* plaintiffs' exh. I.B. 10(4) (transcribed remarks of the lead speakers for the plaintiffs and defendants at fairness hearing).

*berg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Newman v. Graddick,* 740 F.2d 1513 (11th Cir.1984). "As both the plaintiffs and the defendants ... observe[d], the incorporation of these standards into a settlement ma[de] these standards ... unsusceptible to challenges because of present and future changes in the law. Without question, one of the most significant things bargained away by the defendants in order to secure the plaintiffs' approval of the settlement is the defendants' vigorously asserted and often repeated contention that the court's prior standards and orders are always subject to attack because of the present and future changes in the law." *Wyatt,* 1986 WL 69194, at *4.

Second, the decree enjoined the defendants "to make all reasonable efforts to achieve full accreditation of Alabama's mental health facilities by [JCAHO] and full certification of Alabama's mental retardation facilities under Title XIX." *Id.* Thus, under the settlement, the defendants' motions to vacate and substitute the *Wyatt* standards with JCAHO accreditation and Title XIX certification and the plaintiffs' motions for judicially ordered funding and appointment of an independent receiver were denied.

Third, and "perhaps most importantly," as the court further noted in its discussions of trade-offs between the parties, "the settlement achieve[d] something the plaintiffs were unable to achieve in the past: it substantially broaden[ed] the focus of the litigation to include community placement and require[d] that the defendants make substantial progress in placing people in the community. Indeed, part of the capital construction program contemplated by the settlement include[d] the construction of hundreds of community beds throughout the state." *Id.* at *5.

The settlement provided that, should the defendants fail to comply with the significant provisions in the settlement, the court would entertain requests to reactivate its active supervision of the Mental Health and Mental Retardation System. *Wyatt,* 1986 WL 69194, at *8. Under the settlement, the parties were also ordered to establish a "patient advocate system, operated within and by the Alabama

Department of Mental Health and Mental Retardation, to help protect the rights of the plaintiff class," and a "quality assurance system operated by the central office of the Alabama Department of Mental Health and Retardation to monitor and assure the quality of care provided by the Department." *Id.*

*WYATT* CONSULTANT COMMITTEE ESTABLISHED: Paragraph 11 of the consent decree placed on the plaintiffs and the defendants the affirmative obligation "to cooperate" to establish "a process" by which, first, "plaintiffs' counsel will be apprised of the progress made by the defendants" in meeting the above three substantive requirements, and, second, "the defendants will continue to receive input from independent experts concerning means" of meeting the three requirements. *Id.* at *8. Paragraph 10 also directed the parties to comply with a number of plans of compliance contained in documents filed with the court. *Id.* Pursuant to ¶¶ 10 and 11 of the consent decree, the parties established what is now known as the "*Wyatt* Consultant Committee." *Wyatt v. Horsley,* No. 3195-N (M.D.Ala. Jan.28, 1991) (Thompson, J.).

The committee consisted of five members: two appointed by the plaintiffs, two appointed by the department, and the fifth being the Director of Advocacy Services of the Department. The committee worked with the court, the defendants, and the plaintiffs and served three roles. First, it was a direct source of independent, expert advice for the department. It would periodically visit the department and then offer advice as to how the department could better and more swiftly meet its obligations under the orders of the court. Second, the committee was a direct source of information for the plaintiffs' counsel as to how the department was progressing. The committee pinpointed and explained to plaintiffs' counsel those areas which needed his immediate attention. With the aid of the committee, plaintiffs' counsel, who is not an expert on mental health issues, was better able to meet the obligation he had to the plaintiff class to monitor closely the department's efforts to comply with the consent decree. Third and finally, the commit-

tee assumed another role which was somewhat of an extension of the first two: that of the mediator.

The department and the plaintiffs did not always agree as to how those problems identified by the committee should be approached and resolved. When this happened, the committee would meet with plaintiffs' counsel and department officials and their counsel, sometimes separately and sometimes together, to discuss the problem and to attempt to reach some agreement so as to avoid litigation. If this did not work, the committee would then meet with the court, identify what it considered to be a problem, and ask for the court's assistance. The court, with the assistance of the committee, would then arrange for an informal meeting of all those involved: the court, plaintiff's counsel, the commissioner (or his representative) and his counsel, and the members of the committee. At these meetings, the court and the commissioner spoke directly to each other rather than through attorneys. *Id.*[5]

Between 1987 and 1990, the *Wyatt* Consultant Committee worked with defendants, their attorneys, plaintiffs' attorneys, and the court to attempt to achieve compliance with the 1986 consent decree without resort to litigation. There were regular and extensive meetings. Through this process and with the aid of the committee, the department and the plaintiffs' counsel were able to address effectively a number of continuing and recurring problems. These included: expansion of community facilities and the transfer of mentally ill and mentally retarded patients from state institutions to these community facilities; appropriate placement of mentally retarded and dually diagnosed patients; improvement of the Quality Assurance System and the Patient Advocacy System; revision of the *Wyatt* standards; and securing an adequate budget for the department. *Id.*

In the fall of 1990, in a meeting with the court, the Commissioner of the Alabama Department of Mental Health and Mental Re-

tardation announced that he and his attorneys were contemplating filing a motion seeking to terminate the 1986 consent decree. At that time, the court, the commissioner, counsel for all parties, and the committee were in the midst of addressing a number of important matters. Indeed, resolution appeared near for some of them. For example, the commissioner had presented to the court a novel but very promising solution to some of the urgent problems the department was confronting at one of its institutions, the Eufaula Adolescent Center. Earlier in the year, the committee had reported to plaintiffs' counsel and the court its concern that the majority of the children at the center were not in need of the type of restrictive and isolated environment the facility provides, and that these children could be more appropriately served in a less restrictive program closer to their homes and families. The committee was also working very closely with the commissioner and plaintiffs' counsel on the department's overall continuing efforts with regard to the expansion of community services and facilities and the transfer of eligible mentally ill and mentally retarded patients from state institutions to these facilities. The committee also had pending before it even more issues which did not involve the court.

On November 30, 1990, however, the commissioner, suddenly and without any prior notice—either to the court, the committee members, or plaintiffs' attorneys—terminated the services of the *Wyatt* Consultant Committee. At the time, as stated, several urgent matters were pending before the committee. The commissioner did not allow the committee a period of time to wrap up its affairs. There was no phasing out of the committee. The commissioner stated that he believed that the department had substantially complied with the consent decree and that he would be seeking such a determination from the court. More specifically, the commissioner wrote each member of the commit-

---

5. The committee frequently communicated with the court, the plaintiffs, and the defendants alone or with one other party present only. This was part of the committee's role. During trial and in their posttrial briefs, the defendants attempted to discredit members of the committee by suggest-

ing they had engaged in improper *ex parte* contacts. The court emphasized at trial, and now re-emphasizes, that these contacts were not improper, because this was the committee's role and all parties consented to and understood this role.

tee that he was "of the opinion that there has been substantial compliance with the requirements of the consent decree" and that he "will therefore seek a court determination of such compliance." He explained that he did "not feel that the consultant committee approach is necessary any longer." [6]

By order entered on January 28, 1991, the court reinstated the committee albeit only for three months. The court gave the following reasons: "The issue for the court, therefore, is where can it look for an interim 'process' to fulfill the requirements of the [1986] consent decree. First, because the commissioner acted so precipitously and failed to give advance notice of his intended action, the court has not had sufficient time to seek out alternatives and to have another interim 'process' ready for implementation upon the termination of the committee last November. The court, therefore, has only one place to turn: the current committee. Second, the committee is needed on an interim basis to wind up its affairs and provide an orderly transition to any new 'process' the parties may develop. An orderly transition could only be beneficial for all involved. The court, therefore, turns to the *Wyatt* Consultant Committee to fulfill the requirements of paragraph 11 of the consent decree, though only until the parties can fulfill their obligation under the same paragraph to 'co-operate to establish' the required 'process.'" *Wyatt v. Horsley,* No. 3195–N at 16 (M.D.Ala. Jan.28, 1991) (Thompson, J.). The defendants filed an appeal but later dismissed it.

### D. Fourth and Current Phase of *Wyatt* Litigation

DEFENDANTS' MOTION FOR COMPLIANCE FINDING AND FOR TERMINATION OF LITIGATION FILED: In 1991, a new round of litigation began. On January 18, 1991, the defendants moved for a finding that they have met their obligations under the 1986 consent decree and for an order terminating this lawsuit. In order to facilitate a quick and inexpensive resolution of the lawsuit, the court suggested the ap-

pointment of an independent expert. The parties, however, suggested instead the appointment of a two-expert panel, jointly selected by the plaintiffs and the defendants in lieu of discovery, to "investigate and report to the Court and the parties ... [t]he factual issues pertaining to defendants' compliance with the outstanding orders of the Court." [7] Neither of the experts were sufficiently neutral or independent of the parties to be considered "court-appointed" experts, under Federal Rule of Evidence 706. Nonetheless, the court approved the proposed two-expert panel as "an agreement" between the parties for the orderly and efficient resolution of the defendants' motion. *Wyatt v. Horsley,* No. 3195–N (M.D.Ala. July 2, 1991) (Thompson, J.).

CLARENCE SUNDRAM APPOINTED: Subsequently, at the request of the parties, the court substituted one expert, Clarence Sundram, for the two-expert panel. *Wyatt v. King,* No. 3195–N (M.D.Ala. Oct. 25, 1991) (Thompson, J.). The court approved Sundram's methodology, and in November 1992, he submitted a report on Bryce and the Albert P. Brewer Developmental Center as to their compliance with the *Wyatt* standards. Sundram's proposed study consisted of three phases: first, to review the system's compliance with court orders; second, to assess the adequacy and effectiveness of the process used to identify patients and residents who require less restrictive placements; and, third, to assess the adequacy and appropriateness of plans for post-institutional services for patients and residents who have been discharged from the defendants' facilities. The plaintiffs and the defendants both had opportunities to review and comment on drafts of the reports. Sundram's report on Brewer and Bryce found that the department had made significant progress as to certain *Wyatt* standards. He found that the defendants successfully made substantial efforts to improve the physical environments of their institutions and hospitals and increased staffing ratios beyond their prior grossly deficient levels, thus re-

---

**6.** Letter of November 30, 1990, from Commissioner J. Michael Horsley to Dr. Robert Okin, Clarence Sundram, and Dr. Thomas B. Stage.

**7.** Parties' Agreement of April 15, 1991.

sulting in compliance with many standards. Yet, he also found that there remained significant problems and noncompliance as to other critical standards and rights, including treatment and habilitation, safety, assuring residents remain free from excessive and unnecessary medication, and, most significantly, unnecessary institutionalization.[8]

Sundram was unable to complete his entire review of the system because the defendants breached their agreement regarding Sundram's studies. The defendants hired Warren Bock, another expert, to duplicate Sundram's review. Bock conducted tours of Bryce and Brewer following Sundram's tours. When Sundram learned of this breach of the agreement, he resigned, believing that he could no longer function as an independent expert as a result of the defendants' actions.

MARTIN PLAINTIFFS INTERVENE: Also in January 1991, Diane Martin and eleven other patients, now commonly referred to as the 'Martin-intervenors,' filed a complaint-in-intervention asserting two claims: first, that the defendants failed to provide adequate procedural protections to ensure that involuntarily civilly-committed patients are released once they no longer meet the criteria for commitment established in *Lynch v. Baxley*, 386 F.Supp. 378, 387 (M.D.Ala.1974) (three-judge court); and, second, that the care and conditions at one of the state's facilities, the Thomasville Adult Adjustment Center, violated the 1972 orders as well as federal statutory and constitutional law. On July 22, 1991, the court found that Alabama's indefinite institutionalization of the involuntarily civilly committed was unconstitutional and ordered the defendants to conduct periodic post-commitment judicial reviews using the standards and safeguards articulated in *Lynch*.[9] *Wyatt v. King*, 773 F.Supp. 1508 (M.D.Ala.1991) (Thompson, J.). At the time, Alabama was one of only two states that allowed for indefinite institutionalization. *Id.* at 1516. The court emphasized that these new procedural safeguards "complement[], rather than supersede[], all other outstanding obligations the court has placed upon the defendants," reiterating in particular that the defendants remained under an obligation to "immediately release any patient who 'no longer requires hospitalization in accordance with the standards for commitment,' *Wyatt [ ]*, 344 F.Supp. at 386 (standard 33), and . . . [to] 'provide adequate transitional treatment and care for all patients released after a period of involuntary confinement.' *Id.* (standard 34)." *Wyatt*, 773 F.Supp. at 1517.[10] In a series of later orders the court adopted plans for implementing the July 22 order.[11] There was no appeal from these orders.

APPROVAL AND DISAPPROVAL OF MODIFICATIONS TO 1986 CONSENT DECREE: In May 1991, the parties sought court approval of two consent decrees that proposed to modify several of the *Wyatt* standards. Primarily because of the apparent lack of support for the consent decrees among the state's mental health consumers and their advocates, the court refused to approve the decrees. *Wyatt v. Horsley*, 793 F.Supp. 1053 (M.D.Ala.1991) (Thompson, J.). The court cautioned the parties as follows: "The court understands the difficulties class counsel faces in endeavoring to solicit the views of such persons. However, to the extent plaintiffs' counsel cannot receive input from class members, he must seek it from such secondary sources as public interest organizations, former mental patients, and family members and caregivers who have

---

**8.** Plaintiffs' exhs. I.A. (1)(1–3) (Sundram's reports). The plaintiffs' exhibits are designated by roman numerals, letters, and numbers—*e.g.*, I.A. 1((1)(a)). The defendants' exhibits are designated by category and number—*e.g.*, defendants' expert exh. 1. The United States's exhibits are designated either by "U.S. MR" (mental retardation) or "U.S. MI" (mental illness) and a number, *e.g.*, "U.S. MR 1."

**9.** The *Lynch* standards have since been vacated in favor of Alabama's new civil commitment stat-

ute, 1975 Ala.Code § 22–52–1, *et seq. Lynch v. Sessions*, 942 F.Supp. 1419 (M.D.Ala.1996) (three-judge court) (Albritton, J.).

**10.** Mental-illness standard 33 has since been deleted, *Wyatt v. King*, 793 F.Supp. 1058, 1062 (M.D.Ala.1992) (Thompson, J.); and mental-illness standard 34 can be found *infra* at note 202.

**11.** *See* Orders of Nov. 18 and Dec. 19, 1991.

day-to-day contact with class members in the state's institutions. While fulfilling this duty may render the settlement process more complex and problematic, it is essential if the class attorney is to persuade the court that an agreement is in the best interests of the class, rather than merely expect the court to trust his professional judgment. To allow any less in a class action would be to accept the cynical view that the attorney for the plaintiffs is 'the *dominus litus*,' that is, the true master of the lawsuit, and the plaintiffs 'only a key to the courthouse door dispensable once entry has been effected.' *Saylor v. Lindsley*, 456 F.2d 896, 899 (2nd Cir.1972)." *Id.* at 1056. *See also Wyatt v. King*, No. 3195–N, 1991 WL 365043 (M.D.Ala. Oct. 28, 1991) (Thompson, J.). In the fall of 1991, the court held a trial on the Martin-intervenors' challenge to the care and conditions at the Thomasville Adult Adjustment Center, followed by briefing in January and February 1992.

In May 1992, the parties submitted, for court approval, three new consent decrees modifying mental-illness standards 7, 9(3), 21, 23, 26–29, 31, and 33. This time the court approved the decrees, noting, among other things, that "The three new consent decrees currently before the court differ in many respects from those submitted to the court previously; most importantly, these decrees, unlike the earlier versions, now appear to have the support of a large segment of the mental health community. This is primarily due to the efforts of counsel for the plaintiff class and counsel for defendants to involve the state's primary and secondary consumers, consumer organizations, and advocacy groups ... in the revision of the decrees." *Wyatt v. King*, 793 F.Supp. 1058, 1062

---

12. *See infra* note 221 and accompanying text.

13. *See infra* notes 143, 145, 165, 190, and 199.

14. *See infra* text accompanying note 134.

15. *See infra* notes 130.

16. *See infra* note 242.

17. *See infra* notes 145 and 221 and text following note 201.

18. *See infra* notes 129 and 199.

(M.D.Ala.1992) (Thompson, J.). Mental-illness standards 27, 28, 29, and 33 were deleted or superceded.[12] The remainder of mental-illness standards—7, 9(3), 21, 23, 26, and 31—were modified.[13]

Later, in 1992, the court issued an order and memorandum opinion denying motions filed by the defendants that sought modification of the 1986 consent decree by eliminating certain requirements, including several provisions in the original 1972 *Wyatt* standards. *Wyatt v. King*, 803 F.Supp. 377 (M.D.Ala.1992) (Thompson, J.). The defendants had sought the elimination of the following: the minimum standards which guarantee patients' rights to privacy, dignity and humane treatment (mental-illness standard 1[14] and mental-retardation standard 15)[15] the standard that recognizes the right of mentally retarded patients "to a habilitation program which will maximize his human abilities and enhance his ability to cope with his environment (mental-retardation standard 2)[16] the standards which mandate the delivery of care and services in the least restrictive environment necessary (parts of mental-illness standards 2, 26, and 28)[17] and parts of mental-retardation standards 3, 9, and 11[18] and the provision in the 1986 consent decree that obligates the defendants to make substantial progress in placing residents of state institutions in community facilities and programs. The court held that the requirements for modification had not been met. *Id.* The defendants filed an appeal but later dismissed it.[19]

The following January, in 1993, the court entered an order and memorandum opinion denying a motion filed by the defendants that sought the elimination of another *Wyatt* stan-

---

19. In 1992, the court allowed the United States to withdraw as amicus curiae in this litigation. The court, however, noted that it "would welcome a request by the United States in the future to renew its participation in this litigation." Order of September 16, 1992.

Later, by orders entered on September 27, 1994, and October 27, 1994, the court, at the request of the United States, allowed the United States to participate again as amicus curiae in this litigation. *Wyatt v. Hanan*, 868 F.Supp. 1356 (M.D.Ala.1994).

dard, mental-illness standard 34, which obligates them to provide class members with adequate transitional services following release from a state facility.[20] *Wyatt v. King,* 811 F.Supp. 1533 (M.D.Ala.1993) (Thompson, J.). The defendants had alternatively requested that, should the court decline to vacate mental-illness standard 34, the court should clarify that the defendants may fully discharge their obligations under the standard by placing patients in existing programs as space permits, without creating any new programs or services to accommodate patients' needs, and by providing post-release care to each patient for a maximum period of one year following the patient's release. The court held that the requirements for modification and clarification had not been met. The court began by noting that, in light of the court's 1991 decision—condemning Alabama's indeterminate institutionalization of the involuntarily civilly committed and mandating periodic judicial review of commitment decisions—"the defendants now believe that 'it is no longer possible to continue to hospitalize patients involuntarily on the basis of their clinical needs.'" *Id.* at 1543 (footnote omitted). In other words, "Deprived of the option to keep patients institutionalized pending the availability of appropriate post-release care, the defendants now seek to be relieved of the obligation of Standard 34." *Id.* The court rejected for several reasons this basis for eliminating Standard 34:

> "First, the court's 1991 decision did not create any new legal obligation to the extent it stated that the defendants were obligated to release immediately into the community with adequate transitional services those patients who no longer met the criteria for initial commitment; the court merely reaffirmed existing obligations. Included in the 1972 order establishing *minimum constitutional standards* was Standard 33, which provided that 'If the patient no longer requires hospitalization in accordance with the standards for commitment . . ., he must be released immediately unless he agrees to continue with treatment on a voluntary basis.' It was no accident that, in the sequence of *Wyatt*

standards, this standard immediately preceded Standard 34, which requires that the state provide transitional care for these patients once released. Together, these two standards established a scheme which was intended to assure that involuntarily confined patients who no longer meet the criteria for commitment will not be unnecessarily held in confinement but rather will be immediately released into community settings with adequate transitional services. Moreover, in 1972, this court specifically rejected the suggestion that the lack of community facilities would excuse any failure to comply with the *Wyatt* standards, holding that 'the unavailability of neither funds, nor staff and facilities, will justify a default by defendants in the provision of suitable treatment for the mentally ill.'

"The principal import of the 1991 decision, in contrast, is that it established the procedures the state must follow in meeting its obligation under the scheme established by Standards 33 and 34. Under the 1991 decision, the defendants must do the following: conduct periodic post-commitment judicial reviews to determine when persons involuntarily confined because of mental illness should be released; conduct these reviews using the standards and safeguards articulated in *Lynch;* and conduct these reviews within 150 days of the initial commitment and, if the commitment is renewed, annually thereafter. The defendants' argument that it was not until the 1991 decision that they had an obligation to release immediately into adequate community settings those patients who no longer meet commitment criteria is completely meritless.

"But second and more troubling is the fact that defendants even make this argument. With their argument, the defendants implicitly admit that, in order not to comply with Standard 34, they consciously violated Standard 33, with the result that they have essentially ignored both standards over the years. Now that the court has brought to an end their noncompliance with Standard 33, they seek to be relieved of compliance

**20.** *See infra* note 202.

with Standard 34 so that they can continue with their overall non-compliance with the scheme established under both standards. They seek to bring the court into complicity with their unexcused failure for over 20 years to comply with both Standards 33 and 34. In this, the court cannot acquiesce. To the contrary, it is this court's heavy responsibility finally to bring the defendants into immediate and full compliance with both standards."

*Id.* at 1543–44 (footnotes omitted) (citations omitted). The defendants filed an appeal but later dismissed it.[21]

Later, on July 11, 1995, the court approved a proposal by amicus curiae United States to modify mental *Wyatt* mental-retardation standard 22(b) (medication: unnecessary, excessive, review, etc.). *Wyatt v. Poundstone,* 1995 WL 430939 (M.D.Ala.1995) (Thompson, J.).

PLAINTIFFS' MOTION TO ENFORCE FILED: On January 22, 1993, the plaintiffs brought a motion to enforce the 1986 consent decree, claiming that defendants had failed to comply with the 1986 consent decree and were violating the recently enacted ADA.

In 1994, the parties resumed litigation after the collapse of extensive efforts in 1992 and 1993 to enter into an agreement to establish formal procedures for settlement of the current round of litigation on the pending substantive motions—that is, the defendants' January 18, 1991, motion for a finding that they had met their obligations under the 1986 consent decree and for an order termi-

nating this litigation, and the plaintiffs' January 22, 1993, motion to enforce the 1986 consent decree and for further relief. *See Wyatt v. Hanan,* 871 F.Supp. 415 (M.D.Ala. 1994) (Thompson, J.) (discussing 1992 and 1993 efforts at settlement).

Trial on the two substantive motions—the defendants' January 18, 1991, motion for a finding that they had met their obligations under the 1986 consent decree and for an order terminating this litigation, and the plaintiffs' January 22, 1993, motion to enforce the 1986 consent decree and for further relief—began in the spring of 1995. The trial lasted 35 days, spanning the months of March, April, and May.[22] The trial was followed by extensive briefing of the parties in July.

PROBLEMS REVEALED AT EUFAULA ADOLESCENT CENTER: At the beginning of the trial, the court expressed concern about violations of the *Wyatt* standards at the Eufaula Adolescent Center.[23] The center was a secure, residential treatment facility located in a remote and rural part of Barbour County, Alabama. It served 55 children ages 12 to 18, who had either a mental illness or emotional disturbance.[24] Formerly a military base, it was comprised of several buildings—two dorms, a recreational and gym area, a school, an administration building with professional offices, and a security building. The area was surrounded by a chain link fence.[25] The physical plant of the children's dorms—old military style bar-

---

21. Admittedly, mental-illness standard 33 has been deleted. But the requirement of release of those patients who no longer need the need for institutionalization is still embodied in other *Wyatt* standards. *See infra* notes 200 and 202, and accompanying text. And, in any event, the law itself requires as much. *See O'Connor v. Donaldson,* 422 U.S. 563, 574–75, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975) ("A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely.... [There is] no constitutional basis for confining [the mentally ill] involuntarily if they are dangerous to no one and can live safely in freedom"); *Birl v. Wallis,* 633 F.Supp. 707, 710–11 (M.D.Ala.1986) (Thompson, J.) ("it is well established that a patient must be unconditionally released from involuntary confinement once the grounds for initial confinement cease to ex-

ist"); *Wyatt,* 773 F.Supp. at 1513 (discussing other cases holding, prior to the 1986 consent decree, that the state must release from involuntary confinement patients who no longer meet the criteria for initial confinement).

22. The court also folded into the evidence and considered at 1995 trial that which had been presented earlier, in 1991 and 1992, by the Martin-intervenors regarding Thomasville.

23. Transcript of March 13, 1995, at 31, filed March 14, 1995.

24. Defendants' general exh. 429 (Vaughn affidavit); plaintiffs' exhs. IV.C. 2(6); IV.C. 2(7).

25. Defendants' expert exh. 1 (Gualtieri report at 54).

racks—was "Spartan" and outdated.[26] Furthermore, its remote location made it difficult for families to visit their children and participate in therapy, and difficult to recruit qualified staff.[27]

The briefs and the evidentiary record filed prior to the trial indicated that there were pervasive and severe safety problems and abuse of resident children at the center. After presenting their evidence on the Eufaula Adolescent Center, the plaintiffs filed a motion requesting preliminary injunctive relief as to these safety problems.[28]

On July 11, 1995, in response to the plaintiffs' motion for preliminary relief, the court entered a memorandum opinion preliminarily finding that resident children at the center were not safe due to pervasive and severe safety and abuse problems. This danger was most pronounced in three areas: gang activities; staff abuse; and the improper use of restraint techniques. *Wyatt v. Poundstone*, 892 F.Supp. 1410 (M.D.Ala.1995) (Thompson, J.). These preliminary findings, which are now made final, were as follows.

Although envisioned as a facility for treatment of mentally ill adolescents in a secure environment, the Eufaula Adolescent Center evolved in the 1980s into a "penal" facility for "antisocial adolescent, conduct disorder patients who get in trouble with the law, and are sent to a secure psychiatric facility as a less restrictive alternative to incarceration."[29] "The fact that the [center] was a secure facility represented a convenient resource for commitment by probate judges or juvenile judges who were faced with the problems of delinquent youth. The alternatives were the [center] or a training school."[30] The center was essentially a "correctional facility" with a "penal atmosphere."[31] Its program was "punitive" and "not nearly so therapeutic as it might have been."[32] "There was an excessive reliance on seclusion, a large number of patient injuries, allegations of staff abuse, programming that was overly restrictive and punitive in nature."[33] Therefore, the center's mission was, to speak kindly, confusing: in theory, it was a treatment facility; but, in realty, it was essentially a penal institution.

This evolution into a penal facility violated the 1986 consent decree in a number of serious ways. First, the defendants abandoned any effort to seek accreditation by JCAHO. As stated, the 1986 consent decree required that the defendants make substantial efforts to achieve JCAHO accreditation at all its psychiatric facilities. JCAHO is an independent organization of health care professionals which promulgates national standards for health care facilities. In order to become accredited, a team of doctors, nurses, and administrators conducts an on-site survey at least every three years.[34] In October of 1987, the defendants unilaterally chose, instead, to pursue and obtain accreditation by the American Association of Psychiatric Services for Children (AAPSC).[35] AAPSC accreditation required "very little expense or changes in current operation."[36] Because the defen-

---

**26.** *Id.* at 55; *see also* plaintiffs' exh. IV.C. 2(1) at 000032 (JCAHO accreditation report, Eufaula Adolescent Center, Aug. 18, 1994) (finding dorm rooms to be "stark and impoverished").

**27.** *See, e.g.*, plaintiffs' exh. I.B. 1(9) (White report at 34 n.48).

**28.** Filed April 17, 1995 (Doc. no. 901).

**29.** Defendants' expert exh. 1: Gualtieri report at 51.

**30.** *Id.* at 52.

**31.** *Id.*

**32.** *Id.* at 52–53.

**33.** *Id.* at 52.

**34.** Defendants' general exh. 36: Understanding the Hospital Performance Report.

**35.** Defendants' general exh. 338: memorandum, dated October 9, 1987, from Dykes to Pouncy; *id.*: memorandum, dated October 19, 1988, from Dykes to Pouncy.

**36.** *Id.*: memorandum, dated October 9, 1987, from Dykes to Pouncy. In any event, the less demanding AAPSC found serious problems at the center. The AAPSC noted, among other problems, that the center "lacks a clear philosophy of treatment", that its use of seclusion violated its own policies, that there was a need for training in dealing with suicidal behavior, and that gangs were a problem. Plaintiffs' exh. IV.C. 2(3) at 002611–12: AAPSC report of accreditation review and recommendations, based on May 1992 site visits.

dants' action was without court approval, it can be characterized only as a conscious violation of the 1986 consent decree.[37]

Second, in 1990, the *Wyatt* Consultant Committee—an entity which, as stated, was created under the terms of the 1986 consent decree to both monitor the defendants' progress and to advise the defendants—toured the center. The committee found numerous serious violations of the 1986 consent decree and reported back to the court.[38] The most disturbing was that most of the children did not belong in the center's restrictive environment.[39] In May 1990, the committee and the defendants entered into an agreement to end placements at the center. The court acknowledged this agreement in a letter to the Commissioner of the Department Mental Health and Mental Retardation, stating that "there appears to be a general agreement between the department and the [*Wyatt* Consultant Committee] that the vast majority of the 115 children residing at the Eufaula facility are not in need of the type of restrictive and isolated environment Eufaula currently provides, and that these children could be more appropriately served in less restrictive, community-based programs, closer to their homes and families."[40] The court stated that it was agreed "that the department should develop, by no later than mid-August 1990, a detailed plan for providing both a conceptual framework for children's mental health services and an operational plan to develop needed community-based services and to end placements at Eufaula."[41] How-

ever, the defendants did not comply with this agreement.[42]

Admittedly, beginning in the early 1990s, the defendants attempted to improve conditions at the center. First, it commissioned another consultant committee, known as the Vaughan Committee, to review the center and make recommendations. The Vaughan Committee developed a new mission statement regarding admissions, programming, staff training, and other aspects of the center's program, moving the center back toward treatment and away from its penal dimension.[43] As a result of these efforts at reform, the center was downsized from around 115 beds at its peak to a 60–bed capacity, which was evenly divided between boys and girls ages 12 to 18, and children admitted to the center must have had either a serious emotional disturbance or mental illness.[44] The most egregious exclusion practice—confinement to building 112, which, as will be shown later, resembled solitary confinement in a prison more than therapeutic exclusion in a psychiatric facility—ended before trial. Moreover, the center was eventually accredited by JCAHO.[45] However, it cannot be overlooked that the Vaughan Committee's report and implementation plan did not focus on the needed community-based services intended to end placements at Eufaula, as promised by the defendants, and that it was not until 1991 and 1992, some four or five years after the 1986 decree, that the defendants began taking the steps necessary

---

37. The defendants contend that they did not pursue accreditation because of their confusion over which of several manuals JCAHO would use to survey the facility. Transcript of April 12, 1995, at 3900–02, filed April 13, 1995. They also contend they were uncertain whether the center would be kept open. *Id.* at 3901–02. These concerns, however, do not justify a five- or six-year delay, and they do not explain at all the defendants' failure to seek court approval for delay.

38. Plaintiffs' exh. II.E. (101): letter to Commissioner from court, dated May 22, 1990. In 1991, the *Wyatt* Consultant Committee filed a formal report regarding the problems it found at the center. Plaintiffs' exh. I.A. 5(3): *Wyatt* Consultant Committee's March 19, 1991 Report to the Court at 6–7.

39. *Id.* at 6.

40. Plaintiffs' exh. II.E. 101: letter to Commissioner from court, dated May 22, 1990.

41. *Id.* (emphasis added).

42. Plaintiffs' exh. I.C. 4(21) at 107: deposition of Poundstone.

43. Plaintiffs' exh. IV.C. 2(6): final Vaughan report; plaintiffs' exh. IV.C. 2(13): implementation plan, dated October 8, 1992.

44. Defendants' general exh. 429: Vaughan affidavit; plaintiffs' exh. IV.C. 2(6): final Vaughan report at 002423–24; *see also* plaintiffs' exh. IV.C. 2(7): draft of Vaughan report.

45. Order of April 17, 1995 (Doc. no 906). *See also infra* text accompanying notes 99 and 100.

to upgrade the substandard conditions at the center to meet JCAHO accreditation requirements.[46]

At the time of trial in 1995, therefore, the department had changed its admissions criteria and reduced the census at the center to approximately 55 children. However, many of these children still did not require institutionalization in a locked and secure facility and with the appropriate supports could have been served in communities closer to their families.[47] Once children were discharged from the center, transitional services and treatment were also inadequate. Children were often discharged to their homes, where support services were not always provided.[48] Very few children had involvement with community mental health centers after discharge.[49] Thus, the center did not provide adequate discharge planning or ensure the requisite services were available to children once they were in their communities.

Third, the evidence reflected that children at the centers were subjected to abuse both physically and mentally. To be sure, the center, because of its nature, had always had somewhat of a dual personality: on the one hand, the center was a mental-illness facility and, as such, provided treatment to its residents; and, on the other hand, because its residents also suffered from conduct disorders, it also provided a "secure environment." The critical question, however, is whether, in spite of these improvements, the facility was still unnecessarily "penal" in nature and not sufficiently therapeutic, safe, and free from abuse, in violation of the *Wyatt* standards. The court finds, as is shown below, that the defendants failed to correct adequately the safety and abuse problems at the center.

As stated, the abuse and unsafe conditions at the center were reflected in three particular areas: (1) gang activity; (2) staff abuse of children; and (3) the use of improper restraint techniques. At the time of trial, gang activity was current and widespread at the center. Many children credibly attested: "There are gangs here [at the center]. They hit and kick and beat up on kids."[50] "The gangs are known to jump on kids they don't like and to hit and punch kids that are not members of their gang."[51] Gang members were sent on "missions" where they "g[o]t higher ranks for beating other people up."[52] Or the mission may have involved "males mak[ing] the female do sex acts with them."[53] The gangs created fear in the children at the center. As one child attested, "The gangs scare me ... I feel threatened for my physical safety here. This is not a safe place for kids to be."[54] And children joined gangs in order to feel safer and avoid being physically assaulted. As one child stated, "I joined a gang because I kept getting hit and I thought once I joined people would leave me alone."[55] In order to identify with a gang, a child might tattoo himself or herself with a gang symbol.[56]

The gang activity had not only been current and widespread at the time of trial, it had been longstanding and within the defen-

**46.** *Id.*

**47.** Plaintiffs' exh. I.B. 1(9) at 47–52 (White report).

**48.** *See, e.g.*, Plaintiffs' exh. I.B. 1(9) at 52–53 (White report); transcript at 4277–80 (Diane H. testimony).

**49.** Plaintiffs' exh. I.B. 1(9) at 53 (White report).

**50.** Plaintiffs' additional submission concerning the center, filed May 10, 1995 (Doc. No. 1013), at exh. 1; *see also id.* at exhs. 2–8; plaintiffs' additional submission concerning gang activity, etc ., filed May 1, 1995 (Doc. no. 942), at exhs. 1–22. The plaintiffs submitted 30 affidavits in total from children at the center describing gang activity.

**51.** Plaintiffs' additional submission concerning gang activity, etc., filed May 1, 1995 (Doc. no. 942), at exh. 4.

**52.** *Id.* at exh. 1.

**53.** *Id.* at exh. 10; *see also id.* at exh. 22; transcript of April 13, 1995, at 4242–43, filed April 14, 1995 (testimony of Diane H.).

**54.** Plaintiffs' additional submission concerning gang activity, etc., filed May 1, 1995 (Doc. no. 942), at exh. 6; *see also id.* at exhs. 1, 3, and 5.

**55.** *Id.* at exh. 8.

**56.** Transcript of April 13, 1995, at 4243–44, filed April 14, 1995 (testimony of Diane H.); *id.* at 4188–89 (testimony of Wayne T.).

dants' knowledge for some time. Dr. Buzogany, a member of the Vaughan Committee, testified that he and the Department of Mental Health and Mental Retardation were aware that gang activity existed at the center.[57] Additionally, AAPSC noted in its report of accreditation review and recommendations that the center, itself, reported that it had continuing problems with gangs.[58]

The defendants failed to address adequately the gang activity at the center. Other than telling children to throw away gang signs or not wear gang colors, little else was done to eliminate gang activity.[59] Thus, children did not feel safe and did not feel as though they had any recourse. As one child stated, "I don't believe any of the staff put much effort into trying to stop the gangs here."[60] And another expressed similar frustrations: "The staffs know there are gangs here and that there is gang violence here but they do nothing about it except tell us we cannot wear [gang] 'colors.' They know a lot of the fights that happen here are

because of the gangs but they still don't do anything to try to stop the gangs. They just act like the gangs do not exist, but they do. It is not a safe place here."[61] At the time of trial in 1995, gang activity was serious and pervasive at the center and posed a direct and continuing threat to the safety of the children who were there.

The defendants' reaction at the hearing before the court to the evidence of gang activity was also informative. The defendants accused counsel for the plaintiffs of headline seeking and sensationalism for raising gang activities as a safety violation at the center. And without even conducting a serious investigation of the allegations, the defendants denied that gang activity constituted a problem at the center.[62] Only after the court had openly questioned whether the defendants' denial-without-investigation was indicative of how they typically reacted to problems at the center, did the defendants conduct a serious inquiry into gang activity at the center.[63] In its July 11, 1995, memo-

**57.** Plaintiffs' exh. I.C. 3(12) at 80: Deposition of Buzogany.

**58.** Plaintiffs' exh. IV.C. 2(3) at 002612 ("The agency itself reports a problem with gangs in the facility. It is recommended that added training be given to staff about the management and handling of gangs").

**59.** Plaintiffs' additional submission concerning gang activity, filed May 1, 1995 (Doc. no. 942), at exhs. 4 and 7. According to one child's affidavit, the staff told children that all gang members would be sent to a Department of Youth Services facility and, as a result, many children began to deny that they were in gangs. This approach merely served to drive gang activity underground; it was not an effective way of addressing and eliminating gang influences and behaviors. *Id.* at exh. 17.

**60.** *Id.* at exh. 1.

**61.** *Id.* at exh. 4. The center's advocate for children appears to have been ineffective in addressing the children's concerns and fear of gangs. *Id.* at exhs. 1, 3, and 18. As one child reported, "Since it doesn't do any good to tell him [the advocate,] no one really goes to him very much." *Id.* at exh. 18.

**62.** Transcript of April 14, 1995, at 4465, 4468–70, filed April 17, 1995.

**63.** After the court's admonishment, the defendants hired a team of four experts to conduct a

tour of the center. Dr. Galloway, who testified on behalf of this team, stated that, although there was informal group activity that the children perceived as gang activity, there was no formal and organized gang activity. He observed informal group activity, such as gang markings, and noted that some children said they were in gangs, but he did not consider this to constitute a "gang" problem. Transcript of May 16, 1995, at 8050–52, filed May 17, 1995. Whether one refers to gang activities as formal and organized or informal group activity, the evidence reflected that the children at the center engaged in damaging rituals and threatening behavior which seriously jeopardized their safety and the safety of other children.

The findings of Galloway and his team regarding gang activity were also compromised by several factors. The first compromising factor was the extremely narrow focus of Galloway's investigation. He limited his inquiry to the observations made in the four days he and the team were at the center. Transcript of May 15, 1995, at 7987–91, filed May 16, 1995. Thus, prior incidents were ignored. Second, he did not examine virtually any hard data—for example, incident reports or the like. *Id.* at 7985–86. And third, despite the fact that he was at the center to examine gang activity, he did not investigate in any fashion the fact that two of the three clinical records he examined while at the center had references, either in progress notes or behavioral reports, to gang activities. Transcript of May 16, 1995, at 8063–78, filed May 17, 1995. For example, in one record the therapist noted that in a

randum opinion, the court wrote that "it was deeply disappointed that, rather than blanketly denying the allegations without their own investigation, they had not stood up and promised a personal and thorough investigation of their own and that, if the allegations proved true, there was nothing within reason the court could order that they would not have already done on their own to remedy the problem effectively." 892 F.Supp. at 1417.

The evidence of pervasive and serious gang activity at the center and the defendants' reaction to the evidence led the court to three important inferences: "First, the defendants' tolerance of the destructive activity is indicative of the fact that they view[ed] the activity as natural to the facility and not worthy of any remedial effort, and of the further fact that they thus still view[ed] the Center as substantially penal rather than therapeutic in nature. Second, unless serious problems are brought out into the open before the court and public, it is likely that the defendants will not address them. And third, absent direct and continuing judicial oversight, it is likely that the defendants will not remedy a serious problem, even though brought out into the open; they will often deny it without adequate inquiry." *Id.*

With regard to staff abuse, the evidence reflected that the administration at Eufaula Adolescent Center did not respond appropriately to evidence and allegations of staff abuse of children. Indeed, the evidence supported the conclusion that the center, through inaction as well as action, condoned and allowed continued abuse of children. The center had a large number of abuse and neglect allegations, with an excessive number of children and staff being involved in multiple incidents of abuse and neglect.[64] During

the period from November 1990 to August 1993, 42 staff members at the center were involved in multiple abuse and neglect investigations, representing a ·total of 240 incidents.[65] Five of the center staff were involved in eleven or more abuse and neglect incidents each.[66] These numbers indicated that appropriate action was not taken to assure that staff did not abuse their positions of control and authority over children, who, of course, were naturally vulnerable.

Several examples are illustrative of this problem. Mr. M. was involved in 13 different investigations from September 1992 to January 1993. Shortly after beginning work, he physically abused a child by pushing him against a wall and injuring his head.[67] The only remedial action taken was verbal counseling and a one-day suspension without pay.[68] Additional complaints were filed against Mr. M. and investigated, six for physical abuse and two for verbal abuse. The center found insufficient evidence to determine whether there had been physical abuse in the six physical abuse complaints, and the center found that two instances of verbal abuse had occurred. The physical abuse allegations included slamming a boy into a gym door, throwing a boy against a security screen and rubbing his face against the window, throwing a boy against his bed, purposefully scraping a boy's elbow against a wall, pushing a boy against a wall and verbally threatening him, and throwing a boy against a wall and twisting his arm behind his back in a choke hold. Additional allegations included allowing one boy to beat up another and asking a boy to tattoo him.[69] During one of the verbal abuse incidents, Mr. M. teased and taunted a child, making inappropriate and unprofessional comments concerning a child's mother.[70] In the other instance, Mr. M. called a boy a "white crack-

session with the patient he or she "focused on [the patient's] gang involvement." *Id.* at 8063. While this could have referred to prior gang involvement, there was no way of knowing if it referred to current or prior gang involvement without having made further inquiry.

64. Plaintiffs' exh. I.B. 1(9): White report at 5–8; Plaintiffs' exhs. IV C. 2(20) and IV C. 2 (31–32).

65. Plaintiffs' exh. I.B. 1(9): White report at 7; plaintiffs' exhs. IV.C. 2(31–32).

66. *Id.*

67. Plaintiffs' exh. IV.C. 4(5)(d) at 001315–16.

68. *Id.*

69. Plaintiffs' exh. IV.C. 4(5)(d) at 001316–17.

70. *Id.* at 001316.

er," a "pecker head," and a "4–eyed bitch," and told the boy, "suck my dick." [71] For the verbal abuse, the center sent a reprimand letter for one instance and issued a verbal warning for the other. The center allowed Mr. M. to continue working with children after a substantiated instance and multiple allegations of physical abuse and instances of verbal abuse, potentially placing children in danger and certainly not providing appropriate care. Not until March 1993, did the center terminate him.

Another staff member, a mental health worker, had sexual relationships with a child at the center. The Department's Bureau of Special Investigations found evidence "sufficient to establish reason to believe and probable cause to believe" that Mr. H. engaged in sexual intercourse with a 15–year–old girl in a bathroom stall. [72] Prior to this incident, Mr. H. had been investigated regarding five other incidents of physical abuse and sexual misconduct at the center. In fact, Mr. H. had allegedly engaged in "digital intercourse" with the same woman on another occasion. A staff member reported this incident to the director of the center, but he failed to act or limit Mr. H.'s contact with children despite Mr. H.'s previous extensive record of sexual misconduct and the fact that the report mentioned that Mr. H. and this girl were planning to have intercourse in the bathroom. [73]

The center's director learned of the alleged sexual intercourse in August 1993. In early September, he interviewed the victim and a second child who witnessed the sexual act,

and he initiated an investigation by the Bureau of Special Investigation. The director, however, took no personnel action against Mr. H. until October 30, when he reassigned Mr. H. to the boys' dorm, and, on November 5, when he placed Mr. H. on mandatory annual leave. One week later, he allowed Mr. H. to resign. During the interim, before he reassigned Mr. H. to the boys' dorm and then placed him on leave, a resident reported that the alleged victim had been skipping classes to have sex with Mr. H.; the mother of a former resident called to report that her daughter had received letters from Mr. H. with inappropriate sexual language; and a staff member reported that Mr. H. was on the telephone with another girl arranging to meet her in the bathroom. [74] Thus, the center allowed a staff member with a history of physical and sexual abuse to remain in contact with children while he was the subject of an ongoing investigation for a serious allegation of sexually abusing a child. The center did not reassign Mr. H. to the boys' dorm until over two months after the alleged incident; and even this reassignment did not ensure he would have no contact with girls. This failure to act swiftly, firmly, and adequately, placed children in danger, by exposing them to a high risk of sexual and physical abuse. It also sent a message to the children and staff regarding the acceptability of the inappropriate sexual conduct at issue.

Equally disturbing was the defendants' failure to administer to the victim any follow-up counseling specifically designed to address this incident. Although her clinical

**71.** *Id.*

**72.** Plaintiffs' review of Benjamin H.'s personnel file, filed May 16, 1995 (Doc. No. 1035), at exh. 5 at 00004.

**73.** Plaintiffs' review of Benjamin H.'s personnel file, filed May 16, 1995 (Doc. No. 1035), at exh. 5a. Prior to this instance of sexual misconduct, a girl patient had reported that Mr. H. had asked her to pull up her shirt while in the gym and to go to the bathroom because he had something to show her. She also reported that Mr. H. winked at her and would bump into her and hit her with his hand on her bottom. The center issued a letter of reprimand for this behavior. *Id.* at exh. 1. Additionally, a girl had alleged that Mr. H. had something going with two other girls, a boy had

accused Mr. H. of being involved with a 15–year-old resident, and a boy admitted to assisting in the relay of a letter from a girl patient to Mr. H. During the investigation of the latter incident, one girl admitted that Mr. H. made sexual comments, touched her breasts, patted her butt, and had asked her to have sex with him. The investigation file also indicated that another boy reported overhearing Mr. H. tell a girl patient he wanted to have intercourse with her. *Id.* at exhs. 2–4. Despite this record, Mr. H. still was in direct contact with children when he allegedly had sexual intercourse with a girl patient at the center in a bathroom stall.

**74.** Plaintiffs' review of Benjamin H.'s file, filed May 16, 1995 (Doc. no. 1035), at exhs. 5b, 8, and 5c.

record reflected that her therapists, in individual and group sessions, addressed this incident, it did not indicate that she received any special therapy or additional therapy after the incident was reported.[75] The court is further disturbed by the center's failure to aid the victim in any manner in pursuing criminal charges.[76] Once the center discharged her and she left the center's gates, the center absolved itself of all responsibility for this incident as far as the victim was concerned.

The court therefore finds that the center did not respond appropriately to serious instances of staff abuse. The court recognizes that, because of the type of residents it has, the center would probably have had more false allegations of abuse than other facilities did, and the court further recognizes that it is impossible to prevent abuse from ever occurring at an institution; nevertheless, the number of incidents of abuse at the center was unacceptably high.

Third, with regard to the use of force to restrain children, the evidence reflected that staff improperly used dangerous physical force to restrain children at the center. These included: hammerlocks, bending a child's thumb back while holding the child in a hammerlock, placing forearms against a child's neck while the child is against a wall, and using knees in a child's back to pin the child on the ground.[77] Some of the children sustained welts, scrapes, and bruises as a result of improper restraint practices.[78] The administration at the center did not take action to redress such abuse. Although the defendants reported that one staff member who used improper force to restrain children had been fired,[79] this was only one staff member and did not address the institutional problem. This would have required training staff to restrain children in a proper way, and not tolerating the failure to do so. The center had a history of tolerating such abuse.[80] There are proper and safe methods for restraining even the most volatile individuals and these should have been used. Failure to use proven and safe methods should not have been tolerated and should have been firmly addressed.

Fourth, Eufaula Adolescent Center failed to create a sufficiently therapeutic environment. Treatment plans at the center did not meet mental-illness standard 26's requirements for individualization.[81] Treatment plans were not individualized, but rather were canned, repeatedly listing in a cursory

75. Notice of filing of client record (Doc. no. 924). Her progress notes indicate that this incident arose in therapy sessions on September 13, 21, and 28, 1993.

76. The incident involving Mr. H. having sexual intercourse with a girl patient in the bathroom was referred to a grand jury. However, the state did not pursue criminal charges because the girl did not appear at the grand jury hearing.

77. See, e.g., Plaintiffs' exh. I.B. 1(9): White report at 11; transcript of April 13, at 4174–78, filed April 14, 1995 (testimony of Wayne T.); transcript of April 14, 1995, at 4476–78, filed April 17, 1995 (testimony of White); plaintiffs' exh. IV.C. 4(5)n; plaintiffs' exh. IV.H. 21: BSI investigative report of case M7–0907–94 (concluding that in incident involving improper restraint "evidence ... is sufficient to establish reason to believe and probable cause to believe that staff members Mental-retardation standard. K. and Y. did abuse" a child at the center and that Y. abused another child by the use of improper restraint techniques).

78. Plaintiffs' exh. I.B.1(9): White report at 12–13; transcript of April 14, 1995, at 4478, filed April 17, 1995 (testimony of White). White's testimony as to the use of improper restraint was corroborated by both the testimony of Wayne T. (transcript of April 13, 1995, at 4174–78, filed April 14, 1995) and the Bureau of Special Investigation report of case M7–0907–94 (plaintiffs' exh. IV.H.21).

79. Defendants' brief in opposition to plaintiffs' motion for preliminary relief, filed May 26, 1995, at 44.

80. For example, in one incident a staff member "grabbed [a child] by the wrist and began pulling him across the floor toward the door ... [while he was] lying on the floor." Plaintiffs' exh. IV. C.4(5)(n) at 001445. The facility characterizes such conduct as neglect, not abuse, and merely issued a written reprimand to the staff member. Id. at 001440. After three more instances of substantiated abuse or neglect, the center terminated this staff member, in light of a long record of abuse of children and inappropriate behavior. Plaintiffs ex. IV.C.4(5)n at 001766–69: letter, dated October 28, 1993, from Anthony Dykes to Mr. M.

81. See infra note 145.

fashion the same problems for child after child in plan after plan.[82] Defendants did not provide structured and therapeutic activities for children. The absence of positive planned and structured activities was a deficiency that led to serious behavior problems and incidents among children and between staff and children.[83] The center's "levels system" was also non-therapeutic and not in compliance with professional standards of treatment. The center operated on a level system and token economy.[84] This system and its goals, however, were not individualized, but rather generic, in violation of professional standards. Further refinements and improvements were needed in this system to make it individualized and to ensure that large numbers of children were not denied therapeutic activities as a result of their level.[85]

Finally, seclusions were used for non-therapeutic purposes. Until just before trial, the defendants would seclude children in building 112. Seclusion practices in building 112 were more punitive than therapeutic and resembled solitary confinement in a prison more than therapeutic exclusion in a psychiatric facility. Children were placed in a row of cells, with no fixtures other than a light, a cement floor, and little-to-no heat or air-conditioning.[86] Confinement in building 112 ended only in 1994, in the wake of discovery in this case.[87] While this practice has ended, its use up to 1994, several years after the defendants filed their motion to terminate the lawsuits, reflects the tension at the center between its "penal" and "therapeutic" missions.

The defendants also improperly secluded children through use of a "behavior modification unit" or "B-mod," a locked ward with individual rooms. Children were confined to a room and could not leave. There were no doors on the rooms, but a staff person sat at or near the entrance ensuring the child does not leave.[88] Defendants, however, did not consider this to be "seclusion" because of the absence of the door on the room. Therefore, there was no clinical oversight, no required recording of confinements, nor any time limits on confinement to B-mod, in clear violation of the Wyatt standards.[89] Absence of a door, however, does not eviscerate the requirements for seclusion and restraint set out in mental-illness standard 7.[90] A child was still confined to a room on a locked ward. There was usually nothing in the room, but the frame of a bed, a pillow, and a blanket, if the child brought that with him or her. Seclusion in B-mod was a clear violation of standard 7.[91] B-mod also resulted in a deceptively low number of official seclusions at the facility.

As for the monitored and recorded seclusions, the center also failed to comply with mental-illness standard 7. The center failed to meet its own compliance criteria goals in several areas: children were not always given bathroom privileges on an hourly basis, they were not offered fluids on an hourly basis, clinical assessments were not always completed, nor were physician's orders always signed within the requisite 24–hour

---

82. Plaintiffs' exh. I.B. 1(9) at 44–45 (White report); *see also* plaintiffs' exh. I.A. 5(3) at 6 (*Wyatt* Consultant Committee's March 19, 1991 Report to court) (noting same problem in 1990).

83. Plaintiffs' exh. I.B. 1(9) at 33–34, 38–40 (White report).

84. Defendants' expert exh. 38 at 4–5, app. C & D (Galloway report); plaintiffs' exh. I.B. 1(9) at 34 (White report).

85. *See, e.g.,* defendants' expert exh. 38 at 7 (Galloway report); plaintiffs' exh. I.B. 1(9) at 34 (White report).

86. Plaintiffs' exh. I.B. 1(9) at 21–22 (White report).

87. *Id.* at 22.

88. *Id.* at 19.

89. *Id.* In fact, the Center's clinical director acknowledged that some children had been excluded in B-mod for up to five days. Plaintiffs' exh. I.C. 4(3) at 152–53 (deposition of Darnell); *see also* transcript at 4251 (Diane H. testimony); *id.* at 4194–95 (Wayne T. testimony).

90. This standard can found *infra* at note 190.

91. *See also* plaintiffs' exh. IV.C. 2(1) at 000035 (JCAHO accreditation report, Eufaula Adolescent Center, Aug. 18, 1994) (finding problems with the center's time out practices).

time period.[92] Furthermore, despite the failure to monitor and report B-mod seclusions, the center's number and frequency of exclusions were extremely high and increasing.[93] While the court recognizes that given the nature of the center's residents, its incidents of seclusion may be higher than other facilities, the increasing number of seclusions was unacceptably high, especially in light of the failure to even record B-mod exclusions.

The evidence therefore reflected that the defendants were in violation of, at least, the following *Wyatt* mental-illness standards: 2 and 34 (least restrictive environment and transitional care),[94] 26 (adequate treatment and individual habilitation plans),[95] 7 (seclusion and restraint),[96] and 1 and 19 (safety and freedom from abuse).[97]

The court issued a preliminary injunction requiring that the defendants "take immediate and affirmative steps to provide for the safety and protection from abuse of all resident children at the ... Center, as required by *Wyatt* mental-illness standards 1, 7, and 19." *Wyatt*, 892 F.Supp. at 1423. The defendants were required to submit, after receiving and considering input from the plaintiffs and amicus United States of America, two plans to the court: first, a "plan containing measures ... to address and resolve immediately the severe and pervasive safety problems and abuse of resident children at the Eufaula Adolescent Center"; and, second, a "plan ... providing for independent monitoring of the defendants' implementation of the above measures." *Id.* at 1423–24. The court further required that the defendants "furnish the following to the parents or guardians of all residents of the Eufaula Adolescent Center and their attorneys, if any: a copy of this order and preliminary injunction and accompanying memorandum opinion, along with a cover letter," *id.* at 1424, explaining "to the parents, guardians, and their attorneys the need for them to

monitor the conditions at the Eufaula Adolescent Center by visiting it personally and frequently." *Id.* at 1423.

In ordering this relief the court wrote that it "cannot rely solely on a 'promise' by the defendants to implement any proposed measures. Throughout the history of this litigation, the defendants have left and continue to leave 'a trail of broken promises.' *Wyatt*, 1986 WL 69194, at *6. A formal court order, incorporating all measures necessary to address the safety problems at the Center, is warranted." *Wyatt*, 892 F.Supp. at 1422. The court further wrote that, "the defendants' past conduct teaches that, absent judicial oversight, even a court order is inadequate to assure compliance. Only when two circumstances are present does it appear that there can be any reasonable assurance of the defendants' immediate and substantial compliance with a court order. The first circumstance is that the defendants' conduct be kept out in the open subject to scrutiny by both the court and the public. The second circumstance is that there be direct pressure from an outside source. For example, only when the issue of gang activity was brought out in the open and the court applied direct pressure, did the defendants initiate an investigation. The court believes that the effects of these two circumstances can be achieved prophylactically through a limited measure: the temporary appointment of a monitor."

The defendants appealed the preliminary injunction order to the Eleventh Circuit Court of Appeals. In the meantime, the Department of Mental Health and Mental Retardation closed the Eufaula Adolescent Center, and this court then stayed the preliminary injunction, finding that "the need for the preliminary injunction ... is moot." *Wyatt v. Poundstone*, 941 F.Supp. 1100, 1109 (M.D.Ala.1996) (Thompson, J.). The court

---

**92.** Plaintiffs' exh. I.B. 1(9) at 18–19 (White report).

**93.** *Id.* at 17.

**94.** Mental-illness standards 2 and 34 can be found *infra* at note 202 and in the text following note 201.

**95.** *See infra* note 145.

**96.** Mental-illness standard 7 can be found *infra* at note 190

**97.** Mental-illness standards 1 and 19 can be found *infra* at note 123 and in text accompanying note 134.

also informed the Eleventh Circuit that upon remand of this appeal it would dissolve the preliminary injunction. *Id.* The Eleventh Circuit then dismissed the appeal, *Wyatt v. Rogers,* 92 F.3d 1074 (11th Cir.1996), and this court dissolved the preliminary injunction.[98]

SUMMARY FINDINGS OF PARTIAL COMPLIANCE: During trial and at the invitation of the court, the defendants filed motions requesting the following: a judgment on partial findings, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, as to mental-illness standards 3 (no incompetency by reason of commitment), 5 (send/receive mail), 8 (experimental research), 9 (lobotomy/averse conditioning, etc.), 11 (wear own clothes; keep possessions), 13 (laundering of clothes), 17 (interaction with members of opposite sex), 18 (patient labor, etc.), 21 (staff licensing and certification requirements), and 25 (patient exams following admission); a judgment on partial findings, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, as to mental-retardation standards 8 (evaluation within 14 days of admission), 17 (no incompetency by reason of commitment), 18 (religion), 19 (telephone/visitation rights), 20 (send/receive mail), 21 (interaction with opposite sex), 23 (no seclusion; "time-out" ok), 24 (behavior modification only with consent), 25 (electric shock only for extraordinary circumstances), 29 (no experimental treatment without consent), 30 (no unusual or hazardous treatment without consent), 32 (outdoors at regular intervals), 33 (resident labor, etc.), 42 (written copy of standards upon admission), and 45 (no organ removal); and a finding of compliance with ¶ 8 of the 1986 consent decree, which required the defendants "to make all reasonable efforts to achieve full accreditation of Alabama's mental health facilities by the [JCAHO] and full certification of Alabama's mental retardation facilities under Title XIX . . .—and once attained, to continue to maintain such accreditation and certification." *Wyatt,* 1986 WL 69194, at *7 (¶ 8).

The court granted the defendants' motions for partial finding as to all but mental-retar-

dation standard 42. *Wyatt v. Poundstone,* No. 3195–N, 1995 WL 569121 (M.D.Ala. April 18, 1995) (Thompson, J.); *Wyatt v. Poundstone,* No. 3195–N, 1995 WL 938444 (M.D.Ala. Dec. 5, 1995) (Thompson, J.). The court also granted the defendants' motion for a finding of compliance with ¶ 8 of the consent decree as to all facilities.[99] While the court readily found ¶ 8 compliance with all facilities except the Eufaula Adolescent Center, the court wrote that it "finds that the Department achieved full accreditation of the Eufaula Adolescent Center as of May 1994, and that the Department has so far maintained such accreditation," but that, "between 1986 and late 1991, the defendants did not take 'all reasonable efforts' to obtain accreditation."[100] The court explained:

"The 1986 Consent Decree entered on September 22, 1986 stated:

'By agreement of the parties, the defendants are hereby ENJOINED to make all reasonable efforts to achieve full accreditation of Alabama's mental health facilities by the Joint Commission on the Accreditation of Hospitals [JCAHO] . . . and once attained, to continue to maintain such accreditation.'

This meant that beginning on September 22, 1986, the defendants were to begin taking all reasonable steps to obtain accreditation. The defendants did not, however, begin to make all reasonable efforts to obtain accreditation as of this date. The defendants contend that they did not pursue accreditation because of confusion over which of several manuals JCAHO would use to survey the facility. The defendants made one inquiry to the JCAHO on September 15, 1987. After a response from JCAHO on September 30, 1987, indicating that Eufaula should probably be surveyed under one manual, but that the defendants should review one other manual as well, the defendants did not pursue accreditation nor attempt to clear up the confusion over which manual JCAHO would use. Instead, in October of 1987, the defendants

---

**98.** Order of August 13, 1996 (Doc. no. 1420).

**99.** Orders of April 5 and 17, 1995 (Doc. nos. 848 & 906).

**100.** Order of April 17, 1995 (Doc. no. 906).

unilaterally chose to pursue and obtain accreditation by [AAPSC]. AAPSC accreditation would require "very little expense or changes in current operation." While the *Wyatt* Committee encouraged Eufaula to seek AAPSC accreditation, the Wyatt Committee did not accept AAPSC accreditation as a substitute for JCAHO accreditation. If the defendants believed that the AAPSC was an adequate substitute, they should have sought the court's permission to substitute this accreditation for JCAHO accreditation. They did not do so however. Indeed, the court finds that they chose accreditation by an agency that would require little change or expense. "Additionally, the defendants contend that they did not seek accreditation because they were not sure whether or not the court would require them to close the facility. If the defendants decided to 'delay' their effort pending such a decision, they should have either gained the plaintiffs' consent or sought approval from the court. "Finally, the evidence reflects that not until 1991 and 1992 did the defendants begin taking the steps necessary to upgrade the substandard conditions at Eufaula to meet JCAHO accreditation requirements. The defendants have not offered any credible reasons for not beginning this process in 1986 or, for the reasons given above, as early as 1987."

PLAINTIFF CLASS RECERTIFIED: On December 22, 1994, in the midst of heated and extensive preparations for trial by the parties and the court, the defendants filed a motion to recertify or modify the plaintiff class.[101] They requested that the court do the following: appoint new class representatives and new class counsel; explicitly state who is in the class; clarify whether this class action is pursuant to subsection(b)(2) or (b)(3) of Rule 23 of the Federal Rules of Civil Procedure; permit members of the plaintiff class to opt out of the class pursuant to subsection (b)(3) of the rule if they wish; and issue notice to class members pursuant to subsection (d)(2) of the rule. On January 18, 1995, after over 24 years of litigation, the defendants filed a supplemental motion adding an alternative request to decertify the plaintiff class.[102] The defendants argued that the class should be decertified because there had never been a formal order of certification, because the former named plaintiffs' claims were moot, and because of a conflict of interest within the plaintiff class.

After trial and while the appeal regarding Eufaula Adolescent Center was pending, the court refused to decertify the plaintiff class and, instead, allowed additional plaintiffs to intervene and recertified "A plaintiff class consisting of all current and future mentally-retarded and mentally-ill residents of any facility, hospital, center, or home, public or private, to which they are assigned or transferred for residence by the Alabama Department of Mental Health and Mental Retardation, ... pursuant to Fed.R.Civ.P. 23(a) & (b)(2)." *Wyatt v. Poundstone*, 169 F.R.D. 155 (M.D.Ala.1995) (Thompson, J.).

In recertifying the plaintiff class, the court rejected the defendants' contention that the class should be immediately decertified because of a conflict of interest within the plaintiff class between those who advocate community placement of residents and those who oppose it. It appeared that any conflict within the plaintiff class resulted, at least in large part, from misinformation disseminated by the defendants. The defendants had sent letters to class members, their guardians, caregivers, and next-of-kin informing them that the plaintiffs and their attorneys were seeking to have services for all class members reduced and full deinstitutionalization of the mentally-retarded, that is, to have all mentally-retarded class members now residing in the defendants' developmental centers moved into the community. The defendants failed to state in their letters that the plaintiffs advocate that the defendants be required to develop more extensive and greater community services and that institutionalized residents be given the choice between institutionalization and community placement. With this omission, the defendants left the important misimpression that the plaintiffs

---

**101.** Doc. no. 417.

**102.** Doc. no. 456.

seek to close the state's facilities and force patients out without any support services.

The defendants sent a letter to guardians of mentally-retarded residents in the state's developmental centers stating:

> "This letter shall serve as notice that the Department of Mental Health and Mental Retardation is currently involved in a lawsuit involving your ward, [name], at the [name] Developmental Center. The plaintiffs' attorneys in this lawsuit claim to represent your ward. One of the Plaintiffs' objectives in this case is to close the state's mental retardation facilities, including [name] Developmental Center." [103]

The defendants failed to add that the plaintiffs advocate the development of more extensive and greater community services and want to give institutionalized residents the choice, where appropriate, between institutionalization and community placement. Other letters were sent to family members and guardians of class members, including the mentally-ill patients, stating:

> "This letter shall serve as notice that the Department of Mental Health and Mental Retardation is currently involved in a lawsuit involving your ward/relative at [name of institution]. The Plaintiffs' attorneys in this lawsuit claim to represent your ward/relative as counsel for the Plaintiff's class members. One of the Plaintiffs' objectives in this case is to substantially reduce the state's mental health facilities." [104]

Again, with their omission, the defendants presented a false picture of the plaintiffs' position in this litigation. These letters went on to state that the Department of Mental Health and Mental Retardation was objecting to producing class members' records to plaintiffs' attorneys and encouraged the guardian or family member to contact the department if he or she objected to counsel having access to their ward's records.

These letters were sent to guardians after the court had specifically cautioned the defendants not to "encourage" plaintiffs and their guardians to object to producing the class members' records without explicit approval of the district court—approval which was not obtained.[105] Also, some of the letters implied (with a space provided for approval or disapproval of the release of information to plaintiffs' counsel) that guardian-or-parent approval was necessary to release of the information, despite the fact that mental-illness standard 31[106] expressly gives to plaintiffs' counsel and their agents, in the same manner that it gives to employees of the Department of Mental Health and Mental Retardation, the right to full access to patients' records.[107]

DENIAL, IN PART, OF PLAINTIFFS' MOTION TO ENFORCE: Finally, in the wake of the dismissal of the appeal, the court entered an order on October 8, 1996, denying plaintiffs' motion for enforcement except to the extent they seek relief other than under the 1986 consent decree. *Wyatt v. Rogers,* 942 F.Supp. 518 (M.D.Ala.1996) (Thompson, J.). The court reasoned that "In its opinion of August 8, the Eleventh Circuit stated that 'Precedent dictates that a plaintiff seeking to obtain the defendant's compliance with the provisions of an injunctive order move the court to issue an order requiring the defendant to show cause why he should not be held in contempt and sanctioned for his noncompliance.' 92 F.3d at 1078 n. 8. The appellate court concluded that, with their motion for enforcement filed in January 1993 ..., the plaintiffs ... 'have not resorted to the traditional means of enforcing injunctions.' *Id.*" *Wyatt,* 942 F.Supp. at 520. The court also denied, for these same reasons, the Martin-intervenors' complaint-in-intervention, filed on January 25, 1991—asserting, among other things, that the care and conditions at one of the state's facilities, the Thomasville

---

**103.** Plaintiffs' brief filed on February 6, 1995 (Doc. no. 516) (exh. C).

**104.** Plaintiffs' brief filed on February 6, 1995 (Doc. no. 516) (exh. D).

**105.** Transcript of July 21, 1994, proceedings before United States Magistrate Judge McPherson, at 69.

**106.** Mental-illness standard 31 is reproduced *infra* note 143.

**107.** Plaintiffs' brief filed on February 6, 1995 (Doc. no. 516) (exh. C).

Adult Adjustment Center, violated prior court orders as well as federal statutory and constitutional law—to the extent that the Martin-intervenors seek enforcement of prior court orders. *Id.*

Against this background, the court now turns to the two substantive motions now before it: the defendants' motion for a finding that they have met their obligations under the 1986 decree and for an order terminating this lawsuit; and the plaintiffs' motion to the extent they seek relief other than under the 1986 consent decree.

## II. DEFENDANTS' MOTION FOR FINDING THAT THEY HAVE MET THEIR OBLIGATIONS UNDER THE 1986 CONSENT DECREE AND FOR TERMINATION OF LITIGATION

In considering the defendants' motion for a finding that they have met their obligations under the 1986 consent decree and for an order terminating this lawsuit, the court will first address what legal principles should be applied. The court will then make its findings of compliance or noncompliance in light of these principles. And, finally, the court will conclude with its holding as to whether there should be full or incremental release and whether this litigation should be terminated.

### A. Governing Legal Principles

In 1991, in *Board of Educ. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715, the Supreme Court addressed explicitly when it is appropriate for a federal court to dissolve a school desegregation decree and terminate litigation. The Court reaffirmed the important principle that a decree may not be dissolved "if the purposes of the litigation as incorporated in the decree ... have not been fully achieved." 498 U.S. at 247, 111 S.Ct. at 636 (quoting *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968)). In other words, there must be a showing of full and satisfactory compliance with the basic purposes and provisions of the decree before it may be terminated. The Court, however, made clear that school desegregation decrees must be viewed as only "temporary measure[s]," *id.* at 247, 111 S.Ct. at 637; "[s]uch

decrees ... are not intended to operate in perpetuity." *Id.* at 248, 111 S.Ct. at 637. Two limitations, inherent in the jurisprudence of federal courts, warranted this conclusion: the first limitation is inherent in the nature of the equitable authority of federal courts to fashion appropriate relief; and the second limitation derives from our dual system of federal and state governments.

As to the first limitation, the Court wrote: " '[F]ederal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.' " *Id.* at 247, 111 S.Ct. at 637 (quoting *Milliken v. Bradley*, 433 U.S. 267, 282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977)). With regard to the second limitation, the Court explained: "Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that 'necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.' " *Id.* at 248, 111 S.Ct. at 637 (quoting *Spangler v. Pasadena City Bd. of Educ.*, 611 F.2d 1239, 1245 n.5 (9th Cir.1979) (Kennedy, J., concurring)). "From the very first," therefore, "federal supervision of local school systems was intended as a *temporary measure* to remedy past discrimination." *Id.* at 247, 111 S.Ct. at 637 (emphasis added.)

Based on these principles, the Supreme Court then articulated two overarching considerations that must inform a trial court's determination of when "the purposes of the litigation as incorporated in the decree ... have ... been fully achieved." *Id.* at 247, 111 S.Ct. at 636 (quoting *United Shoe Machinery Corp.*, 391 U.S. at 248, 88 S.Ct. at 1499). The first is whether the vestiges of past discrimination have been eliminated to the extent practicable. *Id.* at 249–50, 111 S.Ct. at 638. The second is whether the school board has complied in good faith with

the desegregation decree as a whole since it was entered. *Id.* The trial court must be satisfied that "it is unlikely that the school board would return to its former ways," *id.* at 247, 111 S.Ct. at 636–37, and thus that the constitutional violation will not be promptly repeated once the decree is lifted. The trial court "need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future." *Id.* at 249, 111 S.Ct. at 637. Rather, a school board's past record and present attitudes towards the reforms mandated in the decree are highly relevant to this inquiry. *Id.* at 249, 111 S.Ct. at 637. Good faith, therefore, is generally best demonstrated by compliance with the basic provisions and purposes of the decree for a reasonable period of time.

A year later, in 1992, in *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108, the Supreme Court addressed whether and when it is appropriate for a federal court to relinquish supervision and control over a school district in incremental stages before there has been full compliance in every area of school operation under an existing court decree. The Court held that, "A federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control." 503 U.S. at 489, 112 S.Ct. at 1444–45. The Court modified the considerations announced in *Dowell.* These considerations, as modified, are, first, "whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn," *id.* at 491, 112 S.Ct. at 1446, and, second, "whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system." *Id.* As to the second consideration, the Court explained that aspects of the decree may be so "intertwined or synergistic in their relation ... that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses other matters as well." *Id.* at 497, 112 S.Ct. at 1449. The third and last consideration, according to the Court, is essentially the same good-faith consideration announced in *Dowell*: "whether the school district has demonstrated, to the public and

to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *Id.* at 491, 112 S.Ct. at 1446. The Court again emphasized that, in "considering these factors, a court should give particular attention to the school system's record of compliance." *Id.* "A school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." *Id. See also Missouri v. Jenkins,* 515 U.S. 70, 88–89, 115 S.Ct. 2038, 2049, 132 L.Ed.2d 63 (1995) (reaffirming considerations articulated in *Freeman* ).

The Court in *Freeman* reasoned, as it did in *Dowell,* that the remedial authority of federal courts is limited by the principle "that 'judicial powers may be exercised only on the basis of a constitutional violation,' and that 'the nature of the violation determines the scope of the remedy.' " *Freeman,* 503 U.S. at 489, 112 S.Ct. at 1445 (quoting *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)). "A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." *Id.* at 489, 112 S.Ct. at 1445. The Court then reemphasized that these remedial principles take on special import when they implicate federal-state relations, observing that "the court's end purpose must be to remedy the violation *and,* in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Id.* (emphasis added.) "[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id.* (quoting *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977)). The Court concluded that, "Partial relinquishment of judicial control, where justified by the facts of the case, can be an important and significant step in fulfilling the district

court's duty to return the operations and control of schools to local authorities." *Id.* Moreover, "By withdrawing control over areas where judicial supervision is no longer needed, a district court can concentrate both its own resources and those of the school district on the areas where the effects of de jure discrimination have not been eliminated and further action is necessary in order to provide real and tangible relief to minority students." *Id.* at 493, 112 S.Ct. at 1447.

■ While the decisions in *Dowell* and *Freeman* specifically concerned school desegregation decrees, the reasoning behind those decisions was based on limiting principles of equitable relief and federalism which govern federal courts in general. *See Swann*, 402 U.S. at 15–16, 91 S.Ct. at 1275–76 ("a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution."). Therefore, these limiting principles—that a remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation, and that the control of a state institution that is operating in good-faith compliance with a court decree must be restored to state authorities—apply with equal force to federal court decrees governing other state institutions, including mental-health institutions. *See United States v. Miami*, 2 F.3d 1497, 1505, 1508 (11th Cir.1993) (applying *Dowell* standard to consent decree entered to redress discrimination in city fire department); *United States v. City of Montgomery*, 948 F.Supp. 1553 (M.D.Ala.1996) (Thompson, J.) (terminating, based on considerations articulated in *Freeman*, decrees redressing race and sex discrimination in city police department); *Jordan v. Wilson*, 951 F.Supp. 1571 (M.D.Ala.1996) (Thompson, J.) (longstanding sex discrimination lawsuit against city police department terminated based on considerations articulated in *Freeman* ). This court will therefore apply these principles, and the considerations derived from these principles, to the defendants' motion for a finding that they have met their obligations under the 1986 consent decree and for an order terminating this lawsuit.

■ The considerations, reformulated to apply in general to state institutions that are subject to detailed remedial decrees, are as follows. A federal court may, in its discretion, dissolve a decree in full and terminate the litigation if it finds such dissolution is appropriate in light of the following two considerations: first, whether the conditions that gave rise to the need for the litigation have been fully remedied, and, second, whether the state defendants have complied in good faith with the decree as a whole since it was entered. A court, in its discretion, may order an incremental or partial release from a decree if it finds such action is appropriate in light of the following considerations: first, whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; second, whether retention of judicial control in those aspects of the system is not necessary or practicable to achieve compliance with the decree in other facets of the system; and, third, whether the state defendants have demonstrated their good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

■ In considering whether to order full, partial, or no release, a court should give particular attention to the state defendants' record of compliance. State defendants are better positioned to demonstrate their good-faith commitment to the decree when their policies and actions form a consistent pattern of lawful conduct in compliance with the decree.

■ However, while the principles reaffirmed, and the considerations articulated, in *Dowell* and *Freeman* are binding on this court, they are still essentially general notions. Other than noting that the burden of establishing that court supervision is no longer needed rests with defendant state officials, *Freeman*, 503 U.S. at 490–91, 112 S.Ct. at 1445–46 (indicating that the school board must "demonstrate its good-faith commitment" before judicial control may be relin-

quished), and that whether there has been good-faith compliance is a subject for a specific factual finding by the trial court, *id.* at 498, 112 S.Ct. at 1449, the two decisions do not provide details, outside the context of school desegregation, as to how a court should go about determining when, in fact, there has been compliance with a court decree and when that compliance rises to the level of a demonstration of good faith.

First and obviously, good-faith compliance with most of the provisions of the 1986 consent decree, and thus with the decree as a whole, cannot be determined with mathematical certainty. The question for the court, therefore, is the proper standard for determining whether the state defendants have or have not complied with the provisions of the decree. While *Dowell* and *Freeman* offer little to assist the court in approaching this question, another Supreme Court decision, rendered ten years earlier, does. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court addressed whether an involuntarily committed person has a constitutionally protected liberty interest under the due-process clause of the fourteenth amendment to reasonably safe conditions of confinement and to freedom from unreasonable bodily restraints, and, if so, what the proper standard for determining whether a state has adequately protected these interests is. After answering yes to the first issue, the Court stated the resolution of the second issue—the proper-standard issue—must be "determined by balancing [the committed person's] liberty interest against the relevant state interest." 457 U.S. at 321, 102 S.Ct. at 2461. The Court then answered the second question as follows: " 'the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.' " *Id.* at 321, 102 S.Ct. at 2461 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3rd Cir.1980) (Seitz, J, concurring)).

The Court then explained: "By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Id.* at 322–23, 102 S.Ct. at 2461–62. The Court then concluded that, "[f]or these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462.

Here, admittedly, the responsibility of this court is to secure the defendants' swift and full compliance with the 1986 consent decree. Nevertheless, as would be the case with a court seeking to vindicate the liberty interests identified in *Youngberg,* this court is still an interloper, for the ultimate responsibility for the operation of the Alabama Mental Health and Mental Retardation System still lies with the State of Alabama. Therefore, interference by this court "with the internal operations of [the Alabama Department of Mental Health and Mental Retardation] should be minimized," *id.* at 322, 102 S.Ct. at 2461, to that necessary to vindicate compliance with the decree. Similarly, because "there certainly is no reason to think [this] judge[] ... [is] better qualified than appropriate professionals in making ... decisions" in the Alabama system calling for professional judgment, *id.* at 323, 102 S.Ct. at 2462, a "decision, if made by a professional, [should be] presumptively valid." *Id.*

 Therefore, in determining whether the defendants have complied with the 1986 decree—and, in particular with each of the *Wyatt* standards to the extent the standard calls for professional judgment—the role of this court is to make certain that professional judgment was, in fact, exercised. It is not appropriate for the court to specify which of several professionally acceptable choices should have been made. The court should, however, be careful not to apply an 'anything goes' view. In other words, the mere presence of conflict in expert testimony does not

mean that professional judgment was used, nor does it mean that professional judgment was not used.

In addition, of course, a decision is entitled to such deference only if it is one that calls for professional judgment. For example, whether a patient should be placed in a community setting would be a decision that would call for professional judgment, and the court should not second guess such a decision as long as it was based on acceptable professional judgment. However, whether the Department of Mental Health and Mental Retardation has met its obligation to create community facilities would not turn exclusively on professional judgment. The bottom line is that, in those instances where professionals have determined that a patient could or should be in a community setting, the decree requires that, within practical administrative and budgetary limits, the department have such settings available, and the court's limited role under the consent decree is to make sure that this is so. The force of the 1986 consent decree is that, if a state professional finds that a patient could or should be in a local community facility, the patient should not he hospitalized far away from home, from family, and from local community simply because an appropriate local community facility is not, within practical limits, available.

Moreover, it is the court's responsibility to ensure that a judgment is made by a competent professional based on professional standards and practices, appropriate medical and psychological criteria, and not on administrative convenience or nonmedical criteria. *Thomas S. v. Flaherty,* 699 F.Supp. 1178, 1183, 1200 (W.D.N.C.1988), *aff'd,* 902 F.2d 250 (4th Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990); *Lelsz v. Kavanagh,* 673 F.Supp. 828, 835 (N.D.Tex. 1987); *Clark v. Cohen,* 613 F.Supp. 684, 704 (E.D.Pa.1985), *aff'd,* 794 F.2d 79 (3d Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93

L.Ed.2d 404 (1986). Thus, the court has a responsibility to assess a professional's expert opinion, by assessing the expert's credibility and the reliability of the information on which the expert bases his or her opinion. The court has assessed the credibility of each witness and the weight to be given each witness's testimony. In assessing the credibility of the experts, the court took into account the sources of the expert's opinions. Some of the experts' selection of data was decidedly unprofessional.[108] Where the expert's data were not random, but selected by the party he or she represented, where the expert relied on the representations of the parties instead of making an independent determination, and where the expert deliberately attempted to mislead the court, the court has taken all these into account in its assessment.[109]

Second, the determination of whether the defendants have complied with the 1986 consent decree requires a close and detailed scrutiny of the Alabama Mental Health and Mental Retardation System; and, without question, close scrutiny of any state institution of the magnitude presented here will inevitably reveal numerous deficiencies, and these deficiencies will not be of equal footing. Moreover, as this case dramatically demonstrates, decree requirements come in all shapes and forms. At one extreme, there are those that are simple and objective, and that can be easily and quickly met. It would be practical, and thus reasonable, to expect 100% compliance 100% of the time as to these requirements. For example, the defendants have fully complied, as the court has expected, with the mental-illness standards 8 and 9, which require that patients not be subjected to experimental research without informed consent and which prohibit lobotomies, psychosurgery, electro-convulsive therapy, and other unusual or hazardous

---

**108.** *See, e.g.,* Transcript at 6236–38 (testimony of Dr. Walter Christian) (describing unprofessional review by several of defendants' experts); transcript at 2677–78 (testimony of Dr. Dennis Reid) (describing his unprofessional method of record review).

**109.** *See, e.g.,* Transcript at 1089–98 (court questioning Gualtieri's credibility because of attempt to mislead it, through charts purporting to give a national average, that was in fact not such an average); *id.* at 1313–27 (Gualtieri's failure to correct known error that went to the substance of some very important conclusions).

medical procedures without strict safeguards.[110]

At the other extreme, there are those requirements that are complex and greatly subjective, and that require a substantial commitment of time and resources. It would be impractical, and thus unreasonable, to expect 100% compliance 100% of the time as to these requirements. For example, the court would not expect that the defendants would be able to prohibit all patient abuse in the future. Obviously, the Alabama Department of Mental Health and Mental Retardation can act only through people who, though professional, are still fallible. Therefore, in reviewing whether the defendants have complied with mental-illness standards 1 and 19—which together prohibit patient abuse by staff—the question for the court is not simply whether there has been no patient abuse in any of the state's mental health facilities, for such an absolute requirement would simply be impractical in the imperfect world in which we live.[111] And although relevant, the question is not just how frequent the abuse has been. Rather, the question is multifaceted: what measures the defendants have adopted to help prevent such abuse; whether and how these measures have been implemented; and what steps the defendants have taken in those instances when they have been presented with evidence of possible abuse. Therefore evidence that, over a period of time, there may have been isolated instances of patient abuse would not necessarily preclude a finding of good-faith full compliance with mental-illness standards 1 and 19.

Indeed, in its memorandum opinion regarding the Eufaula Adolescent Center, the court was concerned not only about the lack of safety for children at the center, but also about the fact that the defendants, when confronted with such evidence, denied it without conducting their own serious and thorough investigation. The court wrote with dismay: "The court admonished the defendants that it was deeply disappointed that, rather than blanketly denying the allegations without their own investigation, they had not stood up and promised a personal and thorough investigation of their own and that, if the allegations proved true, there was nothing within reason the court could order that they would not have already done on their own to remedy the problem effectively." *Wyatt,* 892 F.Supp. at 1417 (footnotes omitted). Indeed, much of the relief fashioned by the court went to the defendants' reaction to the evidence. The court recognizes that the defendants cannot provide 100% assurance that unsafe conditions will not recur, and the defendants should not fear that bringing such conditions out in the open for all to see. But the defendants can assure (and what the court in the end is really looking for) is that the defendants have in place reasonable means for preventing such conditions to the extent practicable, and that they have in place reasonable means for uncovering and remedying the conditions when, unfortunately, they do arise.

Finally, there are some *Wyatt* standards that even conflict with one another. For example, mental-illness standards 1 and 19 require that patients be provided with a safe environment,[112] while mental-illness standard 7 requires freedom from unnecessary bodily restraint.[113] "[A]n institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement." *Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460. This conflict was most pronounced in the cases of the elderly. On the one hand, because the elderly are fragile, there is the reasonable need to restrain them to keep them from falling and severely hurting themselves, and, on the other hand, there is the humane concern that they should be allowed some freedom of movement. These cases have no brightline solutions.

Therefore, relevant to the inquiry about compliance with the individual provisions in

---

**110.** Mental-illness standards 8 and 9 can be found *infra* at note 199.

**111.** Mental-illness standards 1 and 19 can be found *infra* at note 123 and text accompanying note 134.

**112.** Mental-illness standards 1 and 19 can be found *infra* at note 123 and text accompany note 134.

**113.** Mental-illness standard 7 can be found *infra* at note 190.

the 1986 consent decree are the following: the nature of the specific term of the consent decree; the relationship of the term to other terms and to the decree's basic purposes; the length of time the consent decree has been in effect; the defendants' history of specific as well as overall compliance; and the degree of compliance.

With the above legal principles and considerations in mind, the court will now turn to the specific provisions in the 1986 consent decree. The court will address these provisions in the following order: the *Wyatt* mental-illness standards; the *Wyatt* mental-retardation standards; the requirements for JCAHO accreditation and Title XIX certification; and all the other provisions in the 1986 consent decree.

### B. *Wyatt* Mental–Illness Standards

The defendants operate six psychiatric facilities with a census of between 1,400 and 1,900 patients.[114] The six facilities are Bryce Hospital, Searcy Hospital, Greil Memorial Hospital, North Alabama Regional Hospital, Thomasville Mental Health Rehabilitation Center, and Taylor Hardin Facility.[115]

Bryce Hospital, established in 1861, is the oldest and largest public mental health hospital in Alabama. At its peak in 1969 it housed over 6,000 patients.[116] It is organized into separate units, including acute care, adolescent, long-term care, and nursing facilities. Today its average census is approximately 1,037 patients.[117] Searcy is the next largest mental hospital with approximately 484 patients. It is also organized into separate units.[118] Virtually all of Alabama's adult long-term patients reside at either Bryce or Searcy.[119] Greil Memorial and North Alabama Regional Hospitals are both acute-care facilities. They treat between 66 and 95 patients, respectively.[120] Approximately 135 individuals reside at Thomasville, a transitional facility.[121]

There are 31 current *Wyatt* mental-illness standards.[122] The court has already made partial findings of compliance as to ten of these standards under Rule 52(c) of the Federal Rules of Civil Procedure: mental-illness standards 3 (no incompetency by reason of commitment), 5 (send/receive mail), 8 (experimental research), 9 (lobotomy/averse conditioning, etc.), 11 (wear own clothes; keep possessions), 13 (laundering of clothes), 17 (interaction with members of opposite sex), 18 (patient labor, etc.), 21 (staff licensing and certification requirements), and 25 (patient exams following admission). *Wyatt v. Poundstone*, No. 3195–N, 1995 WL 938444 (M.D.Ala. Dec. 5, 1995) (Thompson, J.).

The court assesses the defendants' compliance with the *Wyatt* mental-illness standards by category: (1) physical living environment and custodial care; (2) personal liberties; (3) treatment and record keeping; (4) medical care; (5) use and administration of psycho-

114. Plaintiffs' exh. I.C. 4(9) at 34–35 (Deposition of Poundstone). The defendants contend in their posttrial brief that there are approximately 1,400 adult patients in their psychiatric facilities. However then-Commissioner Poundstone indicated in his deposition of February 20, 1995, that the total is approximately 1,970.

115. Whether Taylor Hardin is subject to the consent decree is uncertain. The parties presented virtually no evidence on this facility at trial, although there is evidence in the record. Because of its uncertain status, the court will not make any findings at this point as to Taylor Hardin. This does not mean, however, that Taylor Hardin is not subject to the consent decree.
At the time of trial, the Eufaula Adolescent Center was also operated by the defendants. As shown earlier, the defendants have now closed the center.

116. Plaintiffs' exh. I.A. 1(2) at 1 (Sundram's Bryce report).

117. Plaintiffs' exh. I.C. 4(9) at 34–35 (Deposition of Poundstone). These numbers include the 337 residents of the Kidd and Allen nursing facilities. These numbers are only approximations. The census at each facility changes on a daily basis as patients are admitted and released. *Id.*

118. *Id.* This number includes the 124 residents residing at Searcy's Claudette Box nursing facility.

119. Transcript at 4763–64 (Bernstein testimony).

120. Plaintiffs' exh. I.C. 4(9) at 34 (deposition of Poundstone).

121. *Id.*

122. These standards are found at court's exh. 2.

tropic medications; (6) protection from harm and physical safety; (7) adequate staffing and staff supervision; (8) high risk or unusually restrictive treatment; (9) seclusion and restraint; (10) treatment in the least restrictive environment appropriate and transitional services; and (11) children's services.

### 1. Physical Living Environment and Custodial Care: Mental-illness Standards 12, 13, 19, and 20

■ The defendants have made significant progress in improving the physical living environment and custodial care. For the most part, the defendants provide the patients in their mental-illness facilities an adequate living environment and custodial care as defined by standards 12, 13, 19, and 20.[123] These standards require adequate clothing, adequate physical facilities, and nutritious meals.

The court has already made a finding of compliance with standard 13. The court now makes a finding of compliance with standards 12 and 20. Generally, as to standard 12, residents are provided an adequate selection of seasonable clothing.[124] While there are isolated incidents of noncompliance, such as elderly residents inadequately clothed in only robes, these incidents do not amount to a systematic violation of the standard. Furthermore, while there are problems with theft of clothes and while residents complain of a communal clothing mentality among the staff, patients are generally adequately clothed.[125]

As for standard 20, patients are provided with nutritionally adequate meals in dining rooms.[126] Some residents are not able to eat in dining rooms because the tables are not equipped for wheelchairs and geri-chairs. While it is preferable for all patients to eat in dining rooms, the standard does not require that non-mobile patients eat in dining rooms.

■ The court reads standard 19 to apply to patients' safety in a broad sense. To the extent it prohibits abuse and neglect, the defendants are not in compliance, as the court will explain in its abuse-and-neglect discussion. To the extent it applies to the physical facilities, the defendants are also not in compliance. While the defendants have made significant progress in improving their

123. Mental-illness standard 12 provides:
"The hospital has an obligation to supply an adequate allowance of clothing to any patients who do not have suitable clothing of their own. Patients shall have the opportunity to select from various types of neat, clean, and seasonable clothing. Such clothing shall be considered the patient's throughout his stay in the hospital."

Standard 13 provides:
"The hospital shall make provision for the laundering of patient clothing."

Standard 19 provides:
"A patient has a right to a humane psychological and physical environment within the hospital facilities. These facilities shall be designed to afford patients with comfort and safety, promote dignity, and ensure privacy. The facilities shall be designed to make a positive contribution to the efficient attainment of the treatment goals of the hospital."
Standard 19 then sets forth specific requirements for resident units, toilets and lavatories, showers, day rooms, dining facilities, linen servicing, housekeeping, geriatric-and-nonambulatory facilities, and the overall physical plants.

Standard 20 provides:
"Patients, except for the non-mobile, shall eat or be fed in dining rooms. The diet for patients will provide at a minimum the Recommended Daily Dietary Allowances as developed by the National Academy of Sciences. Menus shall be satisfying and nutritionally adequate to provide the Recommended Daily Dietary Allowances. In developing such menus, the hospital will utilize the Moderate Cost Food Plan of the Department of Agriculture. The hospital will not spend less per patient for raw food, including the value of donated food, than the most recent per person costs of the Moderate Cost Food Plan for the Southern Region of the Untied States, as compiled by the United States Department of Agriculture, for appropriate groupings of patients, discounted for any savings which might result from institutional procurement of such food. Provisions shall be made for special therapeutic diets and for substitutes at the request of the patient, or his guardian or next of kin, in accordance with the religious requirements of any patient's faith. Denial of a nutritionally adequate diet shall not be used as punishment."

124. Plaintiffs' exh. I.A. 1(2) at ii, 8–9 (Sundram's Bryce report).

125. *Id.* at iii.

126. *Id.* at ii, 10–11.

physical facilities, they have yet to meet standard 19's requirements, for there are still fire and safety hazards and other serious physical safety hazards in old buildings. The court does not find compliance to this extent.[127] As long as patients continue to live in unsafe buildings, the defendants cannot be found in compliance. Additionally, there is no compliance to the extent defendants have failed to install special alert systems in bedrooms for patients with mobility and communication problems.[128] Discouraging patients from personalizing their rooms and displaying personal objects violates this standard as well, as do sparsely decorated day rooms.

Thus, the court concludes that the defendants are in compliance with mental-illness standards 12, 13, and 20 and not in compliance with standard 19.

**2. Personal Liberties: Mental-illness Standards 1, 3, 4, 5, 11, 14, 15, 16, 17, 18, 31 and 35**

 The court finds compliance with the vast majority of the personal liberty standards. The court has already found compliance with five of the standards addressing personal liberties: 3, 5, 11, 17, and 18.[129] The defendants are in partial compliance with standards 14 and 15.[130] Standards 14 and 15 address patients' rights to regular physical exercise and to be outdoors. Most patients have the opportunity for physical exercise and to be outdoors.[131] However, patients on certain wards do not have an opportunity to exercise, and those who live on locked wards or who do not have unescorted ground privileges do not have an opportunity to be outdoors at regular intervals.[132] Thus, the de-

---

**127.** *Id.* at i-ii, 6–8. For example, Sundram found that the wooden stairwells in the old main building of Bryce Hospital constituted a fire hazard. He also found other remaining safety hazards, such as exposed light fixtures in showers, slippery shower floors lacking safety mats, and the like. JCAHO also continues to cite Bryce for deficiencies in basic life safety in some of its units. Plaintiffs' exh. IV.A. 2(19).

**128.** Plaintiffs' exh. I.A. 1(2) at 7 (Sundram's Bryce report).

**129.** Mental-illness standard 3 provides:
"No person shall be deemed incompetent to manage his affairs, to contract, to hold professional or occupational or vehicle operator's licenses, to marry and obtain a divorce, to register and vote, or to make a will solely by reason of his admission or commitment to the hospital."

Standard 5 provides:
"Patients shall have an unrestricted right to send sealed mail. Patients shall have an unrestricted right to receive sealed mail from their attorneys, private physicians, and other mental health professionals, from courts, and government officials. Patients shall have a right to receive sealed mail from others, except to the extent that the Qualified Mental Health Professional responsible for formulation of a particular patient's treatment plan writes an order imposing special restrictions on receipt of sealed mail. The written order must be renewed after each periodic review of the treatment plan if any restrictions are to be continued."

Standard 11 provides:
"Patients have a right to wear their own clothes and to keep and use their own personal possessions except insofar as such clothes or personal possessions may be determined by a Qualified Mental Health Professional to be dangerous or otherwise inappropriate to the treatment regimen."

Standard 17 provides:
"The institution shall provide, with adequate supervision, suitable opportunities for the patient's interaction with members of the opposite sex."

Standard 18 sets forth the rules governing patient labor. It is too long to reproduce in its entirety in this opinion. It can be found at court's exh. 2. In essence it provides that patients shall not be required to provide labor involving the operation and maintenance of the hospital. Patients may voluntarily engage in such labor if it is compensated in accordance with the federal minimum wage laws. The standard allows patients to engage in therapeutic tasks and labor, including labor the hospital would otherwise pay an employee for, provided that it is part of a treatment plan and compensated in accordance with federal minimum wage laws. The standard also permits patients to be required to perform there personal housekeeping chores, such as making a bed.

**130.** Standard 14 provides:
"Patients have a right to regular physical exercise several times a week. Moreover, it shall be the duty of the hospital to provide facilities and equipment for such exercise."

Standard 15 provides:
"Patients have a right to be outdoors at regular and frequent intervals, in the absence of medical considerations."

**131.** Plaintiffs' exh. I.A. 1(2) at iii, 18–20 (Sundram's Bryce Report).

**132.** *Id.*

fendants are not in compliance with these standards.

Standard 35 requires that upon a patient's admission, the patient and his or her family, guardian, or next-of-friend should receive written notice in understandable language of the *Wyatt* standards.[133] It also requires that all standards be posted on each ward. Although, it appeared that the defendants were not yet in full compliance during trial, the defendants should now be in compliance. If the defendants supplement the record forthwith to show full compliance with this standard, the court will so find.

■ The defendants are not in compliance with standards 1, 4, 16, and 31. Standard 1 states that "Patients have a right to privacy and dignity." [134] The defendants require adults to stand naked in the hallway to await group showers.[135] Requiring adults to stand naked in the hallways violates their dignity and privacy. The defendants also place patients in four-point restraints in the middle of hallways, in front of nursing stations.[136] When placed in a four-point restraint a patient is lying on a movable bed spread eagle with his or her ankles and wrists tied to each corner. Placing an individual in such a compromising position in a public space for all to see is an affront to an individual's dignity. JCAHO survey teams have also found the defendants do not promote care for certain patients "in a manner that maintains or enhance[s] each resident's dignity and safety." [137] The defendants are not in compliance with standard 1.

■ Standard 4 requires that patients have the same rights to visitation and telephone calls as do patients at other public hospitals.[138] However, patients' visitors— families and friends—are not allowed to visit them on the wards, but must instead visit with the patients in public common areas which can be loud and noisy and often do not provide for privacy.[139] Today, most public hospitals allow visitors on the living units so that family and friends can observe the living conditions and treatment of loved ones.[140] Indeed, if the court is to release the defendants from any standards, such observation by loved ones is one of the most effective ways by which the court can be assured that the defendants will continue to respect the rights of patients in its hospitals.

■ Standard 16 provides that patients shall have an opportunity for religious wor-

**133.** Standard 35 provides:
"Each patient and his family, guardian, or next friend shall promptly upon the patient's admission receive written notice, in language he understands, of all the above standards for adequate treatment. In addition a copy of all the above standards shall be posted in each ward."

**134.** The defendants sought previously to vacate the standards establishing patients' rights to dignity, privacy, and humane care. *Wyatt v. King*, 803 F.Supp. 377 (M.D.Ala.1992) (Thompson, J.) (denying defendants' request to vacate mental-illness standard 1 and mental-retardation standard 15).

**135.** Plaintiffs' exh. I.A. 1(2) at ii–iii, 12 (Sundram's Bryce report); Transcript at 3948 (former patient Mrs. B. testimony) (describing lack of privacy in group showers).

**136.** Plaintiffs' exh. IV.A. 4(22) (advocacy program complaint intake) (describing patient in four-point restraint in front of ward in full view of other patients); transcript at 4779, 4870–72 (Bernstein testimony); plaintiffs' exh. I.C. 4(20) at 41–42 (deposition of Weathers); transcript at 4023–25 (Wolke testimony).

**137.** Plaintiffs' exh. IV.A. 2(52) at 17774–76 (Title XIX statement of deficiencies and plan of correction, Kidd, spring 1994); plaintiffs' exh. IV.A. 2(50) at 17699 (Title XIX survey report, Kidd, Feb. 1991) (noting among many other problems, patients' lack of privacy in toileting and bathing).

**138.** Standard 4 provides:

"Patients shall have the same rights to visitation and telephone communications as patients at other public hospitals, except to the extent that the Qualified Mental Health Professional responsible for formulation of a particular patient's treatment plan writes an order imposing special restrictions. The written order must be renewed after each periodic review of the treatment plan if any restrictions are to be continued. Patients shall have an unrestricted right to visitation with attorneys and with private physicians and other health professionals."

**139.** Plaintiffs' exh. I.A. 1(2) at iii, 14 (Sundram's Bryce report).

**140.** *Id.* at 14.

ship.[141] While patients have an opportunity to worship, Protestants do not have the opportunity to worship with the denomination of their choice.[142]

■ Standard 31 sets forth the confidentiality rules for patient records.[143] The standard sets forth who may have access to a patients records and what each record shall include at a minimum. The defendants are not in compliance with several provisions of the standard. First, the plaintiff-class's attorneys and their designated agents are among the individuals who entitled to access to a patient's records, notwithstanding applicable rules and statutes. As previously shown, the defendants violated this standard when they sent to each guardian or parent of a resident a misleading letter. The letters misled the guardians and parents about the nature of this litigation. But, in addition to this, as stated, the letters incorrectly suggested that the defendants needed the approval of the guardian or parent in order for the plaintiffs-class's attorneys to see a patient's record.[144]

Standard 31 is also violated in that certain items required by the standard to be in the patient's record are not always there. For example, any physical restraint or seclusion, including soft restraints, requires a signed order by a qualified physician in the patient's file. There is not always a signed order by a physician for every instance of seclusion or restraint. Additionally, summaries of extraordinary incidents in the facility involving the patient are to be included in the file. However, often these are included in an incident report only and are not in the patient's file. These are just some examples of the missing items in patient's records. Thus, the court finds that the defendants do not comply with standard 31 sufficiently.

In sum, the defendants have made progress in assuring patient's personal liberties and are in compliance with standards 3, 5, 11, 17, and 18. However, they still have some progress to make as to standards 1, 4, 14, 15, 16, 31 and 35.

3. Treatment and Record Keeping: Mental-illness Standard 26

■ *Wyatt* mental-illness standard 26 is a comprehensive and detailed standard requiring that the defendants develop and implement for each individual patient an individual treatment plan.[145] The essence of this standard is to provide the committed patients, whose freedom has been taken away, individual treatment that will give each patient a realistic opportunity to be cured or to improve his or her mental condition. *Wyatt*, 325 F.Supp. at 784. Under this standard, each patient shall have an individual treatment plan developed by a treatment team. The standard has many requirements as to how the plan shall be developed, what it shall

141. Standard 16 provides:
"The right to religious worship shall be accorded to each patient who desires such opportunities. Provisions for such worship shall be made available to all patients on a nondiscriminatory basis. No individual shall be coerced into engaging in any religious activities."

142. Plaintiffs' exh. I.A. 1(2) at 21 (Sundram's Bryce report).

143. Standard 31 provides:
"Confidentiality of the patient record shall be protected through strict adherence to applicable statutes and rules. Notwithstanding the preceding, the following shall have access to a patient's record: (a) the patient; (b) the patient's guardian; (c) individuals properly authorized in writing by the patient or the patient's guardian; (d) attorneys for the plaintiff class and their designated agents; (e) the Alabama Disabilities Advocacy Program, or its successor, in accordance with applicable law;

and (f) properly authorized employees of the Alabama Department of Mental Health and Mental Retardation, including the staff of the Department's Internal Rights Protection and Advocacy Program."
The standard then sets forth what each patient record shall include at a minimum. This list may be found at court's exh. 2.

144. *See, e.g.,* Plaintiffs' submission of excerpts of transcript of July 21, 1994 proceedings before the magistrate judge regarding defendants sending communications to guardians and employees, filed May 15, 1995 (Doc. no. 1032); plaintiffs' comments on the need for remedial notice, filed February 16, 1995 (Doc. no. 620); defendants' comments regarding notice to guardians, next-of-kin, and family members, filed February 16, 1995 (Doc. no. 623).

145. Standard 26 is too long to reproduce in this opinion. It can be found in its entirety at court's exh. 2.

contain, and how it shall be implemented and updated. It also requires "utilization review." Utilization review requires the facility to review a patient's need for continued inpatient treatment according to certain criteria, including applicable standards for commitment.[146] If a patient no longer meets the criteria, he or she must be released immediately and linked to appropriate community services, unless the patient agrees to continued voluntary treatment in the facility.

While all patients are given a comprehensive individual treatment plan upon admission, these plans are not always implemented, nor for the intermediate and long-term patients are they updated.[147] Psychiatric assessments of intermediate and long-term patients are often outdated and cursory.[148] For example, in one long-term unit at Bryce Hospital, the average length of time since the last psychiatric assessment was in excess of seven years.[149] Furthermore, untrained and unqualified staff are asked to update treat-

ment plans.[150] Indeed, Greil Memorial Hospital received the lowest form of accreditation awarded by JCAHO recently because of serious deficiencies throughout the hospital, which included deficiencies in treatment planning and therapeutic activities.[151]

Other patients simply do not belong in the hospital in violation of the "utilization review" portion of this standard and other standards relating to least restrictive environment. For example, some patients' only "active" problems are the unavailability of community services.[152] For other patients their treatment plans failed to target the behavior that is keeping them in the hospital. For example, charts reviewed by one of the plaintiffs' experts identified treatment goals that addressed non-psychiatric problems, such as incontinence, obesity, and foot fungus.[153]

Furthermore, an absence of activities and programs exacerbates patients' conditions.[154] Many patients at Bryce spend their days idly, with little or nothing to do.[155] Meaning-

**146.** The *Lynch* standards have since been vacated in favor of state's new civil commitment statute. *See supra* note 22.

**147.** *See, e.g.,* Plaintiffs' exh. I.A. 1(2) at vi–vii, 31, 36–41, 57 (Sundram's Bryce Report).

**148.** Transcript at 4846–47 (Bernstein testimony); plaintiffs' exh. I.B. 1(6) at 8–14 (Bernstein report); plaintiffs' exh. I.B. 1(7) at 25 (Olson report).

**149.** Plaintiffs' exh. I.B. 1(6) at 10 and table 1 (Bernstein report); transcript at 4846–47 (Bernstein testimony); plaintiffs' exh. I.B. (7) at 25 (Olson report) (for many chronically mentally ill and long-term patients treatment strategies are simply carried forward without any consideration of whether they are working).

**150.** For example, Shirley Hodo, an activities specialist with a 12th grade education and no clinical training, testified that she and other activities workers were asked to complete and update treatment plans. Transcript at 7151–54 (Hodo testimony); plaintiffs' exh. I.C. 4(16) at 69–75 (deposition of Hodo). While Hodo is no longer engaged in reviewing and updating treatment plans because she complained that she was unqualified, other employees with similar qualifications continue to do so. Transcript at 7154 (Hodo testimony).

**151.** Plaintiffs' exh. IV.E. 2(31) at 01943 (JCAHO official accreditation report, Feb. 1993) (noting that psychiatric nursing interventions not identified, unless related to physical care, restraint and

seclusion, or assaultive behavior). Title XIX surveys at Greil have found similar deficiencies in treatment planning. Plaintiffs' exh. IV.E. 2(38) at 01834 (Title XIX survey report, Greil, Oct. 1991) (finding treatment plans not specific or detailed enough and therapeutic interventions by RNS absent in most records); plaintiffs' exh. II.D. 6(2) at B19, B23, B79–81 (Title XIX survey report, Greil Hospital, Apr. 1990) (treatment planning not individualized and therapeutic interventions not specific or sufficiently focused to guide staff).

**152.** Transcript at 4850 (Bernstein testimony); plaintiffs' exh. I.C. 3(2) at 321–23 (deposition of Callahan).

**153.** Transcript at 4849 (Bernstein testimony).

**154.** Plaintiffs' exh. I.B. 1(6) at 6–8, 14–16 (Bernstein report).

**155.** Transcript at 5135–36 (Olson testimony); plaintiffs' exh. I.B. 1(6) at 5–8, 14–16 (Bernstein report); plaintiffs' exh. I.B. 1(8) at 10 (Cheren report); plaintiffs' exh. II.D. 6(2) at Tag B79–81 (Title XIX survey report statement of deficiencies and plan of correction, Greil, Apr. 1990,) (noting that activities program consists entirely of diversional activities except for two leisure education groups per week and a macrame class and that for patients who remain on wards, therapeutic activities were limited).

Dr. Parker, a community mental health provider, confirms these observations, transcript at

ful daily activities are critical to the treatment programs for persons with mental illness.[156]

The absence of activities is even more pronounced at the Kidd, Allen, and Box nursing facilities, which serve older adults. Adults are lined up in a circle around the day rooms in geri-chairs and/or restraints all day, doing nothing.[157] The absence of meaningful activities for older adults, especially those with dementia, results in their becoming more withdrawn and apathetic and in further cognitive deterioration.[158] Thus, quality of life significantly deteriorates.

For the reasons set forth above, the court concludes that the defendants are not in compliance with standard 26.

### 4. Medical Care: Mental-illness Standards 10, 25, and 30

Standard 10 states that "Patients have a right to receive prompt and adequate medical treatment for any physical ailments." Standard 25 requires that "Each patient shall have a comprehensive physical and mental examination and review of behavioral status within 48 hours after admission to the hospital." And standard 30 covers the treatment

of other physical illnesses, such as tuberculosis.[159]

The court has already found compliance with standard 25 and now finds compliance with standards 10 and 30.[160] The only reservation the court has as to these two latter standards is the failure of the defendants to provide condoms to patients who are HIV-positive and known to be sexually active. The court hopes that the defendants have addressed this problem.

Admittedly, the plaintiffs identified two or three deaths that they claimed resulted from inadequate care. They further claimed that patients in two cases had limbs amputated because of substandard care. The evidence surrounding these incidents is too insufficient and inconclusive to support the conclusion that defendants provided inadequate medical care to these patients and that the defendants are not entitled to a finding that they have complied with standards 10, 25, and 30.

### 5. Use and Administration of Psychotropic Medications: Mental-illness Standard 6

Standard 6 addresses medications. Standard 6 requires that patients not be medicated unless necessary, and it provides protections and procedures to ensure compliance.[161] The defendants violate this stan-

---

7258–59, as do the defendants' own experts. Plaintiffs' exh. I.C. 3(4) at 18, 48, 90–91, 163–64 (deposition of Fogel); plaintiffs' exh. I.C. 3(5) at 100–102, 123–24 (deposition of Gualtieri). Defendants' staff also confirm these observations. Plaintiffs' exh. I.C. 4(19) at 19 (deposition of Wilson); plaintiffs' exh. I.C. 4(20) at 23–24 (deposition of Weather).

**156.** Transcript at 4844–45 (Bernstein testimony).

**157.** Transcript at 6905–06, 6930–31 (Cheren testimony); transcript at 4866–67 (Bernstein testimony); plaintiffs' experts' reports IF (photo album of patients and conditions at Searcy); *see also* plaintiffs' exh. IV.A. 2(50) at 17708–09 (Title XIX survey post-certification revisit report statement of deficiencies and plan of correction, Kidd, June 13, 1991) (finding that facility does not provide on-going program of activities and most residents sat with nothing to do for most of the day).

**158.** Transcript at 4844–45 (Bernstein testimony).

**159.** Standard 30 provides:

"In addition to treatment for mental disorders, patients confined at mental health institutions also are entitled to and shall receive appropriate treatment for physical illnesses such as

tuberculosis. In providing medical care, the State Board of Mental Health shall take advantage of whatever community-based facilities are appropriate and available and shall coordinate the patient's treatment for mental illness with his medical treatment."

**160.** *See* plaintiffs' exh. I.A. 1(2) at iv, 23–24, (Sundram's Bryce report).

**161.** Standard 6 provides:

"Patients have a right to be free from unnecessary or excessive medication. No medication shall be administered unless at the written order of a physician. The superintendent of the hospital and the attending physician shall be responsible for all medication given or administered to a patient. The use of medication shall not exceed standards of use that are advocated by the United States Food and Drug Administration. Notation of each individual's medication shall be kept in his medical records. At least weekly the attending physician shall review the drug regimen of each patient under his care. All prescriptions shall be written with a termination date, which shall not exceed 30 days. Medication shall not be used as punishment, for the convenience of staff, as

dard in several ways. First, long-term patients are maintained with no improvement on stagnant medication regimes, in violation of professional standards that require experimentation to find drugs that are more effective.[162] Second, the defendants do not follow professional standards in administering drugs. Nurses sometimes initial that a drug has been administered prior to actually administering the medication. This unprofessional practice makes records and notations of medication unreliable in violation of professional standards.[163] Third, medication management does not adequately identify patients' adverse drug reactions.[164]

There was much evidence at trial that the defendants could be in violation of this standard because they were not using Clozaril. However, because there was also evidence that this is a new drug that can cause death in a small number of patients, the court cannot, and should not, fault the defendants for deciding, in their professional judgment, not to use the drug. Moreover, the court's duty does not extend to such minuscule oversight.

### 6. Adequate Staffing and Staff Supervision: Mental-illness Standards 21, 22, 23, and 24

■ Standards 21 through 24 are intended to require staffing and supervision sufficient to administer adequate treatment plans and ensure the safety and basic needs of patients.[165] Standard 21 requires that staff meet certain licensing requirements. The court has already found that the defendants comply with this standard. Standard 22 requires that the defendants provide a certain amount of staff training. The defendants also are in compliance with this standard.[166]

■ The defendants, however, are not in compliance with standards 23 and 24. Standard 23 addresses staff supervision, and re-

---

a substitute for program, or in quantities that interfere with the patient's treatment program."
"This court further understands that the administration of said megavitamin therapy will be only to a patient upon the informed consent of the patient and/or the consent of the patient's parent(s), guardian or next of kin after opportunities for consultation with independent specialists and with legal counsel."

**162.** Transcript at 5131, 5194–95 (Olson testimony); *id.* 7262 (Parker testimony).

**163.** Plaintiffs' exh. I.A. 1(2) at 28–29 (Sundram Bryce report).

**164.** Plaintiffs' exh. IV.F. 2(13) at 6 (JCAHO official accreditation report, North Alabama Regional, Nov. 9, 1994). A mock survey conducted by the Department prior to a JCAHO survey at Searcy detected similar deficiencies in medication practices. Plaintiffs' exh. IV.B. 2(40) at 10471 (memo from Mason to Bartlett re: Searcy Mock Survey, Jan. 25–27, 1994). Olson opined that the failure to recognize adverse drug reactions contributed to the death of a patient in the summer of 1994. Transcript at 5157–65 (Olson testimony); plaintiff's report at I.B. 1(7) at 23 (Olson report).

**165.** Standard 21 provides:
"Each Qualified Mental Health Professional shall meet all licensing and certification requirements promulgated by the State of Alabama, if any, for persons engaged in private practice of the same profession elsewhere in Alabama. Other staff members shall meet the same licensing and certification requirements promulgated by the State of Alabama, if any, as persons who engage in private practice of

their specialty elsewhere in Alabama. Notwithstanding the preceding, psychiatrists who have proven their proficiency in the practice of medicine by the successful completion of required examinations and who have been approved and granted a limited institutional license by the State Board of Medical Examiners may be employed for up to one year."

Standard 22 provides:
"a. All Non–Professional Staff Members who have not had prior clinical experience in a mental institution shall have a substantial orientation training.
"b. Staff members on all levels shall have regularly scheduled in-service training."

Standard 23 provides:
"Each non-QMHP staff member shall be under the supervision of a QMHP appropriate to the work assignment and professional discipline of that non-QMHP staff member. Additionally, the treatment of each patient shall be supervised by a QMHP, and the non-QMHP staff members involved in carrying out treatment activities prescribed in the patient's treatment plan shall be responsible to that QMHP."

Standard 24 provides specific staffing ratios for a whole range of mental health workers and staff members at the defendants' hospitals, ranging from psychiatrists and nurses to social workers, aids, typists, and dental hygienists. The standard in its entirety can be found at court's exh. 2.

**166.** Plaintiffs' exh. I.A. 1(2) at v, 30 (Sundram's Bryce report).

quires that staff who are not qualified mental health professionals be under the supervision of such professionals. The defendants are not in compliance with this standard because most non-professional staff is supervised by nurses who are not qualified mental health personnel. However, this practice is common in psychiatric hospitals, and thus the court would entertain a motion to modify this standard so as to place the defendants into compliance under their current practices.[167]

Standard 24 requires that the defendants meet certain staffing ratios. The specific ratios listed in the standard apply to Bryce and Searcy Hospitals only, and there is no evidence before the court that the defendants do not comply with these specific ratios at these two hospitals. The court therefore finds compliance with this standard.[168]

In summary, the court finds that the defendants are in compliance with standards 21, 22, and 24 and are not in compliance with standard 23.

### 7. Protection From Harm and Physical Safety: Mental-illness Standards 1 and 19

This court reads standards 1 and 19 to also require that patients confined by the defendants in their institutions be protected from harm. As stated, standard 1 provides that "Patients have a right to privacy and dignity," and standard 19 provides, in part, that "A patient has a right to a humane psychological and physical environment."[169] Patients are not protected from harm and provided a safe environment. Incident reports reveal large numbers of incidents of staff abuse of patients, patient-on-patient abuse, sexual abuse, and unexplained injuries.[170] Examples of abuse and neglect revealed in the incident reports include the following:

* On June 22, at Searcy, a mental health worker jumped a female patient who was mentally retarded. According to witnesses, the patient, was kicked in the stomach, on her buttocks, and between her legs. The mental health worker also pulled her hair and scratched her face. During the fight, other patients (and staff) gathered around, yelling encouragement to the worker.[171]

* On November 3, 1993, a female patient was sexually abused by a male mental health worker while seated with other patients in the courtyard. According to the female patient, another patient had rubbed the mental health worker to the point of arousal. The worker wanted the female patient to feel his erection. When she refused and tried to stand up, the mental health worker touched her breasts and grabbed her hand trying to get her to touch him.[172]

Mental health workers push, slap, and hit patients.[173] They also tolerate patient-on-patient abuse.[174]

Certain patients suffer repeated abuse, yet nothing is done. For example, Robert H., a named class member sustained more than 40 injuries over the course of a three-year-and-ten-month period.[175] This one patient was hit by a staff member with a clip board on the head, necessitating 14 sutures, and repeatedly beaten by staff members with coat

---

167. Plaintiffs' exh. I.A. 1(2) at v, 30–31 (Sundram's Bryce report).

168. However, inadequate staffing contributes to the defendants' failure to meet the safety and treatment standards. The court finds that the defendants' failure to adequately implement individual treatment plans in conformance with standard 26 and failure to protect patient's from harm in conformance with standards one and 19 demonstrates inadequate staffing. But these deficiencies are adequately addressed by the requirements in standards 1, 19, and 26.

169. See supra note 88.

170. Transcript at 4876–85 (Bernstein testimony).

171. Plaintiffs' exh. IV.B. 4(93).

172. Plaintiffs exh. IV.B. 4(48).

173. Plaintiffs' exh. I.B. 1(6) at 16–17 (Bernstein report);transcript at 4965–4966 (Bernstein testimony); plaintiffs' exh. IV.B. 4(74).

174. Plaintiffs' exh. I.C. 4(19) at 26 (deposition of Wilson).

175. See, e.g., Defendants' general exh. 427; transcript at 7083–84 (H.testimony); plaintiffs' exhs. IV.B. 4(32), IV.B. 4(73), IV.B., 4(78), IV.B. 4(80).

hangers.[176] Staff also allowed other patients to hurt this patient.

In a three-month period, reports indicated that another patient, John F., was beaten with coat hangers, choked, slapped, hit, and kicked by staff.[177] An advocacy program investigation disclosed 22 incidents in December 1993 alone as to this patient, including staff abuse and self-abusive behaviors.[178] The court concurs with the advocacy program in concluding that this patient's right to a safe environment was violated.[179]

In addition, there was the staff abuse and lack of safety at the Eufaula Adolescent Center. The court will not repeat this evidence.

These incidents are not isolated incidents. Abuse—staff-on-patient, patient-on-patient, and self-abuse due to the failure to provide treatment for maladaptive behaviors—is widespread.[180] Abuse is not only physical, but also verbal.[181]

The defendants have failed to address this abuse in any meaningful and effective way. Indeed, the defendants' response to the widespread incidents of abuse verges on neglect. In part, this is due to problems Sundram identified in his reports on the defendants' investigatory process of incidents, which fails to identify the causes of incidents and recommend changes, so as to prevent future incidents.[182] At the mental-illness facilities, hospital police conduct investigations.[183] These investigations are narrowly focused on whether a criminal statute has been violated and do not focus on the cause of the incident and ways to avoid it in the future.[184] Files contain little to no suggestions for preventing future similar incidents.[185] Reports merely summarize witness statements with little to no analysis or evaluation; nor do reports analyze evidence. Most incidents are "unsubstantiated" even in the face of multiple patient witnesses and physical evidence. The investigators have little to no clinical training, especially in assessing the credibility of patient victims and witnesses. An even greater problem is under-reporting, that is, the failure to report incidents. The follow-up that the defendants conduct on investigations—facility, regional and central review through quality assurance and improvement programs—has failed to detect the deficiencies in investigations noted above.[186] As a result, it is rare that action is taken to correct problems and prevent further abuse from occurring.[187] After Sundram's studies, the defendants requested that he formulate specific written recommendations to address these investigatory problems. Sundram complied with their request, but the defendants, at the time of trial, had not implemented his suggestions, nor corrected the problems he identified.[188]

---

176. Transcript at 7043–49, 7083–85 (parent's and Robert H. testimony); plaintiffs exh. IV.B. 4(78) and IV.B. 4(80).

177. Plaintiffs' exhs. IV.B. 4(78), IV.B. 4(80), IV.B. 4(83), and IV.B. 4(88). Incident reports and investigations indicate that staff hit other patients with coat hangers as well.

178. Plaintiffs' exh. IV.B. 4(39) at A 8523–33.

179. *Id.* (advocacy concluding that defendants failed to provide John F. a safe environment and adequate treatment).

180. In addition to the above incidents, *see, e.g.,* plaintiffs' exh. IV.B. 4(139) at 00637–42.

181. Incident reports reveal numerous incidents of substantiated and unsubstantiated verbal abuse. *See, e.g.,* plaintiffs' exhs. IV.B. 4(53), III.B. 4(10), IV.B. 4(69), IV.B. 4(72), IV.B. 4(86).

182. Plaintiffs' exh. I.A. 1(1) at 2–3 (Sundram's supplemental report); *Id.* at appendix B (memo from Sundram to Poundstone, dated Nov. 6, 1993); plaintiffs' exh. I.A. 1(2) at employee, 66–69 (Sundram's Bryce report).

183. *Id.*

184. *Id.*

185. *Id.*

186. Plaintiffs's exhs. I.A. 1(1) at 2–3 (Sundram's supplemental report).

187. For example, after investigating a sexual assault on a 18–year–old female patient with a history of early childhood sexual abuse and a very low I.Q., the department concluded that two janitors engaged in sex with the patient, but that staff had not been negligent and no corrective action was necessary. Plaintiffs' exh. IV.B. 4(67) at 3223–24; Transcript at 4881–83, 5086, 5096 (Bernstein testimony).

188. Transcript at 7420–23 (Sundram testimony); plaintiffs' exh. I.A. 1(3) at appendix B (Sundram's supplemental report).

The advocacy program, while certainly benefitting patients, has also failed to prevent the abuse detailed above. There are insufficient numbers of advocates to handle all of the patients in the system.[189]

Moreover, as already indicated, the defendants tend to respond to any revelations of serious deficiencies—such as abuse and lack of safety—by coverup and denials, They tend to condemn the messenger of the deficiencies rather than address the problem itself.

### 8. Seclusion and Restraint: Mental-illness Standard 7

Standard 7 states patients' rights to be free from unreasonable seclusion and restraint.[190] Restraint usually refers to tying or strapping someone to a chair or bed. Seclusion refers to the practice of confining someone alone in a bare room. Under standard 7, these methods are to be used only as a last resort, after less restrictive interventions, such as social reinforcement of behavior, have failed, and never for staff convenience or as punishment. Thus, the standard prohibits seclusion or restraint, except for a small number of situations. If one of these situations arises, the standard has multiple procedures that must be used for placing and monitoring someone in seclusion or restraint. While the defendants have made significant progress in improving their seclusion-and-restraint practices, they have not complied with this standard to the extent they can be released.[191] The standards' requirements, which range from requiring a written order from a physician to using restraint only as a last resort, are not always followed; compliance is erratic. Patients are placed in restraints without the requisite orders, and patients are not always given the bathroom privileges and motion exercises that are required by the standard.[192] Restraints are often tied incorrectly, risking injury and causing discomfort to patients.[193] And staff have used sheets to restrain patients placing them at risk for strangulation and in violation of professional standards.[194]

There was also evidence of the improper and excessive use of restraints on elderly patients, and that this use has led to injuries and atrophy of the elderly's mobility. These cases do not, however, present brightline solutions. On the one hand, because the elderly are fragile, there is the reasonable need to restrain them to keep to keep them from falling and severely hurting themselves; but, and, on the other hand, there is the humane concern that they should be allowed some freedom of movement. The court cannot conclude that the defendants' treatment of the elderly has violated standard 7.

**189.** Plaintiffs' exh. I.B. 1(6) at 22 (Bernstein report).

**190.** Standard 7 provides:

"Patients have a right to be free from seclusion and physical restraint. Patients may be placed in seclusion or physically restrained only (a) to prevent a patient from physically injuring himself/herself or others, (b) after alternative treatment interventions have been unsuccessful or after determining—that alternative treatment interventions would not be practicable, and (c) when authorized by a written order of a qualified physician who is physically present and has examined the patient. No order for seclusion and restraint may exceed eight hours."

The standard then proceeds to spell out in detail exceptions to the above requirements, and additional protocols that must be followed when placing someone in seclusion or restraint.

**191.** Plaintiffs' exh. I.A. 1(2) at vii-viii, 43–50 (Sundram's Bryce report).

**192.** Plaintiffs' exhs. I.B. 1(6) at 37, 47–48 (Bernstein report); I.B. 1(8) at 2–3, 6–7 (Cheren report); see also plaintiffs' exhs. IV.B. 4(112) (no authorization for restraint); IV.B. 4(66) (same); plaintiffs' exh. I.C. 4(19) at 94–96 (deposition of Wilson).

One of the experts witnessed an elderly lady restrained in a chair throughout an entire day. This lady was restrained by a crotch and vest restraint, despite not having a physician's order for either of the two types of restraints. Her chart indicated that she was released for toileting and repositioning. However, this information was false. Testimony at 6942–45 (Cheren testimony). The practice of marking that the standard is complied with on the chart, yet failing to actually reposition patients and provide bathroom breaks is widespread. Transcript at 6941–45 (Cheren testimony).

**193.** Transcript at 6909–10, 6912–14, 6939–40 (Cheren testimony); see also plaintiffs' exh. IV.B. 4(111).

**194.** Plaintiffs' exh. IV.E. 4(6) at A 7106, A 7109; plaintiffs' exh. I.B. 1(8) at 4 (Cheren report); transcript at 6908–09 (Cheren testimony).

Furthermore, the Department of Mental Health and Mental Retardation's own data regarding the number of incidents are unreliable due to selective reporting and unwarranted narrow definitions of seclusion and restraint that exclude many occurrences.[195]

Instead of complying with *Wyatt* mental-illness standard 7, the defendants have implemented their own standards, which they contend protect patients' rights. These standards allow standing orders for restraints if a patient's consent is obtained and close monitoring of patients in seclusion and restraint.[196] These safeguards however are insufficient. First, patients cannot meaningfully assert their right to consent.[197] Furthermore, they are not always implemented.[198] More importantly, standard 7 has not been modified by the court, nor have the defendants sought to have it modified. The defendants cannot simply disregard standards with which they disagree.

### 9. Dangerous or Unusual Medical Procedures: Mental-illness Standards 8 and 9

Standard 8 gives patients the right not to be subjected to experimental research without informed consent and standard 9 prohibits lobotomies, psychosurgery, electro-convul-

sive therapy (ECT), and other unusual or hazardous medical procedures without strict safeguards.[199] The court has already found compliance with these standards.

### 10. Treatment in the Least Restrictive Environment Necessary to Achieve the Purposes of Commitment Transitional Community Services, and Community Facilities and Services: Mental-illness Standards 2 and 34 and ¶ 9 of the 1986 Consent Decree

■ As previously explained, one of the central goals of the 1986 consent decree was the development of community facilities and services. Paragraph 9 of the 1986 consent decree provides: "The defendants be and are hereby ENJOINED to continue to make substantial progress in placing members of the plaintiff class in community facilities and programs."[200] This provision in the consent decree essentially sought to implement mental-illness standards 2 and 34.[201]

Standard 2 states that "Patients have a right to the least restrictive conditions necessary to achieve the purposes of commitment." And standard 34 requires that patients not simply be released into the streets once they no longer require institutionalization, but instead be provided appropriate community

---

**195.** The defendants do not include in their reported numbers of seclusions and restraints those implemented as part of a behavior management plan, "non-psychiatric" restraints (e.g. soft restraints on elderly patients), and unofficial seclusions and restraints. Plaintiffs' exh. IV.B. 1(6) at 38; transcript at 4855–70 (Bernstein testimony).

**196.** Plaintiffs' exhs. IV.A. 3(22) at 9999–10,000; plaintiffs' exh. IV.A. 3(4) at 8–9 (advocacy appeal report).

**197.** Plaintiffs' exh. I.B. 1(7) at 15 (Olson report); I.B. 1(6) at 38 (Bernstein report); plaintiffs' exh. IV.A. 3(4) at 8–9 (advocacy report).

**198.** Plaintiffs' exh. IV.A. 3(4) at 8–9 (Advocacy report).

**199.** Standard 8 provides:

"Patients shall have a right not to be subjected to experimental research without the express and informed consent of the patient, if the patient is able to give such consent, and of his guardian or next of kin, after opportunities for consultation with independent specialists and

with legal counsel. Such proposed research shall first have been reviewed and approved by the institution's Human Rights Committee before such consent shall be sought. Prior to such approval the Committee shall determine that such research complies with the principles for research involving human subjects published by the American Psychiatric and Psychological Associations and with those required by the United States Department of Health, Education and Welfare for projects supported by that agency."

Standard 9 is too long to reproduce in this opinion. It can be found in its entirety at court's exh. 2. It addresses the prohibitions on lobotomies and intrusive surgeries, aversive conditioning, electro-convulsive treatment (ECT), and lists in detail all procedures and protections that must be followed if any of these therapies, such as ECT, are administered.

**200.** *Wyatt*, 1986 WL 69194, at *7, ¶ 9.

**201.** Previously, the defendants sought unsuccessfully to eliminate all provisions in the consent decree requiring that treatment be provided in the least restrictive environment. *Wyatt*, 803 F.Supp. at 379–80.

care when released, whether that be a residential live-in program in the community teaching important daily living and coping skills, day treatment, or intermittent crisis care.[202]

The least restrictive environment necessary to achieve the purposes of commitment is a highly individualized concept, requiring that, based on professional judgment, each individual live as independently and with as few restrictions on his or her liberties as practicable.[203] This means that while patients are in the hospital they should be treated in the least restrictive environment that is necessary to achieve the purposes of their commitment. Thus, for example, if a patient does not require restraints, then to place him or her in restraints violates this standard. Or, for example, if a patient does not need to be on a locked ward, placing that individual on a locked ward, or revoking ground privileges if unnecessary for treatment, violates this standard. This standard also requires that if a patient need not be in an institution, that is, they can be either treated adequately in the community with community supports and programs, or they no longer meet the criteria for commitment to an institution, they be released.[204] Based on the professional judgment of their own staff, the defendants do not comply with these requirements.

First, the defendants practice of placing patients on locked wards initially and then allowing them to earn their right to less restrictions violates this standard.[205] Often there are no rationales or justifications for restrictions, such as locked wards and no grounds privileges.[206]

Second, while clearly some individuals with mental illness must be confined in institutions, not all of the individuals in the defendants' institutions belong there. Some patients do not require hospitalization in order to meet the purposes of their commitment. With appropriate supports they can be treated in the community. And some patients meet the commitment criteria only because of the lack of available community services. That is, without these community services they become dangerous either to themselves or to others, but with these services they would not need to be committed in the first place.

In 1986, the defendants committed themselves under the terms of the consent decree to developing a broad range of community facilities and programs to ensure that standards 2 and 34 would be implemented. This range of facilities and programs included a continuum of residential settings for the mentally ill from the most intensively staffed to the least intensively staffed, day treatment programs, a range of psychosocial and vocational rehabilitation programs geared to patients who have a wide variation in skills and functional levels, case management services, substance abuse programs, crisis intervention services, and inpatient services in local hospitals or crisis residences.[207] Establishing these facilities and programs would make unnecessary the ongoing hospitalization in state institutions of hundreds of patients.[208] Through the consent decree and numerous discussions with the *Wyatt* Committee, the Department of Mental Health and Mental Retardation acknowledged the need for these facilities and programs and began to establish them.[209] While the defendants have

---

**202.** Standard 34 provides:
"The Mental Health Board and its agents have an affirmative duty to provide adequate transitional treatment and care for all patients released after a period of involuntary confinement. Transitional care and treatment possibilities include, but are not limited to, psychiatric day care, treatment in the home by a visiting therapist, nursing home or extended care, out-patient treatment, and treatment in psychiatric ward of a general hospital."

**203.** *See, e.g.,* transcript at 7270 (Parker testimony).

**204.** *See also Wyatt,* 773 F.Supp. at 1511–17.

**205.** Plaintiffs' exh. I.A. 1(2) at viii, 51–52 (Sundram's Bryce report).

**206.** *Id.*

**207.** Plaintiffs' exh. I.A. 5(3) at 1–2 (Wyatt Consultant Committee's March 19, 1991 Report to the Court).

**208.** *Id.* at 2.

**209.** *Id.*

made progress, they have failed to allocate the requisite resources to develop the needed community-based facilities and services.[210] The defendants have created a paper structure of a broad range of community facilities and programs, but they have failed to devote the resources needed to develop them.[211] One of the most egregious failures is the failure to develop crisis services. Only five of Alabama's 22 community mental health boards have crisis programs.[212] Case management services are either not provided or are inadequate because the case manager's load is far too high,[213] and community services for the elderly are seriously deficient.[214] The gap between the services that exist and those that are needed is substantial.

As a result of the failure to fund community facilities and programs, individuals who need not be institutionalized remain in institutions where their freedom to live as normal and free a life as possible is significantly diminished.[215] The record is replete with examples of patients for whom there is no clinical justification for continued institutionalization. At the periodic recommitment hearings, required by this court in 1991, many patients were recommitted or placed on voluntary status because of the absence of community alternatives.[216] And other individuals slated for community placements are required to wait months for an opening or are transferred to another institution, such as Thomasville, which is not the least restrictive environment appropriate.[217]

The defendants' failure at achieving this goal is underscored by the fact that they have been under an obligation since 1986 to provide community facilities and programs for those entitled to be the least restrictive environment in light of professional judgment.

Not only does the Department of Mental Health and Mental Retardation fail to discharge patients who do not necessarily require hospitalization if given the appropriate community supports, when it does discharge

---

**210.** Plaintiffs' exh. I.E. 2(1) at 129, 308–09 (deposition of Dill, a community provider); exh. II.E. 20 (letter, dated Sept. 29, 1987 from Wyatt Committee to Commissioner Farland); transcript at 7191 (Dill testimony) (funding is primary barrier to developing community services); plaintiffs' exh. I.E. 2(2) at 95 (deposition of Lovett); *see also* plaintiffs' exh. I.A. 5(3) at 2 (Wyatt Committee's March 19, 1991 Report to the court).

**211.** *See* transcript at 7267–69 (Parker testimony).

The Department contracts with community health center boards for community services. Transcript at 3629 (Fetner testimony).

**212.** Transcript at 7194–98 (Dill testimony). The defendants have not created the crisis beds that the capital improvements portion of the 1986 consent decree in ¶ 10 required.

The community mental health centers engaged in a lengthy planning process for additional crisis services, but the Department of Mental Health and Mental Retardation failed to request any resources from the legislature to fund crisis services. Transcript at 7202–03 (Dill testimony); plaintiffs' exh. I.E. 2(4) at 38–39 (deposition of Bisbee).

**213.** Transcript at 7272, 7292–93 (Parker testimony); plaintiffs' exh. I.E. 2(4) at 24, 32–34 (deposition of Bisbee).

**214.** Plaintiffs exh. I.C. 3(4) at 128–30 (deposition of Fogel); transcript at 1059–60 (Gualtieri testimony).

**215.** For example, reviewers at Bryce found that in a sample of 27 records, 12 patients were psychiatrically stable and did not require inpatient psychiatric hospitalization. These patients remained at Bryce due to the lack of appropriate placements in nursing homes or community residential options. Plaintiffs' exh. I.A. 1(2) at viii, 54–57 (Sundram's Bryce report); *see also* transcript at 7267, 7267–68 (testimony of Dr. Parker, a community provider in Alabama); *id.* at 7724–26 (Sundram testimony); *id.* at 5141–44 (testimony of Olson); *id.* 4849–51 (Bernstein testimony); plaintiffs' exh. IV.H. 2.

**216.** Plaintiffs' exh. IV.E. 2(16) (memo dated Jan. 9, 1995 from Paul Bisbee to James Reddoch re: conversion to voluntary status; memo dated Jan. 12, 1995 from Kimberly Ingram to Charles Fetner re: TMRHC voluntary admissions; memo dated Jan. 5, 1995 from Susan Chambers to Larry Latham); plaintiffs' exh. I.E. 3(1) at 15–16 (deposition of Ransone).

**217.** Transcript at 7268–69 (Parker testimony) (describing how hospital discharge practices needlessly slow down the discharge process); *id.* at 4850–51 (Bernstein testimony) (describing how some patients remain in hospital for years after determination is made that they are ready for discharge); *id.* at 7724–26 (Sundram testimony).

patients it fails to provide adequate transitional care and sometimes places patients in substandard facilities.[218] The defendants typically do no more to ensure adequate transitional care than make a phone call to schedule an appointment for discharged patients at a community mental health center. There is no follow-up to ensure that a patient has kept the appointment and is receiving services from the community mental health center.[219] The court finds that the defendants have failed miserably at meeting standard 34.

In 1991, the defendants moved to vacate standard 34, which requires transitional services. In moving to vacate standard 34, the defendants admitted that they consciously violated then standard 33 (requiring discharge of patients who do not need hospitalization), in order not to have to comply with standard 34. In denying their motion, the court noted that the defendants had "essentially ignored both standards over the years." *Wyatt*, 811 F.Supp. at 1544. By seeking to eliminate the standard, the defendants sought "to bring the court into complicity with their unexcused failure for over 20 years to comply with both Standards 33 and 34." *Id.* This willful violation demonstrates the gravity and duration of defendants' failure to comply with standards 2 and 34 and paragraph nine of the 1986 consent decree.

The court recognizes that the defendants have begun to make progress in discharging patients who are unnecessarily hospitalized. However, this progress is recent and there is no guarantee that they will continue along this path to the extent necessary under the consent decree. An update on the defendants' progress may, and should, reveal more substantial compliance with standards 2 and 34.

### 11. Children's Services: Mental-illness Standard 32

Standard 32 addresses the special needs of children and young adults.[220] Standard 32 requires that the Department of Mental Health and Mental Retardation make special provisions for children in its facilities, including educational opportunities, treatment that considers the child's maturational and developmental level, sufficient staff specialized in the care of children, recreational and play opportunities in the open air, appropriate residential facilities, and arrangements for contact between the hospital and the family.

Apart from evidence on the Eufaula Adolescent Center, very little evidence was provided or highlighted at trial on the services to adolescents in the defendants' other hospitals, such as the Bryce Adolescent Unit. While the evidence is sketchy, it appears that the defendants provide the bare minimum of adolescent services required by standard 32.

---

218. Foster and nursing home placements are made directly by the department without the involvement of the community mental health centers. Some lower functioning patients discharged to foster and nursing homes are placed in homes where they receive substandard care. Care givers at many of the foster homes lack mental health training and medication practices violate professional standards. Plaintiffs' exh. I.E. 2(3) at 76–77, 85–90, 118–19 (deposition of Oetting). And some of the nursing homes fail to meet the most minimal of humane and professional standards. Plaintiffs' exh. I.E. 3(2) at 22, 26, 31–32 (deposition of Raney, an Advocate for Alabama Disabilities Advocacy Program); transcript at 5361, 5369, 5372–78, 5381–84,5398–99 (Walker testimony).

219. Plaintiffs' exh. I.A. 1(2) at ix, 59 (Sundram's Bryce report).

220. Standard 32 provides:
 "In addition to complying with all the other standards herein, a hospital shall make special provisions for the treatment of patients who are children and young adults. These provisions shall include but are not limited to:
 "a. Opportunities for publicly supported education suitable to the educational needs of the patient. This program of education must, in the opinion of the attending Qualified Mental Health Professional, be compatible with the patient's mental condition and his treatment program, and otherwise be in the patient's best interest.
 "b. A treatment plan which considers the chronological, maturational, and developmental level of the patient;
 "c. Sufficient Qualified Mental Health Professionals, teachers, and staff members with specialized skills in the care and treatment of children and young adults;
 "d. Recreation and play opportunities in the open air where possible and appropriate residential facilities;
 "e. Arrangements for contact between the hospital and the family of the patient."

Thus, the court finds compliance with standard 32.

### 12. Summary as to Mental-illness Standards

In conclusion, as to the mental-illness standards, the court finds that the defendants have made significant improvements in their facilities since this litigation began in 1970. The defendants, for the most part, provide clean environments where basic needs are met and develop initially individual treatment plans for each patient. However, significant violations of individual liberties remain as to privacy and safety, violations of professional standards as to the administration of psychotropic medications, updating and implementing adequate treatment programs, safety and abuse, staffing, and the availability of community services for patients, who in the opinion of the state's own professionals, could be returned to their communities if such facilities were available.

For the above reasons, the court concludes as follows:

(1) The defendants are in compliance with the following mental-illness standards: 3 (no incompetency by reason of commitment), 5 (send/receive mail), 8 (experimental research), 9 (lobotomy/averse conditioning, etc.), 10 (prompt and adequate medical treatment), 11 (wear own clothes; keep possessions), 12 (clothing allowance, selection), 13 (laundering of clothes), 17 (interaction with members of opposite sex), 18 (patient labor, etc.), 20 (nutritional standards), 21 (staff licensing and certification requirements), 22 (orientation training for nonprofessional staff), 24 (minimum number of treatment personnel), 25 (patient exams following admission), 30 (entitlement to physical care), and 32 (special provisions for children, young adults).

(2) The defendants are not in compliance with the following mental-illness standards: 1 (privacy and dignity), 2 (least restrictive conditions), 4 (visitation rights), 6 (freedom from unnecessary medication), 7 (freedom from seclusion/physical restraint), 14 (physical exercise), 15 (outdoors at regular intervals), 16 (religion), 19 (humane environment; facilities; etc.), 23 (supervision of staff, patient treatment), 26 (individualized treatment plan, etc.), 31 (confidentiality of records, etc.), 34 (transitional treatment post-release), and 35 (written notice of mental illness standards).[221]

## C. *Wyatt* Mental–Retardation Standards

The defendants operate five mental retardation developmental centers: Partlow Developmental Center, Albert P. Brewer Developmental Center, J.S. Tarwater Developmental Center, Glen Ireland II Developmental Center, and Lurleen B. Wallace Developmental Center. Each of these facilities is a residential training center for individuals with mental retardation and developmental disabilities. The total current census in these facilities is approximately 1000.

There are 47 current mental-retardation standards.[222] The court, as stated, has already made partial findings of compliance under Rule 52(c) of the Federal Rules of Procedure as to 14 of these standards: 8 (evaluation within 14 days of admission), 17 (no incompetency by reason of commitment), 18 (religion), 19 (telephone/visitation rights), 20 (send/receive mail), 21 (interaction with opposite sex), 23 (no seclusion; "time-out" ok), 24 (behavior modification only with consent), 25 (electric shock only for extraordinary circumstances), 29 (no experimental treatment without consent), 30 (no unusual or hazardous treatment without consent), 32 (outdoors at regular intervals), 33 (resident labor, etc.), and 45 (no organ removal). *Wyatt v. Poundstone*, No. 3195–N, 1995 WL 569121 (M.D.Ala. April 18, 1995) (Thompson, J.).

The court assesses the defendants' compliance with the mental-retardation standards by category: (1) physical environment;

---

**221.** Mental-illness standards 27, 28, 29, and 33 have been deleted or superceded. *See supra* note 12 and accompanying text.

**222.** Court's exh. 1.

(2) custodial care; (3) residents' rights; (4) habilitation and programming; (5) least restrictive environment; (6) medication, medical care, and restraint; (7) adequate staffing; and (8) protection from harm. While the court makes findings of compliance for the department's mental-retardation facilities as a whole, the court notes at the outset that there are significant differences in levels of compliance among the different facilities. The court recognizes that certain facilities, such as Brewer, have made significant progress in certain areas, such as habilitation. However, other facilities, such as Wallace and Ireland have failed to make progress and their practices still do not conform to minimal professional standards. Because of the scope of this lawsuit, the court finds compliance and noncompliance as to the mental-retardation system as a whole. Furthermore, the court notes that not one facility is in compliance with all the relevant standards, and therefore none would be eligible for release entirely.

### 1. Physical Environment: Mental-retardation Standard 38

Mental-retardation standard 38 states that "A resident has a right to a humane physical environment within the institutional facilities.

**223.** The standard in its entirety is too long to reproduce in this opinion. The standard can be found at court's exh. 1.

**224.** Plaintiffs' exh. I.A. 1(1) at iii, 5–7 (Sundram's Brewer report).

**225.** *Id.* at 6.

**226.** *Id.*

**227.** Mental-retardation standard 34 provides:
"A nourishing, well-balanced diet shall be provided each resident.
a. The diet for residents shall provide at a minimum the Recommended Daily Dietary Allowance as developed by the National Academy of Sciences. Menus shall be satisfying and shall provide the Recommended Daily Dietary Allowances. In developing such menus, the institution shall utilize the Moderate Cost Food Plan of the United States Department of Agriculture. The institution shall not spend less per patient for raw food, including the value of donated food, than the most recent per person costs of the Moderate Cost Food Plan for the Southern Region of the United States, as compiled by the United States Department of Agriculture, for appropriate groupings of residents,

These facilities shall be designed to make a positive contribution to the efficient attainment of the habilitation goals of the institution."[223] The standard has specific requirements for day rooms, toilets and lavatories, showers, residential units, dining facilities, linen servicing and handling, housekeeping, nonambulatory services, and maintenance and safety of the physical plant. The defendants have made significant progress in upgrading the physical environment at their mental-retardation facilities and, for the most part, the defendants comply with this standard.[224] There are inconsistencies in the availability of adaptive equipment at the defendants' facilities, such as an absence of light alarms for the deaf and hearing impaired.[225] The absence of adaptive equipment shall be corrected by the defendants. With this exception noted, the court finds compliance with this category and standard.[226]

### 2. Custodial Care: Mental-retardation Standards 34, 35, and 37

Mental-retardation standards 34, 35, and 37 address an adequate diet, adequate clothing, and normal grooming, such as teeth brushing and bathing.[227] While the defen-

discounted for any savings which might result from institutional procurement of such food.
b. Provisions shall be made for special therapeutic diets and for substitutes at the request of the resident, or his guardian or next of kin, in accordance with the religious requirements for any resident's faith.
c. Denial of a nutritionally adequate diet shall not be used as punishment.
d. Residents, except for the non-mobile, shall eat or be fed in dining rooms."

Standard 35 provides:
"Each resident shall have an adequate allowance of neat, clean, suitably fitting and seasonable clothing.
a. Each resident shall have his own clothing, which is properly and inconspicuously marked with his name, and he shall be kept dressed in this clothing. The institution has an obligation to supply an adequate allowance of clothing to any residents who do not have suitable clothing of their own. Residents shall have the opportunity to select from various types of neat, clean, and seasonable clothing. Such clothing shall be considered the resident's throughout his stay in the institution.
b. Clothing both in amount and type shall make it possible for residents to go out of doors in inclement weather, to go for trips or

dants have made progress in improving custodial care, they still have failed to ensure that all residents at all of their institutions are provided minimal upkeep.

Standard 34 requires that residents be provided a nourishing and well-balanced diet. The department contracts with a food service, which provides residents with a nourishing and well-balanced diet.[228] The department, however, does not always comply with subsection (b) of the standard, which requires that therapeutic diets be provided to the residents.[229] Some residents require chopped food and liquid diets, but are fed solid food, which can result in choking.[230] Thus, the consequences of noncompliance can be fatal and is unexcused.[231] The court finds compliance with standard 34, with the exception of subsection (b).

Standard 35 requires that residents have an ample supply of neat, fitting, and seasonable clothing. It also requires that special clothing needs be met. Residents at Wallace and Ireland are not always provided neat, fitting, and appropriate clothing. They have been found wearing clothing that is not their own, misfitting, and inappropriate.[232]

Standard 37 requires that residents be regularly groomed and be assisted in learning good grooming practices, including brushing teeth, bathing, and nail cutting. While the defendants comply with this standard at Brewer, they do not comply with this standard at Wallace and Ireland.[233] The defendants fail to ensure that all residents' teeth are brushed, hair is washed, and clothing clean.[234] Many residents at Wallace have lost teeth as a result of inadequate dental hygiene.[235]

visits appropriately dressed, and to make a normal appearance in the community.
c. Nonambulatory residents shall be dressed daily in their own clothing, including shoes, unless contraindicated in written medical order.
d. Washable clothing shall be designed for multiply handicapped residents being trained in self-help skills, in accordance with individual needs.
e. Clothing for incontinent residents shall be designed to foster comfortable sitting, crawling and/or walking, and toilet training.
f. A current inventory shall be kept of each resident's personal and clothing items.
g. The institution shall make provision for the adequate and regular laundering of the resident's clothing."

Standard 37 provides:
"a. Each resident shall be assisted in learning normal grooming practices with individual toilet articles, including soap and toothpaste, that are available to each resident.
"b. Teeth shall be brushed daily with an effective dentifrice. Individual brushes shall be properly marked, used, and stored.
"c. Each resident shall have a shower or tub bath, at least daily, unless medically contraindicated.
"d. Residents shall be regularly scheduled for hair cutting and styling, in an individualized manner, by trained personnel.
"e. For residents who require such assistance, cutting of toe nails and fingernails shall be scheduled at regular intervals."

**228.** Plaintiffs' exh. I.A. 1(1) at 8–9 (Sundram's Brewer report).

**229.** Defendants' general exh. 5 at section beginning with W450 (Title XIX statement of deficiencies and plan of correction, Brewer, July, 1993) (documenting failure to provide residents with specially-prescribed diets); plaintiffs' exh. III.B. 3(23) at 12–16 (Title XIX statement of deficiencies and plan of correction, Partlow, Sept. 12–16, 1994 visit) (citing problems with intravenous feedings of residents).

Although the Title XIX surveys also found that residents did not receive adequately nourishing diets, the evidence at trial indicated the opposite, as did the report of Sundram.

**230.** Plaintiffs' exh. III.A. 2(45) at §§ I, IV, V.

**231.** *See, e.g.*, transcript at 6274–75 (Christian testimony) (describing death of resident who was on special puree diet, but choked to death on dry cake and chicken bone and noting previous choking incidents with same patient on solid foods).

**232.** U.S. MR exh. 135 at 66–68 (deposition of McCostlin) (describing male resident sent to school wearing women's pants that were far too small and given shoes 2 sizes too small to wear); transcript at 6173 (Sanders testimony) (parent describing finding son wearing shoes two sizes too small and toe nails bleeding).

Sundram found compliance at Brewer, but noted that much of the clothing had obviously been recently bought—it still in bags, had original creases, etc.

**233.** Plaintiffs' exh. I.A. 1(1) at 8 (Sundram's Brewer report).

**234.** For example, when one resident's parents visit they usually find his hair unwashed, his teeth unbrushed, his nails untrimmed, and his underwear soiled. Transcript at 6184–85 (Sanders testimony); U.S. MR exh. 131 at 4.

**235.** Transcript at 6185 (Sanders testimony).

For their mental retardation system as a whole, the court finds that the defendants are in compliance with standard 34, excluding subsection (b), and are thus not in compliance with standards 34(b), 35, and 37.

3. Residents' Rights: Mental-retardation Standards 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 27, 29, 30, 31, 32, 36, and 42

The court has, as stated, already found compliance with eleven of these 17 resident-rights standards (mental-retardation standards 17, 18, 19, 20, 21, 23, 24, 25, 29, 30, and 32),[236] and noncompliance with one (standard

**236.** Mental-retardation standard 17 provides:
"No person shall be presumed mentally incompetent solely by reason of his admission or commitment to the institution."

Standard 18 provides:
"The opportunity for religious worship shall be accorded to each resident who desires such worship. Provisions for religious worship shall be made available to all residents on a nondiscriminatory basis. No individual shall be coerced into engaging in any religious activities."

Standard 19 provides:
"Residents shall have the same rights to telephone communication as patients at Alabama public hospitals, except to the extent that a Qualified Mental Retardation Professional responsible for formulation of a particular resident's habilitation plan (see Standard 9) writes an order imposing special restrictions and explains the reasons for any such restrictions. The written order must be renewed semiannually if any restrictions are to be continued. Residents shall have an unrestricted right to visitation, except to the extent that a Qualified Mental Retardation Professional responsible for formulation of a particular resident's habilitation plan (see Standard 9) writes an order imposing special restrictions and explains the reasons for any such restrictions. The written order must be renewed semiannually if any restrictions are to be continued."

Standard 20 provides:
"Residents shall be entitled to send and receive sealed mail. Moreover, it shall be the duty of the institution to facilitate the exercise of this right by furnishing the necessary materials and assistance."

Standard 21 provides:
"The institution shall provide, under appropriate supervision, suitable opportunities for the resident's interaction with members of the opposite sex, except where a Qualified Mental Retardation Professional responsible for the formulation of a particular resident's habilitation plan writes an order to the contrary and explains the reasons therefor."

Standard 23 provides:
"Seclusion, defined as the placement of a resident alone in a locked room, shall not be employed. Legitimate "time out" procedures may be utilized under close and direct professional supervision as a technique in behavior-shaping programs."

Standard 24 provides:
"Behavior modification programs involving the use of noxious or aversive stimuli shall be reviewed and approved by the institution's Human Rights Committee and shall be conducted only with the express and informed consent of the affected resident, if the resident is able to give such consent, and of his guardian or next of kin, after opportunities for consultation with independent specialists and with legal counsel. Such behavior modification programs shall be conducted only under the supervision of and in the presence of a Qualified Mental Retardation Professional who has had proper training in such techniques."

Standard 25 provides:
"Electric shock devices shall be considered a research technique for the purpose of these standards. Such devices shall only be used in extraordinary circumstances to prevent self-mutilation leading to repeated and possibly permanent physical damage to the resident and only after alternative techniques have failed. The use of such devices shall be subject to the conditions prescribed in Standard 24, supra, and Standard 29, infra, and shall be used only under the direct and specific order of the superintendent."

Standard 29 provides:
"Residents shall have a right not to be subjected to experimental research without the express and informed consent of the resident, if the resident is able to give such consent, and of his guardian or next of kin, after opportunities for consultation with independent specialists and with legal counsel. Such proposed research shall first have been reviewed and approved by the institution's Human Rights Committee before such consent shall be sought. Prior to such approval the institution's Human Rights Committee shall determine that such research complies with the principles of the Statement on the Use of Human Subjects for Research of the American Association on Mental Deficiency and with the principles for research involving human subjects required by the United States Department of Health, Education and Welfare for projects supported by that agency."

Standard 30 provides:
"Residents shall have a right not to be subjected to any unusual or hazardous treatment procedures without the express and informed consent of the resident, if the resident is able to give such consent, and of his guardian or next of kin, after opportunities for consultation with

42).[237] The rights that are complied with range from the right to send and receive mail to the right not to be subjected to unusual or hazardous treatments. They are all complied with.

Standard 42 requires that a resident and his or her next-of-kin or guardian receive a copy of his or her rights under the *Wyatt* standards upon admission. As stated, the court has previously found that the defendants were not in compliance with this standard. However, it should take the defendants' little effort to achieve compliance promptly with this standard.

As for the remaining standards 15, 16, 27, 31, and 36, the court finds that the defendants are in compliance with standards 31 and 36, and not in compliance with standards 15, 16, and 27.[238] Standard 31 requires that a resident has a right to regular exercise several times a week. This standard is met.[239]

Standard 36 requires that residents be able to keep their personal possessions. With the exception of some problems with stealing, the defendants comply with this standard.[240]

Standard 15 states that "Residents shall have a right to dignity, privacy and humane care."[241] This standard is met to the extent the above rights are respected; however, it is not met to the extent residents are subject to abuse and neglect. Thus, the court finds noncompliance, but will explain this finding in its discussion of abuse and neglect.

Standard 16 ensures that residents maintain their rights as citizens of the United States and Alabama. As with standard 15, this standard is met to the extent that the above rights are respected; however, it is not met to the extent that residents' rights under the United States Constitution, as embodied, and defined by agreement of the parties, in the 1986 consent decree, are not respected. Thus, to the extent the defendants are in noncompliance with the decree they are in violation of standard 16.

Standard 27 states "Corporal punishment shall not be permitted." This standard is not complied with. Residents are subjected to corporal punishment by staff. The court will explain this findings in its discussion of abuse and neglect of residents.

Thus, while many of the residents' rights are respected and the defendants are in compliance with standards 17, 18, 19, 20, 21, 23, 24, 25, 29, 30, 31, 32, and 36, the defendants still violate significant and important resident's rights and are not in compliance with standards 15, 16, 27, and 42.

independent specialists and legal counsel. Such proposed procedures shall first have been reviewed and approved by the institution's Human Rights Committee before such consent shall be sought."

Standard 32 provides:
"Residents shall have a right to be outdoors daily in the absence of contrary medical considerations."

237. Standard 42 provides:
"The guardian or next of kin of each resident shall promptly, upon resident's admission, receive a written copy of all the above standards for adequate habilitation. Each resident, if the resident is able to comprehend, shall promptly upon his admission be orally informed in clear language of the above standards and, where appropriate, be provided with a written copy."

238. Standard 15 states that "Residents shall have a right to dignity, privacy and humane care."
Standard 16 provides:
"Residents shall lose none of the rights enjoyed by citizens of Alabama and of the United States solely by reason of their admission or commit-

ment to the institution, except as expressly determined by an appropriate court."

Standard 27 states "Corporal punishment shall not be permitted."
Standard 31 provides:
"Residents shall have a right to regular physical exercise several times a week. It shall be the duty of the institution to provide both indoor and outdoor facilities and equipment for such exercise."

Standard 36 provides:
"Each resident shall have the right to keep and use his own personal possessions except insofar as such clothes or personal possessions may be determined to be dangerous, either to himself or to others, by a Qualified Mental Retardation Professional."

239. Plaintiffs' exh. I.A. 1(1) at iv, 12 (Sundram's Brewer report).

240. Plaintiffs' exh. I.A. 1(1) at 8 (Sundram's Brewer report).

241. The defendants sought previously to have this standard eliminated. *Wyatt*, 803 F.Supp. at 382 (denying defendants' motion).

4. Habilitation and Programming: Mental-retardation Standards 1, 2, 5, 7, 8, 9, 11, 12, 14, 33, 43, and 44

These mental-retardation standards—1, 2, 5, 7, 8, 9, 11, 12, 14, 33, 43, and 44—require

that residents receive individual habilitation that is suited to their needs and maximizes their coping and living skills.[242] Habilitation is defined by the *Wyatt* mental-retardation standards as "the process by which the staff

**242.** Standard 1 provides:

"Residents shall have a right to habilitation, including medical treatment, education and care, suited to their needs, regardless of age, degree of retardation or handicapping condition."

Standard 2 provides:

"Each resident has a right to a habilitation program which will maximize his human abilities and enhance his ability to cope with his environment. The institution shall recognize that each resident, regardless of ability or status, is entitled to develop and realize his fullest potential. The institution shall implement the principle of normalization so that each resident may live as normally as possible."

Standard 5 provides:

"Residents shall have a right to receive suitable educational services regardless of chronological age, degree of retardation or accompanying disabilities or handicaps."

The standard goes on to require a written statement of educational objectives, a full and suitable educational program for school age children, and certain class sizes.

Standard 7 provides:

"Prior to his admission to the institution, each resident shall have a comprehensive social, psychological, educational, and medical diagnosis and evaluation by appropriate specialists to determine if admission is appropriate.

a. Unless such preadmission evaluation has been conducted within three months prior to the admission, each resident shall have a new evaluation at the institution to determine if admission is appropriate.

b. When undertaken at the institution, preadmission diagnosis and evaluation shall be completed within five days."

Standard 8 provides:

"Within 14 days of his admission to the institution, each resident shall have an evaluation by appropriate specialists for programming purposes."

Standard 9 provides:

"Each resident shall have an individualized habilitation plan formulated by the institution. This plan shall be developed by appropriate Qualified Mental Retardation Professionals and implemented as soon as possible but no later than 14 days after the resident's admission to the institution. An interim program of habilitation, based on the preadmission evaluation conducted pursuant to Standard 7, shall commence promptly upon the resident's admission."

The standard then lists elements which the individualized habilitation plan shall contain, including a description of the resident's intermediate and long-range habilitation goals and a statement of the least restrictive setting for habilitation necessary to achieve the habilitation goals of the resident, among other items.

Standard 11 provides:

"In the interests of continuity of care, one Qualified Mental Retardation Professional shall be responsible for supervising the implementation of the habilitation plan, integrating the various aspects of the habilitation program, and recording the resident's progress as measured by objective indicators. This Qualified Mental Retardation Professional shall also be responsible for ensuring that the resident is released when appropriate to a less restrictive habilitation setting."

Standard 12 provides:

"The habilitation plan shall be continuously reviewed by the Qualified Mental Retardation Professional responsible for supervising the implementation of the plan and shall be modified if necessary. In addition, six months after admission and at least annually thereafter, each resident shall receive a comprehensive psychological, social, educational and medical diagnosis and evaluation, and his habilitation plan shall be reviewed by an interdisciplinary team of no less than two Qualified Mental Retardation Professionals and such resident care workers as are directly involved in his habilitation and care."

Standard 14 provides:

"Complete records for each resident shall be maintained and shall be readily available to Qualified Mental Retardation Professionals and to the resident care workers who are directly involved with the particular resident. All information contained in a resident's records shall be considered privileged and confidential. The guardian, next of kin, and any person properly authorized in writing by the resident, if such resident is capable of giving informed consent, or by his guardian or next of kin, shall be permitted access to the resident's records."

The standard then goes on to list multiple items that must be included in residents' records, including among other items, the resident's grievances if any and 'a signed order by a Qualified Mental Retardation Professional for any physical restraints, as provided in standard 26(a)(1).

Standard 33 may be found in its entirety at court's exh. 1. The standard sets out in detail under what circumstances residents may be required or allowed to perform maintenance and housekeeping tasks at the facilities.

of the institution assists the resident to acquire and maintain those life skills which enable him to cope more effectively with the demands of his own person and of his environment and to raise the level of his physical, mental, and social efficiency. Habilitation includes but is not limited to programs of formal, structured education and treatment."[243] In lay terms, habilitation means helping individuals with mental retardation or developmental disabilities acquire needed skills. Its focus is on training and development. The term habilitation is used instead of treatment because mental retardation is a learning disability and training impairment rather than an illness. *Youngberg*, 457 U.S. at 309 n. 1, 102 S.Ct. at 2454 n. 1. The habilitation standards address what type of individual habilitation plans are required, what must be in those plans, how those plans shall be implemented and updated, and how parents or guardians shall be updated.

The court has already found compliance with standard 33, which spells out multiple rules for resident labor. It relates to habilitation in so far as labor tasks are or are not assigned as therapeutic tasks aimed at habilitation. The court also finds compliance with certain of the other habilitation standards. Those that merely address paper work and deadlines—that is, those that set deadlines for the development of a plan and evaluation, standards 7, 8, and 9, and the standard that addresses the availability and privacy of records, standard 14—are generally complied with.[244] Additionally, the defendants comply

with standards 5 and 44. Standard 5 requires that residents receive suitable educational services. The defendants comply with this standard. Standard 44 prohibits behavior modification programs in the absence of a physician's certification that the problem is not medically related and prohibits programs seeking to eliminate socially appropriate behavior. The defendants comply with this standard as well.[245]

As for the rest of the habilitation standards—standards 1, 2, 11, 12, and 43, which go to the minimal effect and quality of the habilitation and not just to the mere fact of paperwork or deadlines—the court finds noncompliance. Standards 1 and 2 together provide that each resident has a right to habilitation suited to his or her needs and which will maximize his or her abilities to cope with the world and to live a life as normal as possible.[246] Standards 11 and 12 together require that each residents' habilitation be supervised and integrated by a qualified mental retardation professional or QMRP. They require that the resident be released to less restrictive habilitation settings when appropriate, and that the habilitation plans be continuously reviewed and modified when necessary. These standards are also not being met.

Residents are not being provided adequate and minimally professional habilitation.[247] While the defendants have come a long way in beginning to habilitate their residents,

Standard 43 provides:
"The superintendent shall report in writing to the next of kin or guardian of the resident at least every six months on the resident's educational, vocational and living skills progress and medical condition. Such report shall also state any appropriate habilitation program which has not been afforded to the resident because of inadequate habilitation resources."

Standard 44 provides:
"a. No resident shall be subjected to a behavior modification program designed to eliminate a particular pattern of behavior without prior certification by a physician that he has examined the resident in regard to behavior to be extinguished and finds that such behavior is not caused by a physical condition which could be corrected by appropriate medical procedures.
"b. No resident shall be subjected to a behavior modification program which attempts to

extinguish socially appropriate behavior or to develop new behavior patterns when such behavior modifications serve only institutional convenience."

243. Court's exh. 1.

244. Plaintiffs' exh. I.A. 1(1) at iv–v, 16–18 (Sundram's Brewer report).

245. Plaintiffs' exh. I.A. 1(1) at 17 (Sundram's Brewer report).

246. The defendants sought previously to vacate the provision of standard 2 recognizing the rights of each mentally-retarded resident "to a habilitation program which will maximize his human abilities and enhance his ability to cope with his environment." *Wyatt*, 803 F.Supp. at 382 (denying defendants' motion).

247. *See, e.g.,* U.S. MR 2 at 2–20 (Christian report); transcript at 5564–65 (Metcalf testimony).

they still do not meet minimal professional standards. For example, while each resident has a habilitation plan, these plans are often not individualized and are inconsistently and inadequately implemented.[248] The defendants fail to meet minimal professional standards for teaching the acquisition of skills.[249] Many residents are provided nonfunctional tasks in violation of minimal professional standards.[250] A functional task is one that teaches the resident a functional skill that "enable[s] [the resident] to cope more effec-tively with the demands of his own person and of his environment." [251] For example, instead of being occupied with functional skills many residents spend their time sort-ing and doing make-work.[252] The defendants themselves have recognized that the resi-dents in their facilities have much greater potential to perform useful skills for which they could be paid than they currently teach them.[253]

Staff interaction with patients does little to aid habilitation.[254] Staff fail to adequately

248. U.S. MR 2 at 9 (Christian report); plaintiffs' exh. III.A. 3(31) at 9944–45 (Title XIX Survey, revisit at Ireland, July 8, 1994) ("facility staff did not demonstrate the skills and techniques neces-sary to implement the individual program plans for each client [ ] for whom they were responsi-ble"); plaintiffs' exh. III.B. 2(8) (Title XIX Sur-vey and Plan of Correction for Partlow, Sept. 1992 at # 2 3997–4000 (similar finding)); plain-tiffs' exh. III.C. 2(6) at 5–21 (Title XIX statement of deficiencies and plan of correction, Wallace, Dec. 1993) (finding that staff did not consistently implement or understand individual programs, additionally many sampled clients spent treat-ment time unoccupied with little or no staff di-rection, had programs implemented by staff that were not part of the client's individual program, or had programs implemented that were incon-sistent with the observed client behavior); plain-tiffs' exh. III.A. 2(5) at 60000419–20 (Title XIX statement of deficiencies and plan of correction, Ireland, May 6, 1993) (finding that 50% of resi-dents whose records were sampled did not have program plans based on their primary needs and that QMRP ultimately responsible for implemen-tation of plans had no knowledge of inadequate programs for 40% of these residents); plaintiffs' exh. III.A. 2(4) at 6000346–49 (Title XIX state-ment of deficiencies and plan of correction, Ire-land, Apr. 29, 1994) (facility staff lacked skills to implement individual habilitation programs and programs being implemented that were not part of client's individual program); plaintiffs' exh. III.E. 2(20) at 5853–58 (Title XIX statement of deficiencies and plan of correction, Tarwater, Sept. 10, 1993) (observing residents whose pro-grams "had not been consistently monitored and/or modified"); plaintiffs' exh. III.E. 2(36) at 9999–10002 (Title XIX statement of deficiencies and plan of correction, Tarwater, Aug. 17, 1994) (finding that residents' individual habilitation programs were not implemented); plaintiffs' exh. III.B. 3(23) at 17–24 (Title XIX statement of deficiencies and plan of correction, Partlow, Set. 12–16, 1994) (approximately one in four pro-gramming plans reviewed by surveyors did not adequately indicate residents' needs).

249. Plaintiffs' exh. II.A. 10(2) at 004895 (Ala-bama Behavior Analysis Peer Review Committee 1991–92 Annual Report) (finding that several of state's developmental centers did not meet mini-mal standards for programming because of a lack of trained staff and staff understanding of training, poorly designed program goals, improp-erly designed procedures, inconsistent imple-mentation, and lack of monitoring, among other problems. In 1993, the same report found that three developmental centers—Tarwater, Brewer, and Partlow—were making progress towards at-taining minimal standards in programming, but that other facilities, such as Ireland and Wallace had failed to make any progress. Plaintiffs' exh. II.A. 10(3) at 4880–81(1993 Alabama Behavior Analysis Peer Review Annual Report). In 1994, none of the state's developmental centers had yet achieved minimal programming standards, al-though several facilities, Wallace, Brewer, Part-low, and Tarwater, were making genuine prog-ress. Ireland, however, had failed to make any progress in its programming services. Plaintiffs' exh. IV.H. 20 at 9, 10 (1994 Alabama Behavior Analysis Peer Review Annual Report).

250. Transcript at 6310 (Christian testimony ); plaintiffs' exh. III.A. 3(30) at 10017–18 (Alabama Behavioral Analysis Peer Review Committee June 1994 on–site report, Ireland); transcript at 5811–15 (Records testimony); id. at 2589–90, 2621–22 (Reid testimony).

251. Plaintiffs' exh. I.B. 1(1) at 27 (Records re-port); mental-retardation standard 2; transcript at 5812 (Records testimony).

252. U.S. MR 2 at 9–10 (Christian report); plain-tiffs' exh. I.B. 1(1) at 29–30 (Records report); transcript at 5811 (Records testimony); plain-tiffs' exh. I.B. 1(4) at 4 (Rinere report); plaintiffs' exh. I.B. 1(3) at 31 (McGowan report).

253. Plaintiffs' exh. II.A. 3(1) at 30–32 (Alabama Department of Mental Health and Mental Retar-dation, MR 5–year plan FY 93–94 to FY 97–98); see also transcript at 5813 (Records testimony) (describing federally-funded competitive employ-ment for people with severe mental retardation and severe disabilities).

254. Plaintiffs' exh. III.B. 2(24) at 6–7 (Alabama Behavior Peer Review on-site report, Partlow,

train, supervise and interact with residents. As a result residents remain idle, unoccupied, and inadequately supervised.[255] Staff ignore residents when they are behaving properly, doing little to reinforce good behavior, and intervene only to stop inappropriate behavior, sometimes reinforcing it by giving it attention.[256] Data collection is not consistent with professional standards, nor does it reflect what is actually occurring.[257] Collection of data is critical to adequate habilitation because it is necessary for ensuring that plans are relevant and effective.[258]

In the area of behavioral programming—that is, programming designed to correct maladaptive behaviors—the defendants' habilitation efforts are woefully inadequate.[259] Some residents with severe behavior problems do not even have a program to address their behavior.[260] Those who do have programs often have inadequate ones. Programs are not professionally designed, lacking professional analysis of the behavior to be corrected, and therefore are less effective.[261] Additionally, defendants fail to pro-

Sept. 1993,) (noting "limitations in ... the quality and quantity of staff-client interactions; ... direct care staff were also observed to be difficult to interrupt as they watched television or were engage[d] in social conversations with friends or associates"); plaintiffs' exh. III.A. 2(21) at 5, 8 (Aug. 3, 1994 Ireland Advocacy Committee Third Quarter Monitoring Report); transcript at 6576 (Lomax testimony); plaintiffs' exh. I.B. 1(3) at 6 (Rinere report).

255. Plaintiffs' exh. III.B. 2(8) at # 2 3997–4000 (Title XIX statement of deficiencies and plan of correction, Partlow, Sept. 3, 1992) (observing clients sitting idle in workshops and classrooms, without any interaction from staff); plaintiffs' exh. III.B. 3(23) at 4, 24–30 (Title XIX statement of deficiencies and plan of correction, Partlow, Sept. 16, 1994) (same); plaintiffs' exh. III.C. 2(6) at 5847 (Title XIX statement and restatement of deficiencies and plan of correction, Wallace, Dec. 3, 1993) (describing lack of interaction between staff and residents, including residents who were "unattended and unsupervised for 40 minutes); plaintiffs' exh. III.C. 2(5) at 5832–36 (Title XIX statement of deficiencies and plan of correction, Wallace, March 4, 1994 revisit) (describing many clients sitting unoccupied with little or no staff direction, having programs implemented by staff that were not part of individual's programming, or staff implementing programs that were inconsistent with observed client behavior); plaintiffs' exh. II.A. 2(51) at 5658–61 (Title XIX statement of deficiencies and plan of correction, Ireland, June 15, 1993 visit); plaintiffs' exh. III.A. 2(4) at 600349–50 (Title XIX statement of deficiencies and plan of correction, Ireland, Apr. 29, 1994 visit) (describing observations in which staff failed to interact with residents and staff member walking into observation areas and announcing in a loud voice "Administrations [sic] called and stated surveyors want staff to interact more with the clients"); plaintiffs' exh. III.E. 2(28) at 5343–50 (Title XIX statement of deficiencies and plan of correction, Tarwater, Dec. 15, 1993 revisit) (describing failure of staff to consistently organize, supervise, and/or manage" residents and as a result, "Clients were observed ... to exhibit maladaptive behaviors, wander away from a group, sleep and/or sit unoccupied for period up to one hour"); defen-

dants' general exh. 5 at 600670–75 (Title XIX statement of deficiencies and plan of correction, Brewer, July 22, 1993) (describing staff's failure to "provide continuous consistent training and/or intervention"); plaintiffs' exh. III.D. 3(5) at 9980–87 (Title XIX statement of deficiencies and plan of correction, Brewer, July 15, 1994) (describing inconsistent interventions, monitoring and evaluation of residents' performance of vocational tasks).

256. Transcript at 6242, 6252–53 (Christian testimony); U.S. MR 2 at 15–16 (Christian report).

257. See, e.g., transcript at 6253–59, 6271–74, 6305 (Christian testimony); U.S. MR 2 at 16–17, 30, 87 (table 7) (Christian report) (Wallace engagement ratings highly unreliable and misleading); transcript at 6564–65 (Lomax testimony) (staff fail to record behavior when it is observed); plaintiffs' exh. I.A. 1(1) at 33 (Sundram's Brewer report); plaintiffs' exh. III.A. 2(5) at 6000433–36 (Title XIX statement of deficiencies and plan of correction, Ireland, May 6, 1993); plaintiffs' exh. III.A. 2(51) at 600661–62 (Title XIX statement of deficiencies and plan of correction, Ireland June 16, 1993 visit); defendants' general exh. 5 at 600675–84 (Title XIX statement of deficiencies and plan of correction, Brewer, July 22, 1993).

258. Transcript at 6258–60 (Christian testimony); plaintiffs. exh. III.A. 2(39) at 5014–15 (Alabama Behavior Peer Review Committee on-site Ireland report, July 1993).

259. Transcript at 6249–53, 6259–60, 6308–09 (Christian testimony); U.S. MR exh. 103 at 3, 6 (Alabama Behavior Analysis Peer Review on site Wallace report, May 1994); transcript at 2679–80 (Reid testimony); U.S. MR 2 at 8–20 (Christian report).

260. U.S. MR 2 at 13, 58–60 (table 3), 68–78 (table 6) (Christian report); transcript at 6249–53, 6259, 6428–29 (Christian testimony).

261. Transcript at 6244–45, 6255–56, 6307–10 (Christian testimony); U.S. MR 2 at 11–16 (Christian report); U.S. MR exh. 103 at 3–4

vide adequate services and programming for individuals with communication disorders.[262]

The defendants also fail to meet the standard 2's requirement that habilitation enable residents to live a life "as normally as possible" and that residents be transferred to the least restrictive environment for habilitation. This finding, however, is explained in the next section addressing least restrictive environment.

Standard 43 covers the defendants' obligations to update the guardians or next-of-kin of residents on the progress of residents. It requires that the defendants note in these updates the services which have not been provided because of a lack of resources. While the defendants send letters semiannually to the vast majority of residents and annually to a minority, noting residents' general progress and any significant health problems, they fail to always note services from which a resident could have benefitted

but were not provided because of resources.[263]

Thus, the defendants are in compliance with most of the habilitation standards relating to mere formalities, such as paperwork, standards 7, 8, 9, and 14. They are in compliance with standards 5, 33, and 44 as well. However, they are not in compliance with the standards that go to the quality and effectiveness of habilitation, standards, 1, 2, 11, and 12. They also are not in compliance with standard 43.

5. Least Restrictive Environment and Community Facilities and Programs: Mental-retardation Standards 2, 3, 4, 10, 16, 47, and 49 and ¶ 9 of the 1986 Consent Decree

Combined, *Wyatt* standards 2, 3, 4, 10, 16, 47, and 49 and ¶ 9 of the consent decree require that residents be habilitated in the most integrated or least restrictive environment appropriate for their needs, based on professional judgment.[264] Standard 2 re-

---

(Alabama Behavior Analysis Peer Review Committee, on-site visit, Wallace, May 1994) (while noting progress in functional analysis finding room for improvement); transcript at 2679–80 (Reid testimony).

262. Plaintiffs' exh. I.A. 1(1) at 43(Sundram's Brewer report); plaintiffs' exh. III.B. 2(9) at # 2 4028–33 (Title XIX statement of deficiencies and plan of correction, Partlow, Aug. 26, 1993) (observing staff unable to use sign language with residents who used sign language to communicate and whose habilitation plans included goals related to the use of sign language and residents who had needs in communication skills, but for whom facility failed to develop an program to meet those needs); plaintiffs' exh. III.A. 2(4) at 6000350–56 (Title XIX statement of deficiencies and plan of correction, Ireland, Apr. 29, 1994 20% of clients whose records were reviewed had communication deficits, yet no training programs developed to assist clients in acquiring communication skills).

263. Plaintiffs' exh. I.A. 1(1) at 16 (Sundram's Brewer report).

264. Standard 3 provides:
"(a) No person shall be admitted to the institution unless a prior determination shall have been made that residence in the institution is the least restrictive habilitation setting feasible for that person.
"(b) No mentally retarded person shall be admitted to the institution if services and programs in the community can afford adequate habilitation to such person.

"(c) Residents shall have a right to the least restrictive conditions necessary to achieve the purposes of habilitation. To this end, the institution shall make every attempt to move residents from (1) more to less structured living; (2) larger to smaller facilities; (3) larger to smaller living units; (4) group to individual residence; (5) segregated from the community to integrated into the community living; (6) dependent to independent living."

Standard 4 provides:
"Borderline or mildly retarded persons shall not be residents of the institution. In unusual cases in which borderline or mildly mentally retarded persons have severe additional handicaps which preclude their living in the community, they may reside in Partlow. Such persons will receive suitable remedial training and treatment for the additional handicapping conditions as well as suitable habilitation programming. They will be afforded all the rights afforded other residents.
"For purposes of this standard, a borderline retarded person is defined as an individual who is functioning between one and two standard deviations below the mean on a standardized intelligence test such as the Stanford Binet Scale and on measures of adaptive behavior such as the American Association on Mental Deficiency Adaptive Behavior Scale. A mildly retarded person is defined as an individual who is functioning between two and three standard deviations below the mean on a standardized intelligence test such as the Stanford Binet Scale and on a measure of adaptive behavior such as the American Association on Mental Deficiency Adaptive Behavior Scale."

quires "normalization," that is that residents lead a life as normal as possible. Standard 3 states that residents shall not be admitted to institutions unless it is the least restrictive habilitation setting feasible for that person, nor shall a person be admitted if community services are adequate to serve that person. It also provides that "Residents shall have a right to the least restrictive conditions necessary to achieve the purposes of habilitation."

Less restrictive means moving to less structured living settings, to smaller facilities and living units, and to individual residences, being integrated into the community, and living as independently as possible. In summary, these standards require that if a less restrictive environment (for example, a small community setting as opposed to a large institution) is necessary to or will achieve the purposes of habilitation, then that setting is required within reason. *See, e.g., Thomas S. v. Flaherty*, 902 F.2d 250, 253–54 (4th Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990).[265] The right asserted by the plaintiffs to be integrated or placed in the least restrictive habilitation appropriate is not, as the defendants would suggest, the equivalent of outright and automatic deinstitutionalization. Rather, it is quite to the contrary. As this court emphasized in 1979,

the decision as to what setting is the most integrated or less restrictive depends on each individual's needs and should be left to that individual, his or her family, and his or her treating professionals. Under the consent decree, therefore, the defendants were to set up a process by which the needs of the plaintiffs would be evaluated by professionals on a case-by-case basis, and the professionals might or might not find that the minimally adequate setting for habilitation for an individual plaintiff is community placement. But if they do, as they have so far done, the defendants were required by the consent decree to have such facilities and programs available. The defendants have not done this.

Standards 4, 10, 16, 47, and 49 all help implement the above requirements. Standards 4 and 49 seek to prevent certain inappropriate admissions. Standard 4 disallows institutionalization of borderline and mildly retarded individuals, unless they have severe additional handicaps. Standard 49 prohibits institutionalization unless the *Wyatt* standards are met. Under certain circumstances it allows exceptional admissions if the person will injure himself or others, become home-

Standard 10 provides:

"Residents who hold reasonable promise for eventual placement outside the institution and for living in the community shall have post-institutionalization plans developed for them within the six-month period following admission. Post-institutionalization plans for those now residing in Partlow will be reevaluated so that such plans include only those residents who show reasonable promise of making a satisfactory adjustment in a noninstitutional setting. The plans shall be developed by a Qualified Mental Retardation Professional. The guardian or next of kin of the resident and the resident, if able to give informed consent, shall be consulted in the development of such plan and shall be informed of the content of such plan."

Standard 47 requires that "Each resident discharged to the community shall have a program of transitional habilitation assistance."

Standard 49 provides:

"No person shall be admitted to any publicly supported residential institution caring for mentally retarded persons unless such institution meets the above standards or unless the chief administrator of such institution determines that the person, if allowed to remain in

the community, is likely to cause serious injury to himself or others, or that the only alternative for providing adequate shelter, food and clothing for such person is jail. Any person initially determined to be such an exceptional case shall be admitted for a period not to exceed 30 days during which time a thorough evaluation of such person shall be conducted by the officials of the institution. If this evaluation confirms that such person falls within the limited exception set forth above, then such person may be admitted to an institution for the mentally retarded in a regular status.

"The Director of the institution shall file with this court each thirty days a report setting forth the full details warranting any exceptional admission, including the evaluation of the patient."

The defendants previously sought to eliminate all standards requiring that residents' be provided habilitation in the least restrictive environment. *Wyatt*, 803 F.Supp. at 377 (denying defendants' motion).

265. The purpose of habilitation is to allow an individual to lead a life as normal as possible and as free from restrictions on their liberties as possible.

less, or go to jail, in the absence of institutionalization.

Standards 10 and 47 address residents' transitions to less restrictive community settings. Standard 10 requires post-institutionalization plans be developed for those with the promise of community placement. And standard 47 requires that "Each resident discharged to the community shall have a program of transitional habilitation assistance."

Paragraph 9 of the consent decree essentially implements the above standards. Paragraph 9, as stated, requires the defendants "to continue to make substantial progress in placing members of the plaintiff class in community facilities and programs."

Paragraph 9 of the consent decree and all of the above standards, with the exception of standard 4, are being violated by the defendants.[266] The residents' rights to the least restrictive environment have been reemphasized over the years. In 1979, the court reemphasized that the *Wyatt* mental-retardation standards required that residents be placed in the least restrictive environment appropriate to their needs and that the defendants make every attempt to move residents from segregated living environments into integrated community living environments to the extent necessary to achieve the purposes of habilitation, as these purposes are defined by the defendants' own professionals. The defendants sought in the early 1980s to be relieved from this requirement

based on developments in the law, but in 1986 agreed through bargaining with the plaintiffs to retain this requirement. Indeed, in ¶ 9 of the 1986 consent decree, the defendants committed themselves to developing a whole range of community facilities and programs to implement the *Wyatt* standards' *Wyatt* requirement of a less restrictive environment where determined by professionals to be appropriate. As this court has previously noted, this was one of the most important bargains struck in the settlement process. *Wyatt*, 811 F.Supp. at 1540.

The court again emphasizes that, in discussing the least restrictive environment where appropriate, it is not directing automatic or outright deinstitutionalization; the 1986 consent decree does not, by its own force, require the deinstitutionalization of any patient or any group of patients. Rather it requires that the professionals who work with patients be given an informed choice to place these patients in less restrictive community settings. The field of mental retardation has progressed dramatically since this litigation began in 1970.[267] Today professionals have the capacity to develop community facilities and programs for even the most severely mentally retarded.[268] Therefore, many residents in the defendants' developmental centers could live in the community settings given the appropriate supports and services.[269] This does not mean that mentally-retarded individuals are turned out of institutions onto the street with no appropriate support or services, but rather that they are

---

266. The court finds compliance with standard four. Plaintiffs' exh. I.A. 1(1) at vi, 37–38 (Sundram's Brewer report). The mildly retarded and borderline individuals in the defendants' institutions are dually diagnosed, that is, they have an additional handicap. Thus, the defendants are not violating this standard. By finding compliance with this standard, the court, however, is not finding compliance with the other least restrictive environment standards as to these individuals for whom a less restrictive environment may or may not be appropriate. *Id.* at 38.

267. Plaintiffs'. exh. II.C. 9(22) (ARC report card to the nation on inclusion of people with mental retardation in community housing, Oct. 1994).

268. Plaintiffs' exh. II.C. 9(22) (national Association for Retarded Citizens' (ARC) report card to the nation on inclusion of people with mental

retardation in community housing, Oct. 1994); transcript at 5722–33 (Dutt testimony, president of Alabama ARC); plaintiffs' exh. I.A. 3(1) at 266–67 (deposition of Sundram); transcript at 6775–76 (Provencal testimony).

269. Transcript 3294–95, 3344–45 (Maddox, director of mental retardation facility services, testimony); *id.* at 7380, 7508 (Sundram testimony); plaintiffs' exh. I.C. 4(11) at 72 (deposition of Stokes); plaintiffs' exh. I.C. 4(18) at 127 (deposition of Turnage, Partlow community services director); plaintiffs' exh. I.B. 1(1) at 35 (Records report); U.S. MR at 3 (Christian report) (with the exception of six residents, interdisciplinary teams have determined that each individual at Wallace is capable of living in the community); transcript at 5842, 5818 (Records testimony); *id.* at 6637–38 (Provencal testimony); *id.* at 6316–17 (Christian testimony).

habilitated in smaller non-institutionalized homelier settings in the community. Indeed, the defendants currently provide supports and services to seriously disabled individuals in their communities—for example, those with complex medical, physical, and behavior needs, such as individuals who have seizure disorders, are dually diagnosed, require behavior plans, and use a wheelchair and/or have communication disorders.[270] And the department has started to work towards developing community placements as required by the 1986 consent decree. In its five-year plan covering the period from October 1, 1993 to October 1, 1995, the department had plans to place 570 institutional residents in the community, reducing its institutional mental-retardation population by almost one-half.[271]

However, the fact remains that the defendants did little to nothing to move residents into the community from 1986 until 1992.[272] In fact, the Alabama Department of Mental Health and Mental Retardation admitted many individuals into its institutions during this time-period because of a lack of community alternatives.[273] Professional decisions not to outplace individuals during this time period were not driven by "professional" evaluations based on individual needs but rather by the lack of community alternatives with appropriate supports.[274]

The defendants' efforts at community placements did not begin in earnest until after they filed their motion for finding of compliance and for termination of this litigation. The fact also remains that hundreds of individuals still remain institutionalized in the defendants' facilities for no apparent or good reason.

In addition, there are no selection criteria for the 570 residents actually selected for community placement. Nothing distinguishes them from the hundreds who remain in the defendants' institutions.[275] The process of selection is fairly arbitrary.[276] Indeed, it appears that those who remain in the state's institutions are the less problematic residents, who are less disabled than those outplaced.[277] In fact, the institutionalized residents are generally less disabled than the national norm for institutionalized individuals.[278] .

---

**270.** Transcript at 3367–68 (Maddox testimony); *id.* at 1878–80, 1887 (Haywood testimony).

**271.** Plaintiffs' exh. II.A. 3(1) at 3 (Five-year plan); plaintiffs' exh. I.C. 4(11) at 57–58 (deposition of Stokes).

**272.** Plaintiffs' exh. II.A. 10(5) at 004341 (Admissions study); transcript at 5835 (Records testimony).

**273.** Plaintiffs' exh. II.A. 10(5) at 004332, 004338–39, 004343 (Admissions study); Plaintiffs' exh. I.C. 4(14) at 179, 192 (deposition of Sawyer, head of Department's internal advocacy system); plaintiffs' exh. II.A. 10(11) at A 10202 (memo dated May 26, 1991 from Trawick to Sawyer) (discussing use of mental-illness commitment procedures as "back door" approach to obtain admission to mental retardation facilities and fact that problem will not be solved until community residential services are available); plaintiffs' exh. II.C. 9(8) at A 10162 (memo dated May 18, 1993 from Maddox to Sawyer) (same); plaintiffs' exh. I.A. 1(1) at 36–37 (Sundram's Brewer report) (admissions driven by lack of community alternatives); Transcript at 5832–34 (Records testimony); *id.* at 5528 (Boothe testimony); transcript at 5594 (Ramsey testimony); U.S. MR 2 at 4 (Christian report).

**274.** *See, e.g.,* Plaintiffs' exh. I.B. 1(4) at 19–21 (Rinere report); transcript at 5825–30, 6087–88 (Records testimony) (all records state that resident is in least restrictive environment without any justifications and often followed by description of services and supports needed for individual to live in the community, e.g. in 14 of 16 records reviewed at Tarwater statement appeared that resident was in least restrictive environment, but was immediately followed by an interdisciplinary statement that the team believed the individual could live in the community if provided the appropriate supports); plaintiffs' exh. I.B. 1(1) at 8, 37 (Records report); plaintiffs' exh. I.A. 1(1) at 36 (Sundram's Brewer report); U.S. MR 2 at 5–6 (Christian report).

**275.** Plaintiffs' exh. I.C. 4(11) at 63, 76–77 (deposition of Stokes); *see also* transcript at 5835 (Records testimony) (no good reason for 560 remaining individuals to be in institution).

**276.** Plaintiffs' exh. I.B. 1(2) at 48 (Provencal report); plaintiffs' exh. I.B. 1(1) at 18 (Records report) (referrals to community are based on availability, not individual need).

**277.** Transcript at 6648 (Provencal testimony).

**278.** Plaintiffs' exh. IV.H. 10 (1992 OSCAR analysis and report); transcript at 3369–73 (Maddox testimony); plaintiffs' exh. I.B. 1(1) at 37, 41 (Records report); transcript at 5835 (Records testimony).

Furthermore, less restrictive settings, such as community residential placements, where appropriate services and supports are provided, tend to enable greater growth in skills and development for mentally-retarded individuals; whereas institutionalized settings can have adverse effects.[279] Community settings provide a multitude of opportunities for modeling behavior and learning skills that are simply not available in institutions.[280] And it costs on average twice as much to serve an individual with mental retardation in a state-operated institution as compared to serving that individual in the community.[281]

For all of the above reasons, the court concludes that the defendants' failure to offer those persons, whom they have institutionalized, an informed choice to live in less restrictive community settings where there is a professional determination that such is appropriate violates the 1986 consent decree. An "informed choice" might include the opportunity to visit community sites, talk with the providers, talk with the other consumers, visit community workshops and jobs, and have a trial placement in the living arrangement.[282] Habilitation and normalization require that the plaintiffs have this choice. Because of the defendants' failure to comply with the decree, hundreds of residents are unnecessarily institutionalized. Thus, the defendants are not in compliance with mental-retardation standards 2, 3, 10, 16, 47, and 49 and with ¶ 9 of the consent decree.

6. Medication, Medical Care, and Restraint: Mental-retardation Standards 6, 13, 22, 26, and 45

Standards 6, 13, and 45 require that residents receive adequate medical care.[283] The court has already found compliance with standard 45 and for the most part the defendants comply with standards 6 and 13.[284]

Standard 22 addresses medication practices.[285] It requires that certain professional procedures be followed—for example, that no

279. Plaintiffs' exh. II.C. 9(22) (ARC position statement); transcript at 6666, 6762–63 (Provencal testimony); *id.* at 6262 (Christian testimony).

280. Transcript at 6762–63, 6777–78 (Provencal testimony).

281. Plaintiffs' exh. I.C. 4(11) at 44–46 (deposition of Stokes) (On average it costs $218/day for a bed in a state developmental center versus $100/day to maintain an individual in the community); plaintiffs' exh. I.C. 4(12) at 44–46 (deposition of Stokes) (describing how Department is able to fund two beds in the community by closing one in the institution through obtaining medicaid waivers).

282. Transcript at 6101–03 (Records testimony); *id.* at 6795 (Provencal testimony).

283. Standard 6 provides:
"Residents shall have a right to receive prompt and adequate medical treatment for any physical ailments and for the prevention of any illness or disability. Such medical treatment shall meet standards of medical practice in the community."

Standard 13 provides:
"In addition to habilitation for mental disorders, people confined at mental health institutions also are entitled to and shall receive appropriate treatment for physical illnesses such as tuberculosis. In providing medical care, the State Board of Mental Health shall take advantage of whatever community-based facilities are appropriate and available and shall coordinate the resident's habilitation for

mental retardation with his medical treatment."

Standard 45 provides:
"No resident shall have any of his organs removed for the purpose of transplantation without compliance with the procedures set forth in Standard 30 and after a court hearing on such transplantation in which the resident is represented by a guardian ad litem. This standard shall apply to any other surgical procedure which is undertaken for reasons other than therapeutic benefit to the resident."

284. Plaintiffs' exh. I.A. 1(1) at v, 32–33 (Sundram's Brewer report).

285. Standard 22 provides:
"a. No medication shall be administered unless at the written order of a physician.
"b. Notation of each individual's medication shall be kept in his/her medical records (Standard 14(I) supra). The frequency with which an attending physician shall review the drug regimen of each resident under his/her care should be dictated by good clinical judgment, but at a minimum shall be done: (a) at least quarterly for a resident with a chronic and stable medical condition; (b) at least once a month for a resident taking psychotropic medication; and (c) at least once a week for a resident whose medical condition is unstable in any way. All prescriptions shall be written with a termination date, which shall not exceed 90 days.
Controlled seizures are defined as a stabilized, low number of seizures in a specified period of

medication be administered unless at the written order of a physician and that pharmacists be employed. It also requires that residents not be unnecessarily medicated with psychotropic drugs or given medications as a substitute for adequate habilitation, for the convenience of staff, or as a punishment.

The defendants comply in general with most of standard 22, with the exception of subsections (c) and (d), which address unnecessary medication and medication being used as a substitute for habilitation. Because of inadequate behavioral programming for maladaptive behaviors, residents are subjected to unnecessary medications.[286] And high dosages of psychotropic medications are not

always adequately justified.[287] With these exceptions noted, the court finds compliance with the medical care and medication standards.

Standard 26 addresses physical restraint of residents.[288] The standard requires that residents not be restrained unless absolutely necessary to protect the resident or others from harm. Alternative techniques must have failed before it is used, and it cannot be used as a substitute for habilitation, for the convenience of staff, or as punishment. The standard sets for a number of rules that must be followed before using restraints and once a restraint is used. The court finds compliance with this standard.

time but does not mean zero seizures and does not include an episode of status epilepticus within the past year."

"c. Residents shall have a right to be free from unnecessary of excessive medication. The resident's records shall state the effects of psychoactive medication on the resident. When dosages of such are changed or other psychoactive medications are prescribed, a notation shall be made in the resident's record concerning the effect of the new medication or new dosages and the behavior changes, if any, which occur.

"d. Medication shall not be used as punishment, for the convenience of staff, as a substitute for a habilitation program, or in quantities that interfere with the resident's habilitation program.

"e. Pharmacy services at the institution shall be directed by a professionally competent pharmacist licensed to practice in the State of Alabama. Such pharmacist shall be a graduate of a school of pharmacy accredited by the American Council of Pharmaceutical Education. Appropriate officials of the institution, at their option, may hire such a pharmacist or pharmacists fulltime or, in lieu thereof, contract with outside pharmacists.

"f. Whether employed fulltime or on a contract basis, the pharmacist shall perform duties which include but are not limited to the following."

Standard 22(f) then lists the duties of the pharmacist.

"g. Only appropriately trained staff shall be allowed to administer drugs."

286. Plaintiffs' exh. II.A. 10(2) at 004899–90 (Alabama Behavior Analysis Peer Review 1992–93 Annual Report) (finding problems with the prescription of psychotropic drugs across developmental centers, including inadequate or inappropriate justification for the use of drugs, poor monitoring of side effects, and the use of drugs as a substitute for programs); plaintiffs' exh. IV.H. 20 at 11 (Alabama Behavior Analysis Peer

review 1993–94 Annual Report); Plaintiffs' exh. I.B. 1(3) at 53 (McGowan report).

287. Plaintiffs' exh. I.A. 1(1) at v (Sundram's Brewer report).

288. Standard 26 provides:

"Physical restraint shall be employed only when absolutely necessary to protect the resident from injury to himself or to prevent injury to others. Restraint shall not be employed as punishment, for the convenience of staff, or as a substitute for a habilitation program. Restraint shall be applied only if alternative techniques have failed and only if such restraint imposes the least possible restriction consistent with its purpose.

a. Only Qualified Mental Retardation Professionals may authorize the use of restraints.

(1) Orders for restraints by the Qualified Mental Retardation Professionals shall be in writing and shall not be in force for longer than 12 hours.

(2) A resident placed in restraint shall be checked at least every 30 minutes by staff trained in the use of restraints, and a record of such checks shall be kept.

(3) Mechanical restraints shall be designed and used so as not to cause physical injury to the resident and so as to cause the least possible discomfort.

(4) Opportunity for motion and exercise shall be provided for a period of not less than ten minutes during each two hours in which restraint is employed.

(5) Daily reports shall be made to the superintendent by those Qualified Mental Retardation Professionals ordering the use of restraints, summarizing all such uses of restraint, the types used, the duration, and the reasons therefor.

b. The Institution shall cause a written statement of this policy to be posted in each living unit and circulated to all staff members."

## 7. Adequate Staffing: Mental-retardation Standards 39, 40, and 41

Standards 39, 40, and 41 require that the defendants provide sufficient staffing to enable adequate habilitation.[289] The standards go to staff qualifications, supervision, and staff ratios. Standard 39 requires that staff meet licensing and certification requirements, that staff receive appropriate orientation training, and that staff be supervised by qualified mental retardation professionals or QMRPs. Under standard 40, each resident care worker must under the direct professional supervision of a QMRP. And standard 41 states, in part, that: "Qualified staff in numbers sufficient to administer adequate habilitation shall be provided."[290]

As for the supervision, qualification, and certification requirements, the defendants are in compliance and have thus satisfied standards 39 and 40.[291] However, as for sufficient numbers of staff, standard 41, the defendants are not in compliance. The defendants fail to provide staff in sufficient numbers and sufficiently trained to implement adequate habilitation.[292] Staffing, for example, is inadequate to give residents training in social and self-care skills at meals.[293] And for certain patients, the lack of staffing at meal times places them at risk for choking, which can be fatal.[294] Those staff that are available often are inadequately trained to implement habilitation plans in a manner consistent with minimal professional standards.[295] Furthermore, insufficient staffing also places residents in danger and

289. Standard 39 provides:
"Each Qualified Mental Retardation Professional and each physician shall meet all licensing and certification requirements promulgated by the State of Alabama for persons engaged in private practice of the same profession elsewhere in Alabama. Other staff members shall meet the same licensing and certification requirements as persons who engage in private practice of their specialty elsewhere in Alabama.
a. All resident care workers who have not had prior clinical experience in a mental retardation institution shall have suitable orientation training.
"b. Staff members on all levels shall have suitable, regularly scheduled in-service training."

Standard 40 requires that "Each resident care worker be under the direct professional supervision of a Qualified Mental Retardation Professional."

Mental-retardation standard 41 is lengthy to reproduce but may be found in Court's exh. 1.

290. The standard then includes, but is not limited to, specific staffing ratios that apply literally only to Partlow. This standard can be found in its entirety at court's exh. 2.

291. Plaintiffs' exh. I.A. 1(1) at 42 (Sundram's Brewer report).

292. U.S. MR exh. 2 at 26–30 (Christian report); transcript at 2695–96 (Reid testimony).
Furthermore, the court notes that experts received a false impression of staffing levels due to the defendants' massive deployments of staff during expert tours. Transcript at 6487–88 (McCostlin testimony); *id.* at 6575 (Lomax testimony); *id.* at 7156–58 (Hodo testimony); plaintiffs' exh. I.C. 3(11) at 92–97 (deposition of Favel); U.S. MR exh. 136 (McCostlin diary entry of

Aug. 2, 1994); U.S. MR exh. 121 (memo dated Dec. 13, 1994 from Wallace DTC lead trainers to Garrison describing massive staffing deployed during Dr. Christian's expert tour).

293. Plaintiffs' exh. III.A. 2(45) at §§ I, IV, & V(Ireland Advocacy Committee Food Service Monitoring Report, Jan. 20, 1995); transcript at 6555 (Lomax, a staff member, testimony); plaintiffs' exh. I.C. 4(14) at 228–30 (deposition of Sawyer).

294. Plaintiffs' exh. III.A. 2(45) at §§ IV & V (Ireland advocacy committee food service monitoring report, 1994–95). The death of Jeff M. from choking is one example of the sometimes fatal consequences from inadequate staffing at meal times. Plaintiffs' exh. III.A. 4(36) (Jeff M. investigation file); plaintiffs' exh. II.B. 1(3) at 14–15 (McGowan report); transcript at 6569–73 (Lomax testimony); U.S. MR exh. 136 (McCostlin dairy entry at Aug. 14, 1994); *see also* transcript at 6274–76 (Christian testimony) (re: choking death of another resident Opal Plaintiff.); *id.* at 6495–97 (McCostlin testimony) (same).

295. U.S. MR 2 at 29–32 (Christian report); transcript at 6246, 6308–09 (Christian testimony); plaintiffs' exh. II.A. 10(2) at 9 (Alabama Behavior Analysis Peer Review 1992) (noting " 'relative lack of competency based staff training and management' [CHECK] which has resulted in low levels of expertise in programming personnel at all levels"); plaintiffs' exh. II.A. 10(3) at 9 (Alabama Behavior Peer Analysis Peer Review, 1993) (noting continuing problems in programming, in part, because of a "lack of understanding and kills among staff"); U.S. MR exh. 103 at 2, 6 (Alabama Behavior Analysis Peer Review Committee, on-site visit report, Wallace, May 1994).

leads to unnecessary injuries and abuse.[296] Large numbers of unexplained injuries are often due to inadequate staffing.[297] And patients with severe behavioral problems who require one-to-one supervision do not always receive the required supervision.[298] This can place them at serious risk of injury to themselves and others. For example, one patient sexually abused other patients when he was supposed to be on one-to-one supervision, and others have suffered serious injuries.[299] One resident bled to death after being beaten by another resident. He probably would not have died if he had received prompt medical attention, but the staff person responsible for that area was simply not there for most of that evening.[300] Staffing is often simply insufficient to enable adequate habilitation, monitoring, and care for residents, and to ensure safety.[301]

Despite knowledge of inadequate staffing—from requests by current staff for additional help, advocacy monitoring reports, and investigations of deaths and incidents—the Alabama Department of Mental Health and Mental Retardation has failed to act.[302] The defendants contend that Title XIX certification means they have sufficient staffing despite these complaints and numerous incidents.[303] However, as the court has already explained in its discussion of Title XIX certification, such certification does not, by itself, mean that residents are minimally adequate care as defined in the 1986 consent decree. It only means that the hospital is being reimbursed by Medicaid.

### 8. Protection From Harm/Abuse and Neglect: Mental-retardation Standards 15, 27, and 28

Perhaps most significantly, aside from the fact that many residents need not even be institutionalized, is the fact that residents are subjected to unexcused abuse and neglect in the defendants' institutions. They are not safe and are frequently abused and neglected. Staff members punch, hit, and kick defenseless mentally-retarded residents. Furthermore, failure to adequately staff residences leads to abuse and unnecessary injuries. Even more egregious is the fact that the defendants' know about these problems, and yet fail to correct them.

Standards 15, 27, and 28 all require the defendants to provide a safe environment for the residents in their institutions as does the fourteenth amendment to the United States Constitution.[304] *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982). Standard 15 states that

---

**296.** Plaintiffs' exh. III.A. 2(33) at 6122 (memo, dated July 16, 1993, from Sawyer to Hanan); plaintiffs' exh. III.A. 2(21) at 6 (Ireland Advocacy Office third quarter monitoring report); plaintiffs' exh. III.C. 2(1) at 1417–19 (Wallace Advocacy Office third quarter monitoring report, 1994); plaintiffs' exh. III.B. 2(23) at 2 (Partlow Advocacy Office third quarter monitoring report, 1993); plaintiffs' exh. I.B. 1(4) at 23–24 (Rinere report).

**297.** Plaintiffs' exh. III.A. 2(21) at 001252 (memo, dated Oct. 1994); plaintiffs' exh. III.C. 2(1) (Wallace advocacy office third quarter monitoring report); plaintiffs' exh. III.A. 2(33) at 6122 (memo, dated July 16, 1993, from Sawyer to Hanan).

**298.** Transcript at 6246 (Christian testimony); plaintiffs' exh. III.A. 4(45) (Notice of Investigation, Nov. 1993); plaintiffs' exh. III.A. 4(46) (memo, dated July 29, 1993, from Albritton to Gillespie); plaintiffs' exh. III.A. 2(21) at 2 (Ireland advocacy monitoring report, third quarter 1994).

**299.** U.S. MR 2 at 24 (Christian report).

**300.** Transcript at 5572–73 (Metcalf testimony); transcript at 6287–90 (Christian testimony).

**301.** Transcript at 6476 (McCostlin testimony); transcript at 6554–57 (Lomax testimony); U.S. MR 2 at 28 (Christian report).

**302.** *See, e.g.,* Plaintiffs' exh. III.A. 4(36) at 15442 (memo dated Aug. 12, 1994 from interdisciplinary team to Cutts requesting additional staff to ensure safety of residents); plaintiffs' exh. III.A. 4(36) at 15441 (memo dated Aug. 15, 1994 from Cutts to Calhoun) (denying requests for additional staff two days after resident choked to death due to inadequate staffing); transcript at 5793 (Records testimony); transcript at 6304–05 (Christian testimony).

**303.** *See, e.g.,* plaintiffs' exh. III.A. 4(36) at 15438; transcript at 6304–05 (Christian testimony).

**304.** Standards 15 and 27 have already been reproduced. And Standard 28 provides:
"The institution shall prohibit mistreatment, neglect or abuse in any form of any resident. a. Alleged violations shall be reported immediately to the superintendent and there shall be a written record that:
(1) Each alleged violation has been thoroughly investigated and findings stated;
(2) The results of such investigation are reported to the superintendent and to the commis-

"Residents have a right to dignity, privacy and humane care." This is violated in that residents are abused and neglected. Standard 27 states that "Corporal punishment shall not be permitted." Residents are beaten and abused by staff in violation of this standard.[305] And standard 28 prohibits mistreatment, neglect, or abuse of residents. It also requires that violations be reported and thoroughly investigated. This standard is also not met.

Residents are not safe: they are subject to inexcusable abuse and neglect, due to inadequate staffing and actual abuse by staff.[306] This includes unexplained injuries, physical abuse by staff, verbal abuse, and neglect. Some of the injuries are simply the result of failure to staff adequately and failure to provide appropriate programming to residents.[307] For example, at Wallace, staff fail to adequately monitor patients with pica, a self-injurious behavior of eating inedible objects.[308] They also fail to provide appropriate behavior programs for such behavior, which is treatable.[309] Other incidents of abuse are due to simple and pure staff abuse. For example, an undercover investigation at

sioner within 24 hours of the report of the incident. Such reports shall also be made to the institution's Human Rights Committee monthly and to the Alabama Board of Mental Health at its next scheduled public meeting. b. The institution shall cause a written statement of this policy to be posted in each cottage and building and circulated to all staff members."

305. A prototypical example of the defendants' evidence of compliance as to the *Wyatt* standards is illustrated by this standard. The defendants' expert and his team reviewed the Department's polices and procedures which prohibit corporal punishment and spoke with facility personnel. Defendants' posttrial brief, at 73, filed June 26, 1995 (Doc. no. 1107). The team failed to review incident reports documenting evidence of corporal punishment and abuse and neglect, in essence, it failed to make an independent inquiry into whether these policies were implemented. Instead it conducted a paper inquiry and relied on the defendants' representations. This type of inquiry is typical and applies virtually across the board to the defendants' experts' inquiries.

Furthermore, as the court has previously noted, policies and procedures are meaningless in the face of evidence that they are not implemented. In the face of the overwhelming evidence of abuse and neglect at the defendants' mental-retardation facilities, including the defendants' own undercover operation, the court is compelled to discount the defendants' experts' opinion.

306. Transcript at 6224, 6273, 6297, 6303–04, 6308 (Christian testimony); *id.* at 5773 (Records testimony); U.S. MR 2 at 20, 80–83 (Christian report); U.S. MR exh. 118 (Wallace Advocacy third quarter monitoring report, Oct. 1994); *see also* plaintiffs' exh. I.E. 1(2) at 11–12 (undercover department of public safety agent describing staff member stomping resident in the stomach who had his hands in his pants); *id.* at 16 (describing staff member hitting resident in the stomach); *id.* at 17 (describing staff member hitting resident's side and pulling hair on resident's stomach); *id.* at 19 (describing staff member slapping resident in the face and taunting

resident); *id.* at 21–24 (describing staff member hitting residents, including striking resident on the head, with block of wood); *id.* at 29 (describing staff member bouncing ball off resident's head for fun); *id.* at 32 (describing staff member striking resident with broom); *id.* at 40 (describing staff member repeatedly punching resident in chest); plaintiffs' exh. I.E. 1(1) at 13 (undercover department of public safety agent describing staff member striking resident in back); *id.* at 17–18 (describing staff member repeatedly striking resident in head with two-by-four that had bolts protruding on its side); U.S. MR 136 (diary of Ireland investigator describing abuse and neglect he witnessed and investigated and pattern of cover-up by administration, e.g. "[The residents] are left unattended, there is not enough help most of the times"; "A few days ago I observed a male employee throw a resident to the cement.... I asked the captain if we arrested the staff for abuse or write him up or what we did on viewing this. The captain stated it wont do any good to report it because, if he were fired Montgomery would put him back to work" and many entries describing staff taking and eating residents' food or throwing residents' food away as punishment).

307. U.S. MR 2 at 20–26, 69–86 (Christian report); transcript at 6297 (Christian testimony).

308. Transcript at 6282–85 (Christian testimony). They also fail to adequately supervise individuals with pica at Ireland. U.S. MR exh. 134 at 67–68 (deposition of Lomax).

309. Transcript at 6284–86 (Christian testimony) (noting Title XIX survey finding and that failure to provide programming is inconsistent with professional standards); *id.* at 6429–30 (pica is treatable behavior). Wallace provided no program of treatment for Patricia M's pica. Transcript at 6279–80 (Christian testimony). She died from swallowing inedibles. U.S. MR exh. 23 (death record of Patricia M.) (BSI investigation states death was not due to ingestion of caustic substance, whereas autopsy report states "there was a clear indication that some severely

Ireland led to indictments of 24 Ireland staff for patient abuse. Staff members were charged with kicking and striking residents and hitting them with brushes and metal rods.[310] At Wallace abuse and neglect are also rampant.[311] One resident suffered 140 documented injuries in less than two years, including fractures, lacerations, bites, and beatings with a shoe, mainly at the hands of another resident.[312] Yet nothing was done to protect this resident from these repeated injuries. Residents are also not protected from other residents who are known sexual abusers.[313]

Not only are residents abused, neglected, and not safe but the investigation system has numerous flaws and is ineffective at correcting and reducing risk of injury and abuse.[314] Investigations of injuries and abuse are conducted by departmental police and are inappropriately focused on the narrow issue of whether criminal activity occurred and whether any statutes were violated.[315] Investigators are not trained in evaluating witness statements and evidence. Little to no analysis is conducted of findings. Thus, investigations fail to identify ways to prevent problems from occurring again. As a result, residents are needlessly subject to repeated abuse over and over of the same sort. Review by quality assurance has failed to correct these grave deficiencies. An even greater problem is intimidation of employee-witnesses by other employees leading to a significant under reporting of incidents.[316] It is telling that the abuse uncovered in the Ireland undercover operation was not reported to investigators by other staff, despite occurring in front of other staff.

The department's refusal to investigate anonymous allegations of abuse and neglect also dramatically reduces the number of incidents investigated or reported.[317] And the failure to bring in independent investigators leads to inadequate corrective measures and investigations. It is often a case of the "fox guarding the chicken house."[318] Furthermore, the department's refusal to investigate at all in some incidents is simply unjustified. A former police officer witnessed a staff member slapping a six-year-old resident, reported the abuse, but nothing was done.[319] This staff member who struck the child remained at Ireland until she was arrested in the undercover operation.[320]

The defendants have been on notice of the problems with their investigatory system for

irritant substance had been in the patient's oropharyngeal area").

**310.** Transcript at 6141 (Koerner testimony); plaintiffs' exh. I.E. 1(1) (deposition of Guthrie, undercover agent); plaintiffs' exh. I.E. 1(2) (deposition of Thornton, undercover agent); transcript at 5602–03 (Ramsey testimony, mother of resident continually abused at Ireland).

**311.** Transcript at 6297 (Christian testimony); U.S. MR 2 at 23–24 (Christian report) (noting failure to protect other residents from repeated sexual abuse by one resident).

**312.** Transcript at 6280–82 (Christian testimony); U.S. MR exh. 169 (body check sheet documenting bruises, scratches, bites, and fractures).

**313.** Transcript at 6297 (Christian testimony); U.S. MR 2 at 23–24, 71–76 (Christian report); U.S. MR exh. 13 at 37684, 37690, 37692 (client record of known sexual abuser); see also transcript at 6292–93 (Christian testimony).

**314.** Plaintiffs' exh. I.A. 1(1) at vii, 43–46 (Sundram's Brewer report); transcript at 5777 (Records testimony); U.S. MR 2 at 23–24 (Christian report); transcript at 6296 (Christian testimony).

**315.** Plaintiffs' exh. I.A. 1(1) at vii, 45 (Sundram's Brewer report).

**316.** Transcript at 6151 (Koerner testimony); plaintiffs' exh. I.E. 1(2) at 7 (Thornton deposition); plaintiffs' exh. IV.H. 55 (memo, dated June 11, 1993, from Sawyer to Hanan); see also Kirkley v. Maddox, no. 87–1335–N (M.D. Ala. Aug. 10 and Aug. 17, 1988) (finding retaliation against department employee for cooperating in FBI investigation of sexual abuse at Tarwater).

**317.** Transcript at 6460, 6472–73 (McCostlin testimony); see also id. at 6484–86, 6474–81.

**318.** Plaintiffs' exh. I.B. 1(1) at 13 (Records report); transcript at 5776 (Records testimony).

**319.** Transcript at 6484–86 (McCostlin testimony); U.S. MR 136 (McCostlin diary at recent undercover operation).

**320.** Id. Another staff member continued to work at Ireland long after another staff member reported that she had struck a resident, causing her to fly across a bed and injure her head. Transcript at 6580 (Lomax testimony); see also U.S. MR 134 at 45 (deposition of Lomax).

some time.[321] Yet, they have failed to take action to correct it.[322] This failure is especially egregious in light of the defendants' knowledge of abuse in their institutions.[323] Also inexcusable is the defendants' failure to inform parents of victims of injuries and investigation results.[324]

In summary, the court finds as follows:

(1) The defendants are in compliance with the following *Wyatt* mental-retardation standards: 4 (borderline, mildly MR not institutionalized), 5 (educational services), 6 (prompt and adequate medical treatment), 7 (pre-admission examination/diagnosis required), 8 (evaluation within 14 days of admission), 9 (individualized habilitation plan), 13 (entitlement to physical care), 14 (records maintained; kept confidential), 17 (no incompetency by reason of commitment), 18 (religion), 19 (telephone/visitation rights), 20 (send/receive mail), 21 (interaction with opposite sex), 22(a)–(b), (e)–(g) (medication: unnecessary, excessive, review, etc.), 23 (no seclusion; "time-out" ok), 24 (behavior modification only with consent), 25 (electric shock only for extraordinary circumstances), 26 (physical restraint only when absolutely necessary, etc.), 29 (no experimental treatment without consent), 30 (no unusual or hazardous treatment without consent), 31 (physical exercise), 32 (outdoors at regular intervals), 33 (resident labor, etc.), 34(a) & (c–d) (nutritional standards, diet, etc.), 36 (personal possessions), 39 (staff licensing and certification requirements), 40 (QMRP supervision of staff), 44 (behavior modification, etc.), and 45 (no organ removal).

(2) They are not in compliance with the following standards: 1 (general right to habilitation), 2 (habilitation program to maximize abilities), 3 (admission standards: habilitation is feasible, etc.), 10 (post-institutionalization plan), 11 (QMRP supervision of plan), 12 (plan reviewed by QMRP, team, etc.), 15 (dignity, privacy, humane care), 16 (no state/federal rights lost), 22(c)–(d) (medication: unnecessary, excessive, review, etc.), 27 (no corporal punishment), 28 (no mistreatment, abuse, neglect), 34(b) (nutritional standards, diet, etc.), 35 (clothing allowance, selection, etc.), 37 (grooming practices, etc.), 38 (humane environment, facilities, etc.), 41 (staffing ratios), 42 (written copy of standards upon admission), 43 (written reports every 6 months), 47 (transitional habilitation program), and 49 (no admission to institution not meeting above standards, etc).[325]

### D. JCAHO Accreditation and Title XIX Certification

The defendants have obtained JCAHO accreditation at all their mental-illness facilities and Title XIX certification at all their mental-retardation facilities. While they were less than diligent in obtaining JCAHO accreditation at the Eufaula Adolescent Center, the defendants have maintained accreditation and certification at all of their other facilities. The court finds full compliance with JCAHO and Title XIX provisions in the 1986 consent decree.

---

**321.** Plaintiffs' exh. I.A. 1(3), appendix B (Sundram's Brewer report); transcript at 7413–20 (Sundram testimony).

**322.** Transcript at 7420–39 (Sundram testimony).

**323.** U.S. MR 138 (letter to Commissioner Horsley); U.S. MR 136 (McCostlin diary at Nov. 23, 1993 entry); transcript at 6486–87 (McCostlin testimony); plaintiffs' exh. IV.H. (26) at 1–2 (Memorandum of Agreement between the Department of Public Safety, the Attorney General's Office and the Department of Mental Health). This memorandum of agreement states "Incidents of patient abuse are widespread throughout Mental Health, but primarily occur at the

Ireland center, Taylor Hardin Secure Medical Facility, and Tarwater Center." *Id.* at 2. Clearly, the defendants are and were aware of the rampant abuse of residents in their facilities.

**324.** *See, e.g.,* Transcript at 5570–72, 5587 (Metcalf testimony, parent of resident); plaintiffs' exh. III.B. 4(8) (letter from Boothe to Partlow Developmental Center); transcript at 5520–24, 5527–30, 5534 (Boothe testimony, parent of resident); transcript at 5601–02 (Ramsey testimony, parent of resident).

**325.** Mental-retardation standards 46 and 48 have been deleted or superceded.

### E. Other Provisions in the 1986 Consent Decree

The 1986 consent decree also requires that the plaintiffs and the defendants "cooperate to establish" the following:

(1) "A process by which the private plaintiffs' counsel will be apprised of the progress made by the defendants toward the ends described in paragraphs 7, 8, and 9" of the consent decree, *Wyatt,* 1986 WL 69194, at *8, that is, in complying with the *Wyatt* standards (¶ 7), in obtaining JCAHO accreditation and Title XIX certification (¶ 8), and in placing plaintiff class members in community programs and facilities (¶ 9), *Wyatt,* 1986 WL 69194, at *7;

(2) "A process by which the defendants will continue to receive input from independent experts concerning means of achieving the ends described in paragraphs 7, 8, and 9," *Wyatt,* 1986 WL 69194, at *8;

(3) "A patient advocate system, operated within and by the Alabama Department of Mental Health and Mental Retardation, to help protect the rights of the plaintiff class," *id.;* and

(4) "A quality assurance system operated by the central office of the Alabama Department of Mental Health and Retardation to monitor and assure the quality of care provided by the Department." *Id.*

The defendants have failed to comply in full with the first and second requirements. With their sudden and summary dismissal of The *Wyatt* Consultant Committee and their breach of their agreement with Sundram, they have demonstrated a bad-faith breach of these provisions. The defendants have, however, complied with the other two requirements.

### F. Conclusions as to Defendants' Motion for Finding that They Have Met Their Obligations under the 1986 Consent Decree and for Termination of Litigation

The court now turns to the critical issue of whether the defendants should be released in whole or in part from the 1986 consent decree, and, if in whole, whether this litigation should be terminated. As stated, the considerations articulated by the Supreme Court in *Dowell* and *Freeman,* reformulated to apply in general to state institutions that are subject to detailed remedial decrees, are as follows. A federal court, in its discretion, may dissolve a decree in full and terminate the litigation if the court finds such to be appropriate in light of the following considerations: first, whether the conditions that gave rise to the need for the litigation have been fully remedied, and, second, whether the state defendants have complied in good faith with the decree as a whole since it was entered. Alternatively, a federal court, in its discretion, may order an incremental or partial release from a decree if it determines that such is appropriate in light of the following considerations: first, whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; second, whether retention of judicial control in those aspects of the system is not necessary or practicable to achieve compliance with the decree in other facets of the system; and, third, whether the state defendants have demonstrated their good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

In considering whether to order full, partial, or no release, a court should give particular attention to the state defendants' record of compliance. State defendants are better positioned to demonstrate their good-faith commitment to the decree when their policies and actions form a consistent pattern of lawful conduct in compliance with the decree.

The common consideration in determining whether release should be either full or partial is whether the defendants have acted in good faith with regard to the *whole* of the decree. In making this determination, the court must keep in mind that, as previously indicated, the consent decree's underlying purpose "was not simply to establish the plaintiffs' rights to constitutionally adequate services," *Wyatt,* 803 F.Supp. at 385, for "[t]hat claim had been litigated in 1972 and resolved in favor of the plaintiffs." *Id.; see*

*also Wyatt,* 811 F.Supp. at 1540. In the years leading up to the consent decree, the defendants made vigorous and repeated contentions that, in light of present and future changes in the law, the *Wyatt* standards—in particular, as interpreted by the plaintiffs to require the provision of new and additional community facilities and services and the community placement of those patients who qualify based on professional judgment—then exceeded the requirements of federal statutory and constitutional law. *Id.* They based their attack on a 1982 Supreme Court decision, *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and its progeny, which they strenuously argued cast doubt on the continuing validity of the least-restrictive-environment and other requirements embodied in the standards. In 1986, with the entry of the consent decree and in return for the court's release of active supervision of the Alabama Department of Mental Health and Mental Retardation, the defendants agreed to put to rest, by abandoning, their dispute over whether, in light of developing law, the *Wyatt* standards (including the requirement of providing additional community facilities and programs and the placement of patients in communities if they qualify based on professional judgment) could be maintained as a condition for vindication of the plaintiffs' rights, and thus they further agreed to put to rest what was necessary to establish when the conditions that gave rise to the need for the litigation had been fully remedied; instead, they agreed to the overall objective mandate that the defendants were to comply in full with all provisions in the consent decree, including each and every one of the *Wyatt* standards and the requirements that the defendants "raise capital funds to provide needed community placements and services" and "continue to make substantial progress in placing members of the plaintiff class in community facilities and programs." *Wyatt,* 1986 WL 69194, at *7.

Thus, as previously stated, the disputes resolved by the 1986 consent decree focused on three different issues: (1) the defendants' request to terminate court supervision of the state system; (2) the plaintiffs' concern about the continued viability of the *Wyatt* standards in the face of constitutional challenge; and (3) the plaintiffs' efforts to focus the litigation on the provision of community facilities and services and the placement of patients in those facilities. The final decree reflected a balancing of these concerns and the trade-offs made by both sides in the resulting compromise. The parties were well aware of the trade offs they were making,[326] and the memorandum opinion accompanying the decree in 1986 noted the competing concerns animating the consent decree and the trade-offs accepted by each side. *Id.; see also Wyatt,* 811 F.Supp. at 1540; *Wyatt,* 803 F.Supp. at 385–87.

Therefore, even if the requirements placed on defendants by the consent decree—implementation of the *Wyatt* standards, including providing new and additional community facilities and services and placement of patients in these facilities if they qualify based on professional judgment—exceeded the bare minimum of constitutional care required by the constitution, and, in particular by *Youngberg,* this fact is, by itself, of no moment. In other words, whether the decree exceeds the minimum or not is irrelevant, because the consent decree is legally valid. Parties may agree in a consent decree to more extensive relief than a court would have ordered absent settlement. *Suter v. Artist M.,* 503 U.S. 347, 354 n.6, 112 S.Ct. 1360, 1365 n. 6, 118 L.Ed.2d 1 (1992); *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 389–90, 112 S.Ct. 748, 762–63, 116 L.Ed.2d 867 (1992); *see also Local Number 93, Internat'l Ass'n of Firefighters v. Cleveland,* 478 U.S. 501, 525–26, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986). The agreed relief may go beyond the constitutional floor as long as the relief ordered is "related to" correcting unconstitutional conditions. *Rufo,* 502 U.S. at 389, 112 S.Ct. at 763. In this case, the consent decree, including the *Wyatt* standards and the requirement of providing of new and additional community facilities and services and the placement of patients in communities, were all ordered in order to

**326.** Plaintiffs' exh. II.B. 10(4) (transcribed remarks of plaintiffs' and defendants' lead speakers at fairness hearing on 1986 consent decree); *Wyatt,* 803 F.Supp. at 385.

correct the violation of constitutional rights at state facilities for the mentally ill and retarded. *Wyatt*, 344 F.Supp. 373; *id.*, 344 F.Supp. 387.

The court recognizes that the commitments in the 1986 consent decree are not absolutes and that they are constrained, first, by simple practicalities, such as administrative and budgetary problems and, second, by other appropriate state interests. For example, the state cannot simply shut down its large facilities and then build community facilities, for, in the interim, patients would have no where to seek treatment and the disruption to the staff would be monumental. Moreover, even the degree to which the state should focus on community facilities and programs to the exclusion of large institutions is not explicit under the consent decree, and, indeed, turns on the degree to which the state's own professionals, in the exercise of their sound judgment, decide that patients can and should live in these community settings. But the requirement that the defendants are to move to such settings those patients who qualify based on the judgment of the defendants' own professionals is settled by the entry of the consent decree (regardless as to whether it was required by the Constitution) and is no longer debatable.

Indeed, this obligation is longstanding, reaching far back beyond the 1986 consent decree. In 1979, the court wrote: "Although the minimum constitutional standards require defendants to provide community facilities and services when an individual's habilitation demands such treatment, they do not remove from the professional judgment of qualified staff members the decisions regarding the appropriateness of community placement. In this respect the Court does not believe the standards should be modified." *Wyatt v. Ireland*, No. 3195–N, 1979 WL 48254, at *4 (M.D.Ala.1979) (Johnson, J.). The court then concluded: "From the evidence it is clear that there is debate within the profession concerning the beneficial effects of community placement for the severely and profoundly retarded. The Court will not choose sides in this debate. Nor should it." *Id.* at *5. Similarly, today, the court will still not enter the debate, for that is a matter for professional judgment. But once the state itself has determined based on professional judgment that a patient qualifies for a community setting—as is true in case after case in the Alabama Department of Mental Health and Mental Retardation System—the court has long made clear that "the minimum constitutional standards require defendants to provide community facilities and services." *Id.* at *4.

Here, against this background, the court must conclude that the defendants have acted in good faith with regard to some but not the whole of the decree. The following circumstances prevent the court from concluding that the defendants have acted in good faith with regard to whole of the decree:

(1) The defendants have failed to comply with *Wyatt* mental-illness standards 1 (privacy and dignity), 2 (least restrictive conditions), 4 (visitation rights), 6 (freedom from unnecessary medication), 7 (freedom from seclusion/physical restraint), 14 (physical exercise), 15 (outdoors at regular intervals), 16 (religion), 19 (humane environment; facilities; etc.), 23 (supervision of staff, patient treatment), 26 (individualized treatment plan, etc.), 31 (confidentiality of records, etc.), 34 (transitional treatment post-release), and 35 (written notice of mental-illness standards). In many instances, this failure has been substantial and long standing.

(2) The defendants have failed to comply with *Wyatt* mental-retardation standards 1 (general right to habilitation), 2 (habilitation program to maximize abilities), 3 (admission standards: habilitation is feasible, etc.), 10 (post-institutionalization plan), 11 (QMRP supervision of plan), 12 (plan reviewed by QMRP, team, etc.), 15 (dignity, privacy, humane care), 16 (no state/federal rights lost), 22(c)–(d) (medication: unnecessary, excessive, review, etc.), 27 (no corporal punishment), 28 (no mistreatment, abuse, neglect), 34(b) (nutritional standards, diet, etc.), 35 (clothing allowance, selection, etc.), 37 (grooming practices, etc.), 38 (humane environ-

ment, facilities, etc.), 41 (staffing ratios), 42 (written copy of standards upon admission), 43 (written reports every 6 months), 47 (transitional habilitation program), and 49 (no admission to institution not meeting above standards, etc.). In many instances, this failure has been substantial and long standing.

(3) The defendants have failed to comply with the provisions in the consent decree requiring that they provide additional and new community facilities and programs and for the placement of patients in these facilities and programs to the extent they qualify based on professional judgment.

(4) The defendants exposed children at the Eufaula Adolescent Center to grave and serious danger. Their reaction to the information was to deny it, without investigation.

(5) The defendants breached their agreement for Sundram to do a comprehensive review of the system. The defendants' reaction to critical reports was to get rid of the reporter.

(6) The defendants sudden and summary dismissal of the *Wyatt* Consultant Committee. Again, the defendants' reaction to critical reports was to get rid of the reporter.

(7) The defendants misrepresented in letters to plaintiff class members and their guardians, caretakers, and next-of-kin that the plaintiff class and their attorneys sought to close state facilities and force patients out without any community support services.

(8) The defendants were less than diligent in obtaining JCAHO accreditation at the Eufaula Adolescent Center, and they even actually suspended it without court approval.

These are only some of the circumstances; they are not all.

At first blush—because good faith with regard to the whole of the decree is a common consideration in determining whether release should be full or partial—it would appear that this factual finding would pre-

clude release of the defendants either partially or wholly. However, three circumstances lead the court to a different conclusion.

First, the Supreme Court made clear in *Dowell* and *Freeman* that the considerations it articulated are just that, "considerations." They should inform the trial court's decision; they were not characterized as inflexible requirements.

Second, the Court also emphasized that partial release may have an important practical value in itself: "By withdrawing control over areas where judicial supervision is no longer needed, a district court can concentrate both its own resources and those of the school district on the areas where the effects of de jure discrimination have not been eliminated and further action is necessary in order to provide real and tangible relief to minority students." *Freeman*, 503 U.S. at 493, 112 S.Ct. at 1447. The physical size of this litigation—the number of facilities and the number of employees—has grown so much since the inception of this litigation that in many ways the case today resembles very little the one that was filed. Indeed, part of the problem in litigation of this size has been management alone; maintaining a hold on the whole of the institution at the same time may now be simply impractical. The court is therefore convinced that it would be of benefit to all if this case could be downsized and the issues narrowed so that all can concentrate their limited time and resources to only those areas where further action is necessary under the decree.

Third and finally, the defendants must be strongly credited for having brought the Alabama Department of Mental Health and Mental Retardation a long way. They have demonstrated substantial and good-faith compliance with major provisions in the 1986 consent decree. These include the following:

(1) The defendants have complied with *Wyatt* mental-illness standards 3 (no incompetency by reason of commitment), 5 (send/receive mail), 8 (experimental research), 9 (lobotomy/averse conditioning, etc.), 10 (prompt and adequate medical treatment), 11 (wear own clothes; keep possessions), 12 (clothing allowance, selection), 13 (laun-

dering of clothes), 17 (interaction with members of opposite sex), 18 (patient labor, etc.), 20 (nutritional standards), 21 (staff licensing and certification requirements), 22 (orientation training for nonprofessional staff), 24 (minimum number of treatment personnel), 25 (patient exams following admission), 30 (entitlement to physical care), and 32 (special provisions for children, young adults).

(2) They have complied with *Wyatt* mental-retardation standards 4 (borderline, mildly MR not institutionalized), 5 (educational services), 6 (prompt and adequate medical treatment), 7 (preadmission examination/diagnosis required), 8 (evaluation within 14 days of admission), 9 (individualized habilitation plan), 13 (entitlement to physical care), 14 (records maintained; kept confidential), 17 (no incompetency by reason of commitment), 18 (religion), 19 (telephone/visitation rights), 20 (send/receive mail), 21 (interaction with opposite sex), 22(a)–(b), (e)–(g) (medication: unnecessary, excessive, review, etc.), 23 (no seclusion; "time-out" ok), 24 (behavior modification only with consent), 25 (electric shock only for extraordinary circumstances), 26 (physical restraint only when absolutely necessary, etc.), 29 (no experimental treatment without consent), 30 (no unusual or hazardous treatment without consent), 31 (physical exercise), 32 (outdoors at regular intervals), 33 (resident labor, etc.), 34(a) & (c–d) (nutritional standards, diet, etc.), 36 (personal possessions), 39 (staff licensing and certification requirements), 40 (QMRP supervision of staff), 44 (behavior modification, etc.), and 45 (no organ removal).

(3) They have obtained JCAHO accreditation at all their mental-illness facilities and Title XIX certification at all their mental-retardation facilities.

For all of the above reasons, the court concludes that defendants should be released from the 1986 consent decree to extent that they have complied with these provisions.

The defendants' motion for finding that they have met their obligations under the 1986 consent decree and for termination of litigation will be granted to this extent.

Although the defendants have complied with requirements in the consent decree that they "cooperate" with plaintiffs to establish "A patient advocate system, operated within and by the Alabama Department of Mental Health and Mental Retardation, to help protect the rights of the plaintiff class," *Wyatt*, 1986 WL 69194, *8, and "A quality assurance system operated by the central office of the Alabama Department of Mental Health and Retardation to monitor and assure the quality of care provided by the Department," *id.*, the court exercises its discretion to decline to release the defendants from these two requirements at this time for three reasons. First, the sudden and arbitrary manner in which defendants terminated the *Wyatt* Consultant Committee casts doubt on whether, in the absence of the these requirements, the defendants would maintain such oversight or something comparable to it. Second, the evidence reflects—for example, with the problems at the Eufaula Adolescent Center—that defendants simply do not respond well to outside criticism, and attempt to resolve matters by attempting get rid of the messenger rather than address the problem. Third and finally, these two requirements are so "intertwined or synergistic in their relation," *Freeman*, 503 U.S. at 497, 112 S.Ct. at 1449, with all other substantive provisions in the consent decree that it would not prudent at this time to release the defendants from them while there are so many substantive requirements they have yet to satisfy fully.

The court considered releasing the defendants facility-by-facility rather than standard-by-standard, but such would have resulted in the release of no facilities in whole. The court also considered partial release by facility and by standard—such that one facility could be released as to a standard without releasing another facility as to that standard—but the court believes that this approach would be too small-scaled, in that the focus would not be on the system-wide operation of a standard, a view that would help assure that compliance was truly the result

of systemic reform rather than the fortuity of the energy and good work of one facility manager. Moreover, if this approach were broadened to include the entire system, the approach would become confusing and time-consuming, for whenever the court narrowly reviewed compliance with a particular standard in a particular facility, the court would still always have to look at system-wide systemic compliance, and, as a result, the reviews would be often redundant. Going standard-by-standard appears to be a practical and reasonable compromise, for it allows incremental and partial release, but from a system-wide, and thus systemic, perspective.

▆ In their pretrial brief, throughout trial, and in their posttrial brief, the defendants argued that JCAHO accreditation and Title XIX certification were the equivalent of compliance with the *Wyatt* standards and the rest of the 1986 consent decree, and that the court could not require more. They essentially repeated the arguments made in their pleadings filed in the years leading up to the consent decree. The court rejected these arguments then, and now rejects them again. JCAHO accreditation and Title XIX certification, in and of themselves, do not demonstrate compliance with the *Wyatt* standards or, for that matter, constitutionally required treatment.[327]

First, JCAHO accreditation and Title XIX certification were only one element of the multifaceted 1986 consent decree. Thus, JCAHO accreditation and Title XIX certification, albeit important elements of compliance with the decree, are not the equivalent of compliance with all important and basic aspects of the consent decree. Second, as previously emphasized by this court, the defendants' argument that achievement of JCAHO accreditation and Title XIX certification is full proof of compliance with all *Wyatt* standards and other important aspects of the decree conflicts with the intent behind the decree. In the round of litigation leading up to the decree, the defendants expressly re-

quested that the court replace the *Wyatt* standards with an order requiring JCAHO accreditation and Title XIX certification.[328] With its approval of the 1986 consent decree, the defendants abandoned this argument and, instead, agreed to the continued preservation of the *Wyatt* standards and to the provision of community facilities and programs and the placement of qualifying patients in these facilities and programs. This abandonment was a part of the trade they made, and they are still bound by it. The defendants' asserted reliance on accreditation and certification as constituting substantial compliance with the *Wyatt* standards essentially repeats an argument they, by agreement, abandoned in return for the 1986 consent decree.

Moreover, after hearing and reviewing much evidence on what JCAHO accreditation and Title XIX certification mean substantively, the court is convinced that, while accreditation and certification may be important evidence of compliance, they are not the equivalent of, or a substitute for, compliance with the 1986 consent decree or with minimal constitutional standards. JCAHO, as previously stated, is an independent organization of health care professionals which promulgates national standards for health care facilities. In order to become accredited a hospital undergoes an on-site survey at least every three years.[329] A team of doctors, nurses, and administrators evaluates the facility on hundreds of standards and through a very complicated scoring process determines the score a hospital receives.[330] But accreditation means nothing more than that the hospital meets JCAHO's minimal standards as evaluated by the surveying team. The fact, for example, that the Eufaula Adolescent Center received a very high JCAHO score despite its grave problems regarding the safety and abuse of children and its use of restraints and seclusion raises a red flag for the court as to the meaning of JCAHO accreditation. The evidence demonstrated that

327. *See* Order of March 3, 1995 (Doc. no. 680).

328. Defendants' trial brief, filed Dec. 14, 1982, at 1.

329. Understanding the Hospital Performance Report, defendants' general exh. 36; plaintiffs' exh. II.B. 10(6) at 84–86 (Congressional hearings).

330. *Id.*

the Eufaula Adolescent Center simply did not meet the *Wyatt* standards, yet it was accredited; and, furthermore, accredited with a very high score. The evidence also demonstrates that the defendants simply are not in compliance with multiple *Wyatt* mental-illness standards and other provisions in the consent decree at their other mental-illness facilities. Indeed, as demonstrated by the evidence the court cites to in its findings of fact, JCAHO has found multiple violations of its standards as well in its surveys. Yet, all of the defendants' facilities are and remain JCAHO accredited.[331] An organization can become accredited and remain accredited despite findings of deficient or unsatisfactory standards of care. JCAHO accreditation is simply not the equivalent of compliance with the 1986 consent decree. *Accord Robbins v. Budke,* 739 F.Supp. 1479, 1481 (D.N.M.1990) (JCAHO accreditation is "by no means an assurance that abuse and neglect of patients does not take place in an institution, or that patients' constitutional and statutory rights are being protected").

Furthermore, the survey process itself lends itself to abuse by the institutions and is riddled with problems.[332] Facilities are notified in advance of the survey.[333] As a result they conduct mock surveys in preparation for the actual survey and increase staffing and improve treatment at the time the survey is conducted.[334] The surveyors therefore do not see the facility as it really is on an average day.[335] While JCAHO is working to improve its surveys, there is no evidence that the surveys conducted of the defendants' institutions have been improved to account for all of these problems.

Admittedly, some courts have held that JCAHO accreditation creates a presumption of meeting minimum constitutional standards of care, but the presumption may be rebut-

ted. *Thomas S. v. Flaherty,* 902 F.2d 250, 252–53 (4th Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990); *Woe v. Cuomo,* 729 F.2d 96, 106 (2d Cir.), *cert. denied,* 469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984). Even if the court were to accept the defendants' accreditation as a presumption of compliance, the plaintiffs have rebutted that presumption, through overwhelming evidence that the defendants systematically violate certain standards.

But more importantly, even assuming that the evidence is insufficient to rebut the presumption that defendants are in compliance with minimum constitutional standards and thus that defendants had met all minimum constitutional standards, it would not necessarily follow that defendants were in compliance with the 1986 consent decree. As stated, parties may agree in a consent decree to more extensive relief than a court would have ordered absent settlement. Moreover, as stated, in 1986, with the entry of the consent decree, the parties put to rest their dispute over what was necessary to establish that the conditions that gave rise to the need for the litigation had been fully remedied; they agreed to the overall objective mandate that the defendants were to comply in full with all provisions in the consent decree, including each and every one of the *Wyatt* standards and the provision of new and additional community facilities and programs and the placement in those facilities and programs of all patients who qualify based on professional judgment. The bottom line, therefore, is whether the defendants have met all the requirements of the consent decree.

However, the court does not reject JCAHO accreditation as relevant evidence of compliance with the consent decree. Indeed, the court finds that accreditation is highly relevant proof of compliance with the con-

---

**331.** For example, JCAHO has continually found life safety deficiencies on the Bryce Psychiatric Rehabilitation Unit (PRU). Despite continuing failure to correct these deficiencies Bryce has remained accredited. Plaintiffs' exh. IV.A. 2(19). Thus, over the last six years patients have continued to live in a substandard unit, that even the defendants' own expert characterized as a "dump."

**332.** *See generally* plaintiffs' exh. II.B. 10(6) (congressional hearings ).

**333.** *Id.* at 87–88.

**334.** *Id.* at 91–92; transcript at 7157–58 (Hodo testimony); plaintiffs' exh. IV.B. 2(40) (mock survey in preparation for JCAHO survey).

**335.** Plaintiffs' exh. II.B. 10(6) at 88–91.

sent decree. The absence of accreditation would raise red flags regarding noncompliance. And the presence of accreditation, including the score and presence or absence of deficiencies and recommendations, is, and has been considered by the court as, a reassuring and relevant piece of evidence to be considered in tandem with all of the other relevant evidence. *Cf. Dolihite v. Videon,* 847 F.Supp. 918, 936 (M.D.Ala.1994) (JCAHO accreditation increases the "likelihood that professional judgments will govern individual treatment decisions within the institution"), *aff'd in part and rev'd in part,* 74 F.3d 1027 (11th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996); *but see* plaintiffs' exh. IV.H. 1 at 30 (public citizen's health research group survey stating "JCAHO imposes meaningful penalties so infrequently that it fails to adequately deter violations of quality standards designed to safeguard the public health").

The court makes similar conclusions as to the significance of Title XIX certification. It is not the equivalent of substantial compliance with the 1986 consent decree's other requirements or constitutional minimum standards. It is a necessary requirement for compliance with the standards, but not sufficient.[336] Title XIX requires that the defendants' facilities for the mentally retarded be certified by the Health Care Finance Administration (HCFA) in order to receive Medicaid funding. *Lelsz v. Kavanagh,* 673 F.Supp. 828, 836–37 (N.D.Tex.1987). Surveys are conducted by other state employees who work for the same Governor.[337] If HCFA were to decertify an institution, then that state institution would not continue to receive Medicaid funding. Thus, the incentive is to certify and institutions are rarely decertified.[338] Additionally, as with JCAHO accreditation, facilities deploy additional staffing and give surveyors a false impression of actual care in the facility.[339] Title XIX surveyors simply do not gain, as much as is needed, an accurate insight into the daily reality at mental-retardation facilities.[340] And as with JCAHO, facilities can remain certified, despite findings of serious deficiencies.

Finally, the findings in this case simply do not support the defendants' arguments. The defendants' facilities for the mentally retarded are certified by Title XIX—indeed many, if not all, were certified in 1986. However, the findings demonstrate that the defendants are not in compliance with many crucial standards, such as safety, which not only go to the plaintiffs' rights under the 1986 consent decree, but also go to their constitutional rights. Many courts have considered this issue and they have all reached the same conclusion: that Title XIX is not evidence of meeting minimal standards. *See, e.g., United States v. Illinois,* 803 F.Supp. 1338, 1341 (N.D.Ill.1992); *United States v. Tennessee,* 798 F.Supp. 483, 489 (W.D.Tenn.1992); *Lelsz,* 673 F.Supp. at 841.[341]

### III. PLAINTIFFS' MOTION FOR FURTHER RELIEF

The plaintiffs assert a number of substantive due-process rights under the fourteenth

**336.** Transcript at 2665 (Reid testimony).

**337.** Transcript at 6878–79 (Cheren testimony); *id.* at 6314 (Christian testimony); plaintiffs' exh. II.B. 10(6) at 111.

**338.** Plaintiffs' exh. II.B. 10(6) at 111–112.

**339.** Plaintiffs' exh. II.A. 10(13) (article by defendants' expert Reid, 24 J.Applied Behavior Analysis 293, 296–300 (1991)); transcript at 6487 (McCostlin testimony) (corroborating Reid's article's thesis); U.S. MR exh. 135 at 191–92 (McCostlin deposition) (same).

**340.** Transcript at 1836 (Haywood testimony).

**341.** None of the parties was able to find a case that held the opposite. The defendants rely on *Association for Retarded Citizens of North Dakota v. Schafer,* 872 F.Supp. 689 (D.N.D.1995), *rev'd in nonrelevant part,* 83 F.3d 1008 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 482, 136 L.Ed.2d 376 (1996). In releasing a mentally disabled program from injunctions, the court adopted a report by a panel of masters that cited Title XIX certification as an important element of the system's improvements over the last decade. *Id.* at 699. However, in *Schafer,* meeting Title XIX standards had "been the principal thrust of the U.S. District Court's orders designed to remedy the absence of, or gaps in, federally required services for the developmentally disabled in North Dakota." *Id.* Whereas, in this case, the scope of the court's orders go far beyond achieving Title XIX certification.

amendment to the United States Constitution, which, they contend, are incorporated into the *Wyatt* standards and which the defendants are violating. Under the fourteenth amendment, according to the plaintiffs, involuntarily confined residents and patients have rights to adequate food, shelter, clothing, medical care, and substantive liberty rights to safety, freedom from bodily restraint, freedom from unnecessary institutionalization and segregation from society, and minimally adequate training necessary to secure these rights. Anything that leads to the violation of these rights, the plaintiffs say, is therefore a constitutional violation. For example, inadequate staffing, which contributes to safety problems by allowing residents to injure themselves and others, is a constitutional violation. *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1246 (2d Cir.1984). Virtually every *Wyatt* standard, they argue, goes to securing one of these constitutional rights, and, to the extent that the *Wyatt* standards secure these rights and are violated, these violations are also constitutional violations.

The court's response to the plaintiffs' argument is, to the extent they seek relief outside the four corners of the 1986 consent decree, the same as its response to the defendants' argument to the extent it is of like kind. With the 1986 consent decree, the parties gave flesh to what the fourteenth amendment required, and they agreed to what the amendment required, and no more and no less. The court therefore sees no need to address the plaintiffs' constitutional argument separately. Moreover, in *Wyatt v. Rogers*, 92 F.3d 1074 (11th Cir.1996), the Eleventh Circuit Court of Appeals made clear what the plaintiffs needed to do to seek relief under the consent decree. The plaintiffs' request for relief directly under the Constitution could be viewed as an improper way to get around this approach.[342]

The plaintiffs also assert rights under the ADA to services—that is housing, treatment, habilitation, and the like—in the most integrated environment appropriate to their needs. The defendants argue that the ADA does not provide the plaintiffs this right.

The ADA is a comprehensive piece of civil rights legislation intended to guarantee Americans with disabilities an end to exclusion and segregation and, instead, inclusion and integration into society.[343] Title II of the ADA prohibits state and local governments from discriminating on the basis of a disability in the provision of services. The regulations implementing Title II require that all services be administered in the most integrated environment appropriate. 28 C.F.R. § 35.130(d). Integration is that which "enables individuals with disabilities to interact with non-disabled individuals to the fullest extent possible." 28 C.F.R. pt. 35, App. A at 452. The plaintiffs contend that the defendants are violating this law by failing to expand sufficiently Alabama's integrat-

---

**342.** The court cannot, however, agree with the defendants' argument that the court has limited jurisdiction to enforce this consent decree. The holdings and cases they cite, *Saahir v. Estelle*, 47 F.3d 758, 761 (5th Cir.1995); *Lelsz v. Kavanagh*, 807 F.2d 1243 (5th Cir.), *cert. dismissed*, 483 U.S. 1057, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987), do not apply to this case. In *Saahir* the court's jurisdiction to enforce a consent decree was limited because it had both approved the consent decree and dismissed the case. While the Eleventh Circuit has not expressed a firm view on a court's jurisdiction to enforce a consent decree after the lawsuit has been dismissed, there is a body of case law that holds that the court must have an independent jurisdictional basis to enforce a settlement agreement after the lawsuit has been dismissed. *See, e.g., McCall–Bey v. Franzen*, 777 F.2d 1178, 1185–87 (7th Cir.1985); *Fairfax Countywide Citizens Ass'n v. County of Fairfax*, 571 F.2d 1299 (4th Cir.), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706

(1978), *contra, England v. Kemp*, 976 F.2d 662, 665–666 (11th Cir.1992). The court need not reach whether it has jurisdiction to enforce a decree after the lawsuit has been dismissed because the court has never dismissed this lawsuit. Therefore, its jurisdiction to enforce the settlement agreement is firm. The holding in *Lelsz* is also inapposite. In *Lelsz* the district court did not have jurisdiction to enforce a consent decree, because the consent decree had ordered state officials to undertake certain actions based on state law, which a federal court cannot do, *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). 807 F.2d at 1247–48, 1252. The settlement agreement in this lawsuit was not based on state law.

**343.** H.R.Rep. No. 485(III), 101st Cong, 2d Sess. at 26, *reprinted in* 1990 U.S.C.C.A.N. 267, 445, 449 (Hereinafter House Report (III)).

ed community placement program and, thereby, keeping hundreds of mentally retarded and mentally ill patients in segregated state institutions when those patients could and should be placed in integrated community-based programs. The defendants, however, contend that, as a matter of law, the ADA simply does not guarantee the mentally retarded or mentally ill the right to be placed in the community. And, they further contend, even if the ADA did give the plaintiffs rights to community-based placements, the change to their current services would be so fundamental and the burden so great that the ADA would not require them to make this change. Thus there are two parts to the court's inquiry. First, it must determine whether the plaintiffs have a right to integrated services under the ADA. If they do, the court turns to the second part of its inquiry to determine whether the plaintiffs are entitled to relief.[344]

There are cases that support both the plaintiffs' and the defendants' positions. *See, e.g., Helen L. v. DiDario,* 46 F.3d 325, 337–39 (3d Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995); *Eric L. v. Bird,* 848 F.Supp. 303, 313–14 (D.N.H.1994); *Conner v. Branstad,* 839 F.Supp. 1346 (S.D.Iowa 1993); *Martin v. Voinovich,* 840 F.Supp. 1175, 1190–92 (S.D.Ohio 1993); *People First of Tenn. v. Arlington Developmental Center,* 878 F.Supp. 97 (W.D.Tenn.1992); *Williams v. Secretary of the Executive Office of Human Services,* 414 Mass. 551, 609 N.E.2d 447 (1993). The court need not enter the fray at this time. With the 1986 consent decree, the parties gave flesh to what the fourteenth amendment required, and, the plaintiffs have not pointed to anything in the ADA that is not already required by the consent decree. The court therefore sees no need to address the plaintiffs' ADA argument separately. Moreover, in *Wyatt v. Rogers,* 92 F.3d 1074

(11th Cir.1996), the Eleventh Circuit Court of Appeals made clear what the plaintiffs needed to do to seek relief under the consent decree. The plaintiffs' request for relief directly under the ADA could be viewed, as could their request under the Constitution, as an improper way to get around this approach.[345]

## IV. RELIEF

As stated, the court will grant, in part, the defendants' motion for finding that they have met their obligations under the 1986 consent decree and for termination of litigation, and the court will deny the plaintiffs' motion for further relief. The defendants will be released from the following requirements of the 1986 consent decree:

(1) *Wyatt* mental-illness standards 3 (no incompetency by reason of commitment), 5 (send/receive mail), 8 (experimental research), 9 (lobotomy/averse conditioning, etc.), 10 (prompt and adequate medical treatment), 11 (wear own clothes; keep possessions), 12 (clothing allowance, selection), 13 (laundering of clothes), 17 (interaction with members of opposite sex), 18 (patient labor, etc.), 20 (nutritional standards), 21 (staff licensing and certification requirements), 22 (orientation training for non-professional staff), 24 (minimum number of treatment personnel), 25 (patient exams following admission), 30 (entitlement to physical care), and 32 (special provisions for children, young adults).

(2) *Wyatt* mental-retardation standards 4 (borderline, mildly MR not institutionalized), 5 (educational services), 6 (prompt and adequate medical treatment), 7 (pre-admission examination/diagnosis required), 8 (evaluation within

---

344. Indeed, the ADA parallels the 1986 consent decree in that it focuses on individual circumstances. The ADA requires an individual assessment of each individual on a case-by-case basis as to whether or not community services and what community services are the most integrated appropriate, not a blanket statement regarding whole classes of individuals. *D'Amico v. New York State Bd. of Law Examiners,* 813 F.Supp. 217, 221 (W.D.N.Y.1993); 28 C.F.R. pt. 35, App.

A at 449, 451. As the regulations'· appendix explains the regulations require that actions be based on "facts applicable to individuals and not on prescriptions as to what a class of individuals with disabilities can or cannot do." 28 C.F.R. pt. 35, app. A at 449.

345. For these same reasons, the Martin-intervenors' request for additional relief will be denied.

14 days of admission), 9 (individualized habilitation plan), 13 (entitlement to physical care), 14 (records maintained; kept confidential), 17 (no incompetency by reason of commitment), 18 (religion), 19 (telephone/visitation rights), 20 (send/receive mail), 21 (interaction with opposite sex), 22(a)–(b), (e)–(g) (medication: unnecessary, excessive, review, etc.), 23 (no seclusion; "time-out" ok), 24 (behavior modification only with consent), 25 (electric shock only for extraordinary circumstances), 26 (physical restraint only when absolutely necessary, etc.), 29 (no experimental treatment without consent), 30 (no unusual or hazardous treatment without consent), 31 (physical exercise), 32 (outdoors at regular intervals), 33 (resident labor, etc.), 34(a) & (c–d) (nutritional standards, diet, etc.), 36 (personal possessions), 39 (staff licensing and certification requirements), 40 (QMRP supervision of staff), 44 (behavior modification, etc.), and 45 (no organ removal).

(3) JCAHO accreditation at all their mental-illness facilities and Title XIX certification at all their mental-retardation facilities.

However, as the court has indicated throughout this memorandum opinion, there are areas where it appears that, since trial, defendants should now be in compliance (for example, mental-illness standards 16 (religion) and 35 (written notice of mental-illness standards) and mental-retardation standards 22(c) & (d) (medication: unnecessary, excessive, review, etc.), 34(b) (nutritional standards, diet, etc.), 38 (humane environment, facilities, etc.), and 42 (written copy of standards upon admission)). In addition, there are areas where, with more careful focusing by the court and the parties, the defendants should be able to achieve compliance within a year or so. Therefore, in the future, rather than taking on the system as a whole, the court will require that the parties focus on just one or a few provisions in the consent decree, and see if full compliance can be achieved, albeit piecemeal, more expeditiously.

The court will therefore require that the parties submit a joint proposal for periodic small compliance hearings, which would each focus on a narrow aspect of the litigation, over the next year. In addition, so as to further expedite the resolution of this litigation, the court will set down for an immediate hearing the following consent decree requirements, which the defendants should have met by now:

(1) Mental-illness standards 16 (religion) and 35 (written notice of mental-illness standards); and

(2) Mental-retardation standards 22(c) & (d) (medication: unnecessary, excessive, review, etc.), 34(b) (nutritional standards, diet, etc.), 38 (humane environment, facilities, etc.), and 42 (written copy of standards upon admission).

To be sure, with the entry of an appropriate judgment today, there will be no pending request for further release from the 1986 consent decree. However, the Eleventh Circuit Court of Appeals has made clear that a court may, on its own initiative, review whether a court decree is still needed. *United States v. Miami,* 2 F.3d 1497, 1505, 1506 (11th Cir.1993) ("district court ... is authorized to consider sua sponte whether termination of the consent decree is appropriate"); *see also United States v. City of Montgomery,* 948 F.Supp. 1553, 1562 (M.D.Ala.1996) (Thompson, J.) (court invited parties to take appropriate steps to terminate longstanding decrees providing for redress of past race discrimination in city government); *Jordan v. Wilson,* 951 F.Supp. 1571, 1580 (M.D.Ala. 1996) (Thompson, J.) (court invited parties to take appropriate steps to terminate longstanding decrees providing for redress of past sex discrimination in city government); *Sims v. Montgomery County Commission,* 890 F.Supp. 1520, 1534 (M.D.Ala.1995) (Thompson, J.) (court invited parties to take appropriate steps to terminate longstanding decrees providing for redress of past race and sex discrimination in county government), *aff'd,* 119 F.3d 9 (11th Cir.1997) (table).

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The defendants' motion for finding that they have met their obligations under the 1986 consent decree and for termination of litigation, filed on January 18, 1991, is granted to the following extent:

(A) The defendants are released from *Wyatt* mental-illness standards: 3 (no incompetency by reason of commitment), 5 (send/receive mail), 8 (experimental research), 9 (lobotomy/averse conditioning, etc.), 10 (prompt and adequate medical treatment), 11 (wear own clothes; keep possessions), 12 (clothing allowance, selection), 13 (laundering of clothes), 17 (interaction with members of opposite sex), 18 (patient labor, etc.), 20 (nutritional standards), 21 (staff licensing and certification requirements), 22 (orientation training for nonprofessional staff), 24 (minimum number of treatment personnel), 25 (patient exams following admission), 30 (entitlement to physical care), and 32 (special provisions for children, young adults).

(B) The defendants are released from *Wyatt* mental-retardation standards: 4 (borderline, mildly MR not institutionalized), 5 (educational services), 6 (prompt and adequate medical treatment), 7 (pre-admission examination/diagnosis required), 8 (evaluation within 14 days of admission), 9 (individualized habilitation plan), 13 (entitlement to physical care), 14 (records maintained; kept confidential), 17 (no incompetency by reason of commitment), 18 (religion), 19 (telephone/visitation rights), 20 (send/receive mail), 21 (interaction with opposite sex), 22(a)–(b), (e)–(g) (medication: unnecessary, excessive, review, etc.), 23 (no seclusion; "time–out" ok), 24 (behavior modification only with consent), 25 (electric shock only for extraordinary circumstances), 26 (physical restraint only when absolutely necessary, etc.), 29 (no experimental treatment without consent), 30 (no unusual or hazardous treatment without consent), 31 (physical exercise), 32 (outdoors at regular intervals), 33 (resident labor, etc.), 34(a) & (c–d) (nutritional standards, diet, etc.), 36 (personal possessions), 39 (staff licensing and certification requirements), 40 (QMRP supervision of staff), 44 (behavior modification, etc.), and 45 (no organ removal).

(C) The defendants are released from the provisions in the 1986 consent decree regarding accreditation of mental-illness facilities by the Joint Commission on the Accreditation of Healthcare Organizations and certification of the mental-retardation facilities through Title XIX of the Social Security Act, 42 U.S.C.A. § 1396, *et seq.*

(2) The defendants' motion for finding that they have met their obligations under the 1986 consent decree and for termination of litigation, filed on January 18, 1991, is denied in all other respects.

(3) The plaintiffs' motion for further relief, filed on January 22, 1993, is denied without prejudice to the extent that it has not already been denied. The plaintiffs may renew the motion to the extent it complies with the instructions of the Eleventh Circuit Court of Appeals in *Wyatt v. Rogers,* 92 F.3d 1074 (11th Cir.1996).

(4) The Martin-intervenors' complaint-in-intervention, filed on January 25, 1991, asserting, among other things, that the care and conditions at one of the state's facilities, the Thomasville Adult Adjustment Center, violated federal statutory and constitutional law, is denied without prejudice to the extent that it has not already been denied. The Martin-intervenors may renew the motion to the extent it complies with the instructions of the Eleventh Circuit

Court of Appeals in *Wyatt v. Rogers,* 92 F.3d 1074 (11th Cir.1996).

It is further ORDERED that the plaintiffs, the defendants, and amicus curiae United States of America shall submit to the court, within 28 days, a joint proposal for periodic small compliance hearings which would each focus on narrow aspects of the litigation over the next year.

It is further ORDERED that a compliance hearing is set for February 4, 1998, at 10:00 a.m., on following consent decree requirements, which the defendants should have met by now:

(1) Mental-illness standards 16 (religion) and 35 (written notice of mental-illness standards); and

(2) Mental-retardation standards 22(c) & (d) (medication: unnecessary, excessive, review, etc.), 34(b) (nutritional standards, diet, etc.), 38 (humane environment, facilities, etc.), and 42 (written copy of standards upon admission).